**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

JOHN DOE 1 and
JOHN DOE 2,[1]

    *Plaintiffs*,

    *v.*

KASHYAP P. PATEL
in his official capacity as
Director of the Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, D.C. 20535;

FEDERAL BUREAU OF INVESTIGATION
935 Pennsylvania Avenue, NW
Washington, D.C. 20535;

PAMELA J. BONDI
in her official capacity as Attorney General
of the United States
950 Pennsylvania Avenue, NW
Washington, D.C. 20530;

and

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, D.C. 20530,

    *Defendants*.

Civil Action No. 26-_____

**COMPLAINT**

## I.  INTRODUCTION

1.  Plaintiffs are former Special Agents of the Federal Bureau of Investigation ("FBI").

From approximately November 2022 to June 2023, they were assigned to an investigation into a

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), Plaintiffs' residential addresses are being filed under seal with the Court in a separate Notice of Filing.

1

suspected conspiracy to illegally overturn the results of the 2020 Presidential election. This investigation was known as "Arctic Frost." The results of the investigation criminally implicated then-former President Donald J. Trump and led to his indictment by a federal grand jury in 2023. After Trump was reelected in November 2024, the Department of Justice ("DOJ") sought and obtained dismissal of the indictment, citing its own policy not to prosecute sitting Presidents.

2.    Arctic Frost was one of many investigations to which Plaintiffs were assigned while they were employed by the FBI. Plaintiffs were assigned to Arctic Frost by their superiors within the FBI. DOJ attorneys made the strategic decisions that shaped the investigation and then made prosecutorial decisions based on the law and the facts generated from agents' investigative results. In Arctic Frost, as in all other investigations to which they were assigned, Plaintiffs fully adhered to DOJ policies and procedures, including applicable statutory and regulatory requirements, and executed their law enforcement duties without bias or political motive.

3.    In late October 2025, members of President Trump's political party serving in Congress publicly released unredacted documents associated with Arctic Frost, which contained one Plaintiff's name. The legislators publicly declared Arctic Frost agents to be partisan operatives.

4.    Between October 31, 2025, and November 4, 2025, FBI Director Kashyap "Kash" Patel summarily fired each Plaintiff. No internal investigation, notice, or hearing preceded their firings. Nor were Plaintiffs presented with any evidence purportedly supporting their firings or given an opportunity to appeal.

5.    Through this Complaint, Plaintiffs allege that Defendant Patel terminated their FBI employment based solely on their assignment to Arctic Frost. Defendant Patel, Defendant Pamela J. Bondi, President Trump, and others who urged the agents' firings perceived the agents to be politically opposed to President Trump because of the agents' assignment to Arctic Frost.

6.    Before and after Plaintiffs' firings, President Trump and Defendant Patel made public statements impugning the integrity of Arctic Frost agents, with Patel most recently disparaging the agents he terminated as "corrupt actors" who had engaged in "weaponized law enforcement."[2]

7.    Plaintiffs request that this Court review their firings and grant relief on the grounds that Defendants' actions violated Plaintiffs' First Amendment rights to free association and speech and their Fifth Amendment rights to due process. Plaintiffs seek equitable relief in vindication of their constitutional rights and declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

## II.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the Constitution and laws of the United States. The Court has authority to issue declaratory, injunctive, and equitable relief, including reinstatement of Plaintiffs to their employment with the FBI, pursuant to 28 U.S.C. §§ 2201-2202 and the Court's inherent equitable powers.

9.    Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e).

## III.    PARTIES

### *Plaintiffs*

10.    **John Doe 1** is a former Special Agent who was most recently assigned to the Washington Field Office ("WFO"). At the time of his firing on October 31, 2025, John Doe 1 had served with the FBI for over 21 years. He would have been eligible to retire with a full pension in 2028.

---

[2] Kash Patel (@Kash), TRUTH SOCIAL (Jan. 12, 2026, at 17:42 ET), https://truthsocial.com/@Kash/posts/115884541495218344 (last accessed Mar. 18, 2026).

11.     As a Special Agent, John Doe 1 specialized in investigations of white-collar crime. John Doe 1 entered the FBI Academy in September 2004. Upon completion of his training in January 2005, John Doe 1 spent 30 days on a temporary duty assignment at FBI Headquarters before beginning work at the Chicago Field Office. At FBI Headquarters, John Doe 1 was assigned to the Bureau's Terrorist Financing Operations Section ("TFOS"). After approximately one month, John Doe 1 completed his temporary duty assignment with TFOS and began work in Chicago.

12.     In Chicago, John Doe 1 joined a squad responsible for investigating securities fraud, investment fraud, bank fraud, and other financial crimes. After three years working on white-collar crime cases, John Doe 1 transferred to the San Francisco Field Office. There, he continued his white-collar investigative work, handling, among other things, investigations of insider trading, investment fraud, and other financial fraud.

13.     In February 2012, John Doe 1 began a second temporary duty assignment at Bureau headquarters, where he joined the Economic Crimes Unit, with a special focus on financial crimes. John Doe 1 spent the next nineteen months in the Washington, D.C. area before returning to San Francisco in September 2013. After three more years at the San Francisco Field Office, John Doe 1 moved back to the Washington, D.C. area in June 2016 and resumed white-collar investigative work in Manassas at WFO's Northern Virginia satellite office.

14.     John Doe 1 served at the Manassas office with integrity for nearly a decade. At the time of his firing on October 31, 2025, John Doe 1 was assigned to CR-13, a securities fraud squad, and was the primary or sole agent on multiple fraud and white-collar investigations.

15.     As a non-probationary Special Agent, John Doe 1's performance ratings were consistently "Exemplary," and he received multiple awards for outstanding performance. As recently as 2023, John Doe 1 received a Medal of Excellence for a sustained level of high

performance in his duties. John Doe 1 also had a pristine disciplinary record. In his twenty-one years in the FBI prior to his firing, he was never subject to any disciplinary action or even a complaint.

16.     John Doe 1's contributions were lauded outside the Bureau as well. On multiple occasions, the fruits of John Doe 1's investigative work were featured in the DOJ Fraud Section's comprehensive review of enforcement trends and significant prosecutions. As recently as last year, DOJ highlighted a major fraud case on which John Doe 1 was the primary agent in DOJ's end-of-year report, and Defendant Patel highlighted the case in a weekly email summary disseminated to all FBI employees.

17.     **John Doe 2** is a former Special Agent who was assigned to WFO. At the time of his firing on November 4, 2025, John Doe 2 was assigned to CR-10, a squad focused on local public corruption, and had served with the FBI for nearly eight years.

18.     John Doe 2 graduated from the FBI Academy in July 2018. After completing his training, John Doe 2 was assigned to WFO. There, he spent two and a half years on a squad focused on counterintelligence before transferring to a squad focused on espionage and media leaks. In November 2022, John Doe 2 transferred to CR-10. His assigned investigations focused on public corruption involving local D.C. officials and fraud against the government.

19.     By the time of his firing in November 2025, John Doe 2 had become a senior CR-10 case agent and was one of the main agents on a sensitive fraud against the government investigation that the Trump DOJ considered a high priority. Due to his deep knowledge of that case and superb communication skills, John Doe 2 was himself tasked to brief Defendant Patel—an unusual assignment for a line agent. John Doe 2 met with Patel in person for that briefing on October 1, 2025, after which Patel told him, "good work, keep going."

20.     In addition to his primary duty as a case agent, John Doe 2 volunteered to take on collateral responsibilities. At the time of his firing, John Doe 2 was a senior member of the WFO Crisis Negotiation Team and had participated in several successful resolutions of incidents involving barricaded subjects and victims. John Doe 2 was also training for selection to become a WFO Special Weapons and Tactics ("SWAT") operator, a role which requires intensive physical activity, and he therefore would dedicate several hours each day to maintaining high physical fitness standards. During his morning workouts at the FBI Headquarters gym, John Doe 2 frequently encountered Defendant Patel, and even once received a "fist pump" from Patel when Patel saw him exercising on a holiday.

21.     As a Special Agent, John Doe 2 received multiple individual cash awards and a citation for special achievement in recognition of the quality of his work, including his professionalism, leadership, and dedication in connection with sensitive investigations.

22.     During his approximately eight years in the FBI, John Doe 2 was never subject to any disciplinary action or even a complaint, and as a non-probationary Special Agent, he consistently received "Exemplary" ratings in his performance reviews.

### *Defendants*

23.     Defendant Kashyap P. Patel is sued in his official capacity as the Director of the FBI. In that capacity, Patel maintains an office in Washington, D.C.

24.     Defendant FBI is a subordinate component of DOJ pursuant to 28 C.F.R. § 0.1. The FBI's principal offices are in Washington, D.C.

25.     Defendant Pamela J. Bondi is sued in her official capacity as the Attorney General of the United States. In that capacity, she is the head of DOJ and maintains an office in Washington, D.C.

26.     Defendant DOJ is headquartered in Washington, D.C. and is an agency of the United States subject to the jurisdiction of this Court. DOJ controls its components, including the FBI.

## IV.     FACTS

### A. *Special Agents undergo a rigorous selection process and extensive training for roles that require immense skill, bravery, and sacrifice.*

27.     The FBI is widely considered to be the country's premier law-enforcement agency, and its standards for admission and retention are high. Special Agents accordingly undergo a rigorous selection process and extensive training, consistent with the demanding nature of their roles.

28.     To be considered for the FBI, would-be Special Agents must have at least two years of full-time work experience and a bachelor's degree. A Special Agent applicant with an advanced degree, like a master's or doctorate, may apply with one year of full-time work experience.

29.     The application process to become an FBI Special Agent involves numerous steps, including a written test, an interview, physical-fitness tests, and a background investigation. Unlike many other government positions, the FBI's background investigation requires the candidate to submit to a polygraph examination, during which the examiner questions that candidate about information provided in support of the background check.

30.     The last step of the application process requires the applicant to attend an approximately four-month Basic Field Training Course ("BFTC") in Quantico, Virginia. At BFTC, trainees receive hundreds of hours of classroom and field training that ranges across a variety of topics—academics, firearms, operational skills, constitutional law, legal authorities, DOJ policy, interview and interrogation skills, defensive tactics, law-enforcement driving, physical fitness, and case exercises. Throughout the training, agents reside at Quantico. On

information and belief, the federal government spends approximately $300,000 per agent to train, house, and equip the trainees throughout BFTC.

31.   If an applicant successfully completes all ten steps of the application process, the process culminates in a "career placement."

32.   New Special Agents must complete a probationary period—generally two years—calculated from the first day the employee officially reports for duty at the FBI.[3] During the probationary period, a rating official must confirm that a new Special Agent possesses "the qualities and abilities necessary for successful service."[4]

33.   Many Special Agents will also attend training to perform collateral duties, including SWAT, Cellular Analysis Survey Team ("CAST"), instructor roles, and technical agents. Both the training and the collateral duties themselves are in addition to Special Agents' normal investigative caseloads.

34.   Special Agents must also undergo additional periodic training and examinations, including firearms qualification, and courses in tactical training and defensive tactics. Agents must also complete a significant amount of annually required non-physical training, including online classes on legal authorities, use of force, ethics, insider threats, information security, and bloodborne pathogens.

35.   The FBI continues to invest in Special Agents throughout their careers, including through regular firearms and legal and ethics trainings, and by offering Special Agents the opportunity to gain specialized expertise in areas such as counterintelligence, counterterrorism, public corruption, evidence response teams, sophisticated white-collar crime, cyber investigations,

---

[3] FBI Human Resources Division, *Performance and Development Program Policy Guide* (June 8, 2020), §§ 4.5, 4.5.2, https://vault.fbi.gov/performance-and-development-program-policy-guide-1083pg (last accessed Mar. 18, 2026).
[4] *Id.* § 4.5.2.

crisis negotiation, and others.  Over a typical Special Agent's career, he or she may attend trainings both in these broad categories and in specialized topics within these categories. Such training often entails traveling to the training site and receiving instruction from FBI experts or experienced practitioners in other agencies or the private sector. It also involves provision of special gear and equipment specific to the training.

36.    Special Agents must be willing to be assigned and reassigned to any field office within the United States. Their families, therefore, must also agree to be uprooted and moved across the country with each job assignment. And while at a field office, Special Agents regularly work long hours, without overtime, and in stressful scenarios.

37.    Special Agents accept that they will face physical danger as an inherent part of the job.  As of the date of this filing, the FBI's Wall of Honor depicts 102 agents since the FBI's inception who have lost their lives as a result of their service.[5]

38.    The work of a Special Agent can be grueling and dangerous, and the hours unforgiving. But the job also promises significant benefits, and Special Agents often embark on long careers within the Bureau. Special Agents can retire at any age with 25 years of service or at age 50 with 20 years of service. The FBI's recruitment website advertises that a career as a Special Agent is a way to "SECURE YOUR FUTURE," and that if a person becomes a Special Agent, he or she will "be able to enjoy . . . a secure retirement with pension."[6]

### B. Per FBI policies and practices, non-probationary Special Agents reasonably understand that they may be removed or terminated only for job-related reasons.

39.    FBI policies and practices communicate that non-probationary Special Agents may be removed or terminated only for job-related reasons: unacceptable performance, abuse of leave,

---

[5] *Wall of Honor*, FBI, https://www.fbi.gov/history/wall-of-honor (last accessed Mar. 18, 2026).
[6] Special Agent Overview, fbijobs.gov, https://fbijobs.gov/special-agents#salary-and-benefits (last accessed Mar. 18, 2026).

misconduct, national security concerns, or inability to perform the essential duties and responsibilities of their position.

40.    Written policies delineate permissible bases for removal or termination of Special Agents and establish processes that must be followed in connection with any such removal or termination.

*Unacceptable Performance.*

41.    The *Performance and Development Program Policy Guide* sets forth processes for periodic evaluation of Special Agents' and other FBI employees' performance, explains the circumstances in which a Special Agent may be removed for performance reasons, and describes the procedural protections a Special Agent can invoke if such a removal is proposed. The Guide explains: "The Performance and Development Program supports basic management and supervisory responsibilities by," among other things, "providing a standardized benchmark for performance and a standardized basis for determining performance-based and adverse actions."[7] The *Performance Program and Development Policy Guide* defines "'Unacceptable' performance" as "performance that fails to meet the 'Inconsistent Performer' level in any Objective or Competency elements within an Employee Performance Plan."[8]

42.    After completion of their two-year probationary period, Special Agents, like other FBI employees, are subject to annual performance reviews.[9] "If it is determined that an employee's performance is at the 'Unacceptable' level in either critical element [Performance Objectives or Competencies], the rating official should place the employee on a [Performance Improvement Plan ("PIP")], which will give the employee a 90-calendar-day opportunity period to raise his or her

---

[7] *Performance and Development Program Policy Guide*, *supra* note 3, § 3.
[8] *Id.*, Appendix C: Definitions and Acronyms.
[9] *Id.* §§ 4.3, 4.3.1.1, 4.3.1.3, 4.5.2.

performance to at least the 'Inconsistent Performer' overall level. . . Once approved [by the Performance Appraisal Unit ("PAU")], the PIP letter will be provided to the employee, thereby initiating the 90-calendar-day PIP opportunity period."[10]

43.    "If an employee passes a PIP by improving performance to at least the 'Inconsistent Performer' level, the rating official must notify the employee via a PIP pass letter, which specifies the end date of the PIP jeopardy period (one year from the date the PIP was issued)."[11] In contrast, if the employee fails the PIP, the rating official "must advise the employee [by letter] that he or she failed the PIP and that consideration is being given for a possible performance-based action to be taken."[12]

44.    Possible performance-based actions are demotion, reassignment, or removal from the FBI.[13] The relevant FBI Headquarters division or field office must provide a formal recommendation to the PAU justifying the proposed action.[14] A non-probationary Special Agent may internally appeal a proposed removal for unacceptable performance.[15] Once a decision is made on the appeal, the employee will receive a letter advising of the final decision.[16]

*Abuse of leave.*

45.    Similarly, a Special Agent may be subject to an "adverse action"—up to and including removal—if he or she is improperly using leave.[17] "When a rating official identifies an employee who has leave issues that negatively impact the operation of an FBIHQ division or an FO, the rating official should meet with the employee to discuss the issues and to ensure that the

---

[10] *Id.* § 4.4.
[11] *Id.* § 4.4.3.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.* § 4.5.1.2.
[16] *Id.* § 4.4.3.
[17] *Id.* §§ 4.7, 4.7.1, 4.7.2.

expectations about the Leave Policy Guide . . . and expectations about the proper use of leave are clear."[18] If it is determined that a "Letter of Requirement" ("LOR") is appropriate, an LOR is issued, and the employee has a 90-day opportunity period to resolve his or her leave issues.[19] There is then an LOR jeopardy period that lasts until one year after the LOR was issued, during which the employee must comply with all applicable leave policies.[20] If the employee ultimately fails the LOR, the employee is subject to an adverse action, which may include removal.[21] After an adverse action is proposed, the process tracks the steps that occur when an FBI employee has a proposed performance-based action.[22]

*Misconduct.*

46.    Special Agents may also be removed for misconduct. The FBI has defined the misconduct for which an employee may be disciplined and a range of penalties for different forms of misconduct in its *Offense Codes and Penalty Guidelines.*[23] The *Offense Codes and Penalty Guidelines* "provide general categories of misconduct for which employees may be disciplined" and set forth a "Standard Penalty, a Mitigated Range, and an Aggravated Range" for each category of offense.[24] The Assistant Director, Office of Professional Responsibility ("OPR") or his or her designee is responsible, among other things, for "[c]onducting extensive employee training regarding the *FBI's Offense Codes and Penalty Guidelines*, the FBI's expected standards of conduct, and OPR's policies and procedures."[25]

---

[18] *Id.* § 4.7.
[19] *Id.* §§ 4.7, 4.7.1.
[20] *Id.* § 4.7.2.
[21] *Id.* §§ 4.7.1, 4.7.2.
[22] *Id.* § 4.7.2.
[23] FBI, *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process* (effective Jan. 1, 2024) ("*Offense Codes and Penalty Guidelines*").
[24] *Id.* at 1.
[25] FBI, OPR, *Office of Professional Responsibility Policy Guide* (Sept. 8, 2021), § 2.2.

47.     Per FBI policy, an administrative inquiry precedes any disciplinary action.[26] After internal investigation of misconduct allegations, a report of findings is forwarded for adjudication to FBI OPR, which adheres to the processes and procedures set forth in the *Office of Professional Responsibility Policy Guide* ("*OPR Policy Guide*").[27]

48.     If FBI OPR determines by a preponderance of evidence that an Offense Code was violated, the adjudicator must determine an appropriate disciplinary penalty "after considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors."[28] As summarized by DOJ's Office of the Inspector General ("OIG"): "The Douglas Factors are a set of criteria, established in the Merit Systems Protection Board decision *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981), that obtain structured feedback from the subject's immediate supervisor on 12 topics . . . . FBI OPR considers the Douglas Factors even though the FBI's status as an excepted service agency means that it is not required to do so by law."[29]

49.     The FBI Director, the Deputy Director, or the Director's designee "has the authority to review and amend any disciplinary decision issued by OPR or the FBI's appellate authorities if deemed necessary to correct an injustice or to prevent harm to the FBI. This authority can be exercised in favor of or to the disadvantage of the employee in question and includes the authority to deviate from the FBI's Penalty Guidelines, if required."[30] In other words, the Director, Deputy Director, or Director's designee may assign a greater or lesser disciplinary penalty than the one

---

[26] *Id.* § 4.2.

[27] *Id.* §§ 1.1, 4.2.

[28] *Id.* § 4.5; *see Offense Codes and Penalty Guidelines*, *supra* note 23, at 3.

[29] DOJ OIG, *Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations* 7 n.21, 21-127 (Sept. 2021) ("2021 OIG Report"), https://oig.justice.gov/sites/default/files/reports/21-127.pdf (last accessed Mar. 18, 2026).

[30] *Office of Professional Responsibility Policy Guide*, *supra* note 25, § 4.8.

determined by OPR, but only after an allegation of misconduct has been substantiated.

50.     The FBI's disciplinary policy, like its performance evaluation policy, explicitly distinguishes between probationary and non-probationary employees.[31] Generally, FBI policy provides that, unlike a probationary employee, a non-probationary employee may appeal a removal or other adverse disciplinary penalty to the FBI's Disciplinary Review Board.[32] In exceptional circumstances, FBI policy provides that the potential disciplinary penalties for more severe misconduct include "summary dismissal"—a termination that even non-probationary employees are not permitted to internally appeal.[33]

51.     The FBI's current summary dismissal policy descends from and supersedes part of a 1997 memorandum from then-Director Louis Freeh (the "Freeh Memorandum"), which expanded "procedural protections" in personnel actions but specified that these expanded procedural protections "will not apply to extraordinary cases which require immediate summary dismissal action."[34] As determined by DOJ OIG in 2021, the Freeh Memorandum was not available to FBI employees in the FBI's Policy Library, nor on FBI OPR's intranet website.[35]

52.     While the 1997 Freeh Memorandum arguably left the requirements for summary dismissal vague, the September 2021 DOJ OIG report documented that the FBI had in practice used a "different, more specific set of criteria" for summary dismissals than what was described in the Freeh Memorandum, and DOJ OIG recommended that the FBI formalize its summary dismissal practice in a written policy accessible to FBI employees.[36] The FBI agreed with OIG's

---

[31] *Id.* §§ 4.6.1, 4.7.3.
[32] *Id.* §§ 4.6.1, 4.6.4.
[33] *Id.* §§ 4.6.1, 4.6.4.
[34] Mem. from FBI Dir. Louis J. Freeh, Re: Standards of Conduct Disciplinary Matters – Revision of the FBI's Disciplinary Process 7, 9 (Mar. 5, 1997); 2021 OIG Report, *supra* note 29, at 14-15.
[35] 2021 OIG Report, *supra* note 29, at 14-15.
[36] *Id.* at 16; *see id.* at 40.

14

recommendation, and by September 2021, the FBI had issued such a policy.[37]

53.    The FBI's current summary dismissal policy is set forth in the *OPR Policy Guide*'s section on "Processes and Procedures" for employee misconduct cases, as one of the "Range of Potential Outcomes of OPR Adjudication."[38] The *OPR Policy Guide* states: "When: (a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent considerations are at stake, the Director; [Deputy Director ("DD")]; or [Assistant Director ("AD")], OPR may summarily dismiss an employee. This authority cannot be re-delegated."[39] It also states: "Summary dismissal authority is an extraordinary remedy to be exercised only in compelling or exigent circumstances. The Director, or the Director's designee, will be notified of any summary dismissal."[40] The *OPR Policy Guide* further states, in relevant part: "With the exception of those who are preference-eligible, FBI employees subject to summary dismissal may not (a) review the redacted 263 file;[41] (b) prepare a written response; or (c) make an oral presentation to the AD, OPR."[42] It also states that "[s]ummary dismissals are not subject to internal appeal."[43]

54.    The Preamble to the current version of the *FBI's Offense Codes and Penalty Guidelines* repeats this summary dismissal policy and sets forth additional details about the policy's application.[44] Specifically, the Preamble adds:

---

[37] *Id.* at 82.

[38] *Office of Professional Responsibility Policy Guide*, *supra* note 25, §§ 4.6, 4.6.1, 4.6.4.

[39] *Id.* § 4.6.4 (citing the Director's Memorandum "Designees for the Purposes of Summary Dismissal and Disciplinary Review" (March 10, 2022)).

[40] *Id.* § 4.6.4.

[41] A "263 file" is "[t]he file that contains the investigative and adjudicative records of an employee's administrative inquiry. The file is 'redacted' in accordance with civil discovery procedures by the Office of the General Counsel prior to review by the employee and/or legal counsel." *Id.*, Appendix B: Definitions and Acronyms.

[42] *Id.* § 4.6.4.

[43] *Id.*

[44] *See Offense Codes and Penalty Guidelines, supra* note 23, at 3-4.

Many factors are considered by OPR in determining if a summary dismissal is appropriate, including, but not limited to, the egregiousness of the misconduct, whether the misconduct is illegal/criminal, overwhelming evidence of the misconduct, or impact on the FBI's reputation. Examples include: possession of Child Sexual Abuse Material, arrest for criminal conduct, solicitation of commercial sex acts, and theft of Bureau property. These factors and examples are illustrative, not exhaustive, and the Bureau retains the discretion to consider any factors relevant to the case.[45]

55.     As the foregoing indicates, summary dismissal is solely a disciplinary penalty; FBI policy does not authorize summary dismissal outside the context of employee misconduct that has been the subject of an internal investigation.

*National Security Concerns.*

56.     Because Special Agents hold sensitive positions requiring a security clearance, a Special Agent may also be removed based on national security concerns.[46] Within the FBI, a national security-based termination may result after the FBI's Security Division ("SecD") conducts an internal investigation into security concerns regarding an employee, based on the SEAD4 adjudicative guidelines established by the Director of National Intelligence.[47] Since a Top Secret ("TS") clearance is required of all FBI employees,[48] revocation of one's security clearance ultimately results in termination of employment. But like other federal employees, Special Agents may challenge the revocation of their security clearances.[49]

---

[45] *Id.*

[46] *See generally* Executive Order 10450; Executive Order 12968.

[47] FBI, *Personnel Security Clearance and Access Policy Guide* (Nov. 25, 2009) ("*PSCAPG*"), §§ 2, 2.12, https://vault.fbi.gov/personnel-security-clearance-and-access-policy-guide-0192pg/ (last accessed Mar. 18, 2026); Security Executive Agent Directive 4 (SEAD4), National Security Adjudicative Guidelines (June 8, 2017), https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf (last accessed Mar. 18, 2026). On information and belief, additional, non-public FBI policy documents also address national security-related terminations.

[48] *PSCAPG*, *supra* note 47, § 4.1.1; *see* Application and Evaluation Process, fbijobs.gov, https://fbijobs.gov/special-agents/application-and-evaluation-process (last accessed Mar. 18, 2026).

[49] *PSCAPG*, *supra* note 47, § 3; Executive Order 12968, § 5.2.

*Inability To Perform Essential Duties and Responsibilities.*

57.    A final reason that a non-probationary Special Agent may be terminated is set forth in the FBI's *Fitness-for-Duty Policy Guide*: In narrow circumstances, an agent who is determined by the Medical Mandates Evaluation Board ("MMEB"), in a decision approved by the Deputy Assistant Director ("DAD"), Human Resources Division ("HRD"), to suffer from a condition incompatible with the fitness-for-duty requirements of the Special Agent role may be terminated based on an inability to perform the essential duties and responsibilities of the position.[50] The DAD, HRD may propose to terminate the employee only "[i]f no appropriate position is available, or if an employee declines an offer for an appropriate position."[51] Such a termination is for "non-disciplinary reasons,"[52] and the DAD, HRD's decision may be internally appealed.[53]

58.    In sum, as detailed in paragraphs 43 to 57 above, FBI policies set forth limited reasons why a non-probationary Special Agent might be removed or terminated—all of them job-related.

59.    In any given year, the FBI employs around 13,000 Special Agents, and the FBI currently has approximately 38,000 employees total. OPR data indicates that in the decade between FY 2007 and FY 2018, only 351 FBI employees serving in any role were dismissed for disciplinary reasons.[54] Historically, removals of non-probationary Special Agents based on misconduct thus have been rare. On information and belief, removals of non-probationary Special Agents for other reasons, such as unacceptable performance, are even rarer.

---

[50] FBI Human Resources Division, *Fitness-for-Duty Policy Guide* (Nov. 28, 2014), §§ 4.1, 4.4., 4.4.5, 4.4.7-12, https://vault.fbi.gov/fitness-for-duty-program-policy-directive-and-policy-guide-0735dpg/ (last accessed Mar. 18, 2026).
[51] *Id.* § 4.4.12.
[52] *Id.*
[53] *Id.* § 4.4.13.
[54] 2021 OIG Report, *supra* note 29, at 14 (Figure 2).

60.     Guidance from supervisors, quarterly OPR emails detailing examples of misconduct and corresponding disciplinary penalties, and other FBI communications have reinforced the FBI's message to non-probationary Special Agents that they may consider their employment with the FBI secure absent misconduct, extreme deficiencies in job performance, or the handful of other grounds for termination set forth in the policies detailed above.

61.     Based on the FBI's policies and practices, each Plaintiff reasonably understood that he would not be removed from the FBI without cause, and each Plaintiff relied on that understanding in continuing to serve with the FBI and in making other family, career, and financial decisions.

### C. *Plaintiffs are assigned to the Arctic Frost investigation and serve honorably.*

62.     In the FBI, Special Agents are expected to take on investigations as assigned.

63.     "Arctic Frost" was an FBI investigation into a suspected conspiracy to overturn the results of the 2020 Presidential Election via a fake electors scheme. The investigation was opened in the early months of 2022 and examined dozens of subjects, one of whom was then-former President Trump. After the appointment of Special Counsel Jack Smith in November 2022, oversight of this election interference investigation was transferred to the Special Counsel's Office. The investigation ultimately led to a grand jury indictment of then-former President Trump.[55] After Trump won the Presidential election in November 2024, Smith moved to dismiss the indictment on behalf of DOJ, citing DOJ policy not to prosecute sitting Presidents,[56] and the case and investigation were closed.

64.     John Doe 1's involvement in Arctic Frost was limited. In October 2022, John Doe

---

[55] Indictment, United States v. Trump, No. 1:23-cr-00257-TSC (D.D.C. Aug. 1, 2023), ECF No. 1.
[56] Government's Motion to Dismiss at 6, United States v. Trump, No. 1:23-cr-00257-TSC (D.D.C. Nov. 25, 2024), ECF No. 281.

1's supervisor informed him that the investigation into the former President and his associates required agents with financial investigative experience and that the supervisor had identified John Doe 1 for the assignment. In November 2022, John Doe 1 began working on Arctic Frost.

65.    John Doe 1's contributions to Arctic Frost were largely administrative and ministerial. The financial crimes focus of the investigation did not require much of John Doe 1's time, and so John Doe 1 was asked to assist two of the lead case agents with the administrative task of downloading subpoena productions as they came in and uploading the information to the shared drive cloud folder where the rest of the investigative team could access it. To facilitate this, many subpoenas listed John Doe 1 as the point of contact for the response.

66.    Despite his listing as a point of contact, John Doe 1 himself prepared very few Arctic Frost subpoena requests and performed only a minor role in the investigation. Indeed, his involvement was minimal enough that he continued to work on active, unrelated investigations that preceded his temporary assignment, only driving to Washington, D.C. every few weeks in connection with Arctic Frost. By June 2023, John Doe 1 had largely transitioned off the case.

67.    John Doe 2's involvement with Arctic Frost was similarly a detour from his regular duties, at the direction of a supervisor. In or around November 2022, soon after John Doe 2 transferred to CR-10, the local public corruption squad, John Doe 2's supervisor informed him that a sensitive investigation handled by CR-15, the national public corruption squad, needed another experienced agent. Since John Doe 2 had not yet been assigned any cases for CR-10, the supervisor explained, John Doe 2 would be temporarily assigned to CR-15. John Doe 2 thus began a temporary duty assignment working on Arctic Frost.

68.    From approximately November 2022 to June 2023, John Doe 2 worked the Arctic Frost investigation. John Doe 2 was never one of the primary or lead agents on Arctic Frost, but

19

rather played a supporting role, handling tasks such as recording interviews when requested by lead agents or prosecutors, arranging for transcription services for recorded interviews, and keeping track of interview logs and records. In approximately June 2023, John Doe 2 ended his temporary duty assignment and returned to CR-10 and public corruption investigations involving local DC elections and officials.

69.    Throughout their involvement with Arctic Frost, John Doe 1 and John Doe 2 fully adhered to FBI and DOJ policies and procedures, including applicable statutory and regulatory requirements. Plaintiffs were dedicated federal law-enforcement officers who executed their law-enforcement duties without bias or political motive.

### D. President Trump and Kash Patel assert that the FBI is filled with agents who are politically disloyal to Trump and must be purged.

70.    During his third presidential campaign, President Trump stated his belief that the FBI was filled with employees who were politically opposed to him, and expressed an intention to rid the Bureau of such individuals if he were to be re-elected.

71.    For example, in an interview he posted on Truth Social on May 15, 2023, Trump was asked what he would do to "fix the FBI." He responded that when he began his first term, the FBI was "loaded up with RINOs and with Democrats" and that "we really did do a tremendous job at getting tremendous numbers out," but he also asserted that "this is the deep state" and that his administration would make "very big changes" if he were to be reelected.[57]

72.    Trump's statements aligned with assertions made by Kash Patel in his 2023 book

---

[57] Video posted by Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL 00:01:19 (May 15, 2023 at 23:04 ET), https://truthsocial.com/@realDonaldTrump/posts/110376143522718835 (last accessed Mar. 18, 2026). "RINO" is an acronym for "Republican In Name Only," and, according to Merriam-Webster Dictionary, means "a member of the Republican Party who is disloyal to the party or deemed insufficiently conservative." *RINO*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/RINO (last accessed Mar. 18, 2026).

*Government Gangsters*. Patel's book posited a "Deep State" composed of groups politically aligned against Trump and described the FBI as "[o]ne of the most cunning and powerful arms of the Deep State," calling for the FBI to "be brought back under the control, direction, and accountability of elected officials."[58]

### E. Kash Patel swears under oath he will not fire agents based on case assignments.

73.    In November 2024, Donald J. Trump was elected President for the second time, and he announced that he would nominate Patel to be the Director of the FBI. Following President Trump's inauguration, on January 30, 2025, Patel submitted to a Senate hearing on his nomination. In support of the hearing, he also filled out a Senate questionnaire.

74.    Patel's statements both at his January confirmation hearing and in his written Senate Questionnaire were provided under oath and under the penalty of perjury. Patel wrote seven times in his Senate Questionnaire that if he were confirmed as FBI Director, "no one will be terminated for case assignments" and that employees "should not be terminated for case assignments." He wrote 15 separate times that personnel decisions "should be based on performance and adherence to the law" and that if he were confirmed, "every FBI employee will be held to the absolute same standard."[59]

75.    At Patel's hearing, Senator Richard Blumenthal asked Patel to "commit that you will not tolerate the firing of the FBI agents who worked with the Special Counsel's Office" on investigations involving President Trump, and Patel responded that "[e]very FBI employee will be

---

[58] Kash Pramod Patel, *Government Gangsters: The Deep State, the Truth, and the Battle for Our Democracy* 33, 81 (Post Hill Press 2023).

[59] *Nomination of the Honorable Kashyap Patel to be Director of the Federal Bureau of Investigation: Questions for the Record*, S. Comm. on the Judiciary, 119th Cong. (Jan. 30, 2025) (responses of Kash Patel), https://www.judiciary.senate.gov/download/2025-01-30-qfr-responses-patel (last accessed Mar. 18, 2026).

held to the absolute same standard, and no one will be terminated for case assignments."[60]

### F. Congress begins releasing Arctic Frost records; Senator Grassley casts Arctic Frost agents as politically partisan and disparages their service.

76. On January 30, 2025, the day of Patel's confirmation hearing, Senators Chuck Grassley and Ron Johnson released a first tranche of records related to the Arctic Frost investigation that had been provided to Congress by an alleged whistleblower. At the confirmation hearing, Grassley highlighted these records and stated: "Partisan FBI agents and DOJ officials tried—and ultimately succeeded—in launching a full-field criminal investigation and prosecution of the President of the United States." Grassley also stated: "I expect the production of all records on this matter to better understand the full fact pattern and whether other records exist."[61]

77. On March 14, 2025, Senators Grassley and Johnson released additional Arctic Frost records obtained from the alleged whistleblower, characterizing the investigation as "Anti-Trump."[62] In a letter to Defendants Patel and Bondi, the Senators again requested that DOJ itself produce records of the investigation, stating: "Consistent with Senator Grassley's request during Director Patel's confirmation hearing, we expect the production of all records related to the Arctic Frost investigation, including all internal records of investigative updates."[63]

---

[60] C-SPAN, *FBI Director Nominee Kash Patel Testifies at Confirmation Hearing, Part 1*, at 2:11:25 (C-SPAN, Jan. 30, 2025), https://www.c-span.org/program/senate-committee/fbi-director-nominee-kash-patel-testifies-at-confirmation-hearing-part-1/654894 (last accessed Mar. 18, 2026).

[61] *Id.* at 00:21:12.

[62] Press Release, S. Comm. on the Judiciary, Grassley, Johnson Release Records Showing FBI Obtained Trump, Pence Cell Phones, Conducted Sweeping Interviews to Advance Anti-Trump Arctic Frost Investigation (Mar. 14, 2025), https://www.judiciary.senate.gov/press/rep/releases/grassley-johnson-release-records-showing-fbi-obtained-trump-pence-cell-phones-conducted-sweeping-interviews-to-advance-anti-trump-arctic-frost-investigation (last accessed Mar. 18, 2026).

[63] Letter from Sen. Charles Grassley & Sen. Ron Johnson to Pamela Bondi, Att'y Gen., U.S. Dep't of Just., & Kash Patel., Dir., Fed. Bureau of Investigation (Mar. 13, 2025), https://www.grassley.senate.gov/download/grassley-johnson-to-doj-fbi_-arctic-frost-updates (last accessed Mar. 18, 2026).

78.     On April 8, 2025, Senators Grassley and Johnson released more Arctic Frost records, which they described as detailing a "Sweeping Anti-Trump Investigation," and reiterated "their request for Attorney General Pam Bondi and Federal Bureau of Investigation (FBI) Director Kash Patel to produce all DOJ and FBI records regarding the Arctic Frost investigation."[64]

79.     On April 29, 2025, Senator Grassley stated on the Senate floor that Arctic Frost was a "political case against President Trump," describing the agents first assigned to the investigation as a "merry band of partisans." Grassley asserted that "[p]artisan FBI agents and Department of Justice prosecutors led the charges, and led the charges as a tag-team, causing political chaos to try and destroy President Trump."[65]

## G. Bondi announces a plan to purge the FBI of personnel deemed politically disloyal to President Trump.

80.     Amidst Grassley's and Johnson's Arctic Frost document releases and commentary, Attorney General Pamela J. Bondi announced an intent to purge DOJ and the FBI of employees deemed to be political non-supporters of President Trump—including personnel who worked on matters under the oversight of Special Counsel Jack Smith. During an interview with Sean Hannity of Fox News on March 3, 2025, Defendant Bondi bragged, with respect to DOJ prosecutors who had already been fired: "[W]e got rid of the Jack Smith team. Gone. Those people are gone." She then revealed that such firings would continue, explaining that "[t]here are a lot of people in the FBI and also in the Department of Justice who despise Donald Trump, despise us, don't want to be here" and proclaiming, "right now, we're going to root them out; we will find them, and they

---

[64] Press Release, Sen. Chuck Grassley, Grassley, Johnson Release Additional Arctic Frost Records Detailing Sweeping Anti-Trump Investigation (Apr. 8, 2025), https://www.grassley.senate.gov/news/news-releases/grassley-johnson-release-additional-arctic-frost-records-detailing-sweeping-anti-trump-investigation (last accessed Mar. 18, 2026).
[65] Press Release, S. Comm. on the Judiciary, Grassley: We Need to Expose the Political Conspiracy That Surrounded President Trump (Apr. 29, 2025), https://www.judiciary.senate.gov/grassley-we-need-to-expose-the-political-conspiracy-that-surrounded-president-trump (last accessed Mar. 18, 2026).

will no longer be employed."[66]

**H. Patel begins firing Arctic Frost agents; Grassley, Patel, and Trump continue to disparage Arctic Frost agents; DOJ provides unredacted Arctic Frost records, which Grassley promptly releases to the public.**

81.    On September 16, 2025, during the opening of a Senate Judiciary Committee FBI Oversight hearing, Senator Grassley announced the release of several more pages of whistleblower-provided Arctic Frost records.[67]

82.    During the same FBI Oversight Hearing on September 16, 2025, Patel testified: "I've said it before and I've said again, your case assignment . . . does not dictate your career or your termination." Later in the hearing, Patel testified: "The only way people get terminated at the FBI is if they fail to meet the muster of the job and their duties."[68] Notwithstanding those statements, on information and belief and as publicly reported, Patel by that point had already fired one of the lead Arctic Frost agents, Walter Giardina, as well as Chris Meyer, a Special Agent who had been incorrectly identified as assigned to a different investigation involving Trump.[69]

83.    Approximately three weeks after Patel's FBI Oversight Hearing testimony, news organizations reported that Defendant Patel had fired two more agents associated with Arctic

---

[66] FOX NEWS, *AG Pam Bondi on the Epstein Files: 'The public has a right to know'*, at 00:06:42 (Fox News, Mar. 3, 2025), https://www.foxnews.com/video/6369576644112 (last accessed Mar. 18, 2026).

[67] Press Release, S. Comm. on the Judiciary, Grassley Opens Senate Judiciary FBI Oversight Hearing, Releases Additional Records Demonstrating Political Weaponization and Misconduct at Biden FBI (Sept. 16, 2025), https://www.judiciary.senate.gov/press/rep/releases/grassley-opens-senate-judiciary-fbi-oversight-hearing-releases-additional-records-demonstrating-political-weaponization-and-misconduct-at-biden-fbi (last accessed Mar. 18, 2026).

[68] C-SPAN, *FBI Oversight Hearing*, at 1:57:52, 2:20:41 (C-SPAN, Sept. 16, 2025), https://www.c-span.org/program/senate-committee/fbi-oversight-hearing/665403 (last accessed Mar. 18, 2026).

[69] *See, e.g.*, Glenn Thrush & Alan Feuer, *A 'Broken' Trust: F.B.I. Agents Fired by Patel Speak Out*, N.Y. TIMES (Sept. 16, 2025), https://www.nytimes.com/2025/09/16/us/politics/kash-patel-fired-fbi-agents.html (last accessed Mar. 18, 2026).

Frost.[70] On October 7, 2025, in an interview with Fox News, Patel confirmed the firings, asserting, "You're darn right I fired those agents." He remarked that the firings were based on the agents' "weaponization" and their membership in the so-called "Deep State," and that the FBI's "partners in Congress . . . should be furious" about the agents' "politiciz[ed]" work at the FBI.[71]

84.    On October 10, 2025, the Senate Judiciary Committee issued a press release touting Senator Grassley's release of Arctic Frost records as the impetus for Defendant Patel's firing of FBI agents earlier that week, praising the firings as "accountability," and expressing an expectation that "more will come."[72]

85.    In the weeks that followed, in apparent coordination, Senator Grassley, Defendant Patel, and President Trump continued to target and disparage FBI personnel involved with Arctic Frost.

86.    In a Q&A posted on October 17, 2025, Senator Grassley asserted that "[t]he facts show the [Arctic Frost] investigation was a sweeping partisan fishing expedition to take down political foes."[73]

87.    On October 23, 2025, DOJ provided several hundred pages of Arctic Frost records to Congress, with names of career DOJ and FBI personnel unredacted. Defendant Patel wrote on

---

[70] *See, e.g.*, Ryan J. Reilly, *FBI Fires Special Agents Who Worked on Jack Smith's Probe into Trump*, NBC NEWS (Oct. 8, 2025), https://www.nbcnews.com/politics/justice-department/fbi-fires-special-agents-worked-jack-smiths-probe-trump-rcna236415 (last accessed Mar. 18, 2026).

[71] Fox News, *Patel: We're just warming up' in investigation of alleged tracking of GOP senators*, at 00:04:26 (Fox News, Oct. 7, 2025), https://www.foxnews.com/video/6382234662112 (last accessed Mar. 18, 2026).

[72] Press Release, Sen. Chuck Grassley, ICYMI: Grassley Oversight of Arctic Frost Yields Ongoing Results and Draws National Attention (Oct. 10, 2025), https://www.grassley.senate.gov/news/news-releases/icymi-grassley-oversight-of-arctic-frost-yields-ongoing-results-and-draws-national-attention (last accessed Mar. 18, 2026).

[73] Press Release, Sen. Chuck Grassley, Q&A: Arctic Frost (Oct. 17, 2025), https://www.grassley.senate.gov/news/news-releases/qanda-arctic-frost (last accessed Mar. 18, 2026).

X: "Today, we handed over important documentation showing weaponization and politicization at the highest levels of government. We're proud to work with Chairman Grassley and Senator Johnson on this critical oversight to restore one tier of justice and transparency the American people deserve. Arctic Frost was a stain on this country. That weaponization ends under this FBI."[74]

88.    The next day, October 24, 2025, President Trump posted on Truth Social: "Just in: Documents show conclusively that Christopher Wray, Deranged Jack Smith, Merrick Garland, Lisa Monaco, and other crooked lowlifes from the failed Biden Administration, signed off on Operation Arctic Frost. They spied on Senators and Congressmen/women, and even taped their calls. They cheated and rigged the 2020 Presidential Election. These Radical Left Lunatics should be prosecuted for their illegal and highly unethical behavior!"[75]

89.    On October 29, 2025, Senator Grassley's committee publicly released a trove of Arctic Frost investigation documents provided by DOJ, including documents in which the names of John Doe 1 and other career DOJ and FBI personnel appeared, unredacted. The same day, a post on Senator Grassley's Facebook page stated: "Arctic Frost was the vehicle by which partisan FBI agents and DOJ prosecutors could improperly investigate the entire Republican political apparatus,' Grassley said. My oversight work will continue. #GrassleyWorks."[76]

---

[74] FBI Director Kash Patel (@FBIDirectorKash), X (Oct. 23, 2025 at 16:50 ET), https://x.com/FBIDirectorKash/status/1981463216367779957?s=20 (last accessed Mar. 18, 2026).

[75] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Oct. 24, 2025 at 22:11 ET), https://truthsocial.com/@realdonaldtrump/posts/115432378654253078 (last accessed Mar. 18, 2026).

[76] Chuck Grassley, FACEBOOK (Oct. 29, 2025), https://www.facebook.com/grassleyworks/posts/arctic-frost-was-the-vehicle-by-which-partisan-fbi-agents-and-doj-prosecutors-co/135116549645366/ (last accessed Mar. 18, 2026).

### I.   *John Doe 1 is terminated.*

90.     On October 31, 2025, John Doe 1 was preparing to go trick-or-treating with his two young children when he received a phone call on his FBI mobile phone from a number he did not recognize; it was WFO Special Agent in Charge ("SAC") Paul Reid Davis. Davis informed John Doe 1 that he should immediately report to the main WFO site in Washington, D.C. John Doe 1 asked whether the meeting could happen some other time, explaining that he was about to take his children trick-or-treating for Halloween. Davis said no. John Doe 1 asked something to the effect of, "This is it? Nothing can be done?" and Davis responded, "It is what it is."

91.     At the suggestion of an FBI colleague he had texted, John Doe 1 called Assistant Special Agent in Charge ("ASAC") Kevin Gallagher and asked if members of John Doe 1's chain of command could come to his residence, so that he would not have to abandon his two children, already in costume, who were eagerly waiting to begin Halloween night with their parents. Gallagher responded, in sum and substance, "We can't because you're not the only person this is happening to tonight." John Doe 1 took this to mean that other individuals were also being fired that night.

92.     Leaving behind his wife and children, John Doe 1 then gathered his Bureau equipment and made the hour-long drive to the WFO.

93.     Upon his arrival, ASAC Gallagher met John Doe 1 at the elevator and walked with John Doe 1 to the office of the recently installed Assistant Director in Charge ("ADIC") Darren Cox, where Cox and Davis were waiting.[77]

94.     Cox was holding a termination letter, which he read in part before handing it to John Doe 1 and telling him he had been "removed from federal service." Cox said he was sorry to

---

[77] The ADIC is a SAC's superior and the senior authority at WFO.

have to do this. John Doe 1 asked what if any allegations of misconduct there were against him and what policies or procedures the Bureau followed in reaching the determination to remove him. Cox responded tersely: "I don't know anything beyond what's in the letter."

95.     John Doe 1's letter was dated October 31, 2025. It was incorrectly addressed to "[John Doe 1]" "Office of the General Counsel."  In fact, John Doe 1 was not assigned to the Office of the General Counsel, but rather to CR-13 at WFO.  The letter reads as follows:

> This document provides official notice that you are being summarily dismissed from your position at the Federal Bureau of Investigation, and removed from the federal service under my authority as the FBI Director, effective immediately.
>
> You have exercised poor judgment and a lack of impartiality in carrying out duties, leading to the political weaponization of the government.
>
> Pursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Federal Bureau of Investigation is hereby terminated.
>
> If applicable, you may have a right to file an appeal of this removal with the U.S. Merit Systems Protection Board within 30 days of the effective date of the removal action. For more information on how to file and appeal with the MSPB, please visit www.mspb.gov. [78]

96.     John Doe 1's termination letter was signed by Patel.  *See* **Ex. A.**

97.     At the conclusion of the meeting, John Doe 1 met with members of the Employee Assistance Program and office security personnel and turned in his Bureau-issued equipment, credentials, badge, and firearm to security personnel.

98.     On November 25, 2025, John Doe 1 spoke to a Bureau Human Resources ("HR") employee. In the course of that conversation, the HR employee shared that John Doe 1's firing

---

[78] Within the FBI, "preference-eligible employees"—meaning, chiefly, FBI employees with prior military service—have statutory Merit Systems Protection Board ("MSPB") appeal rights not available to FBI employees generally. *See, e.g.*, *Office of Professional Responsibility Policy Guide*, *supra* note 25, §§ 4.6.4, 4.7.2; *Performance and Development Program Policy Guide*, *supra* note 3, § 4.5.1.2. Neither Plaintiff in this case is preference-eligible.

would be termed an "Article II separation." When John Doe 1 inquired whether his firing concerned misconduct or was for cause, the staff member replied, "No, there are other classifications that would designate that, this one doesn't designate that."

99.    Several weeks later, John Doe 1 received a Standard Form 50, Notification of Personnel Action ("SF-50"). *See* **Ex. B.** The SF-50 documenting John Doe 1's removal has an "Approval Date" of 11/01/2025. Notwithstanding the termination letter's accusation that John Doe 1 "exercised poor judgment and a lack of impartiality in carrying out duties," John Doe 1's SF-50 does not indicate that his removal was based on either misconduct or poor performance. The sole listed "reason" for John Doe 1's removal is "Article 2 USC."

100.    The content of John Doe 1's SF-50, ADIC Cox's asserted lack of knowledge of "anything beyond what's in the letter," and the HR employee's representation that John Doe 1's firing was not for "cause" all indicate that the termination letter's reference to "poor judgment and a lack of impartiality in carrying out duties" was pretextual.

101.    At the time of his firing, John Doe 1 was the primary or sole agent on multiple fraud investigations. In contravention of longstanding FBI practice, he was given no opportunity to transition these matters to other agents. John Doe 1 believes that key case facts he came to know through his investigative work are now simply lost to the FBI, and he fears that certain cases may simply die, or be dismissed.

## J.    John Doe 2 is terminated.

102.    On Monday, November 3, 2025, around 4:15 PM, while working at his squad's office in southwest DC, John Doe 2 received a call from SAC Davis. Aware of how John Doe 1's firing had transpired three days earlier, John Doe 2 immediately understood the import of Davis's call. Davis, who sounded somber, told John Doe 2 to report to the ADIC's office within the next

29

15-30 minutes.

103.   During the ten-minute drive to WFO, John Doe 2 contacted an Assistant United States Attorney ("AUSA") with whom he had been working on a high-profile fraud against the government investigation to let him know that he was being fired and therefore would not be able to brief the U.S. Attorney's Office Criminal Division Chief the next day as scheduled.  John Doe 2 also had recently briefed Defendant Patel and then-Deputy Director Dan Bongino on the fraud case. In addition, John Doe 2 informed the AUSA that he would no longer be able to work on a highly sensitive public corruption case that he had briefed U.S. Attorney for the District of Columbia Jeanine Pirro on earlier in the month. The AUSA told John Doe 2 he would "talk to some people." In addition to the AUSA, John Doe 2 called an attorney for the Federal Bureau of Investigation Agents Association ("FBIAA"), his direct supervisor, and his wife.

104.   At WFO, John Doe 2 was met by a close colleague and the supervisor whom he had called en route. After they arrived at the ADIC's office on the eighth floor, SAC Davis told John Doe 2 "you are going to be terminated" but that ADIC Cox was on a call. John Doe 2 waited outside the office for close to an hour, during which time his firearm was confiscated.

105.   Around 5:30 PM, Davis came out and told John Doe 2 that there would "be no firings today" and that someone "had called on [his] behalf." John Doe 2 was given his firearm back.

106.   The next morning, Tuesday, November 4, 2025, John Doe 2 arrived at the FBI Headquarters gym as usual to train. At around 10:00 AM, soon after John Doe 2 finished his workout and was preparing to drive to the CR-10 squad office, he received a call from Davis. Davis told John Doe 2 that he needed to report to the ADIC's office. After receiving Davis's call, John Doe 2 called his immediate supervisor, who said she would rally the squad to support John

Doe 2 and they would report to the ADIC's office together.

107.    John Doe 2 arrived at WFO with his squad, but only one of John Doe 2's colleagues and his supervisor were permitted to accompany him upstairs. In the lobby outside ADIC Cox's office, they met Davis, who said, "The letter is here this time." John Doe 2's colleague and supervisor asked if they could go into the room with him, and Davis said no.

108.    John Doe 2 met with SAC Davis and ADIC Cox alone. Cox told John Doe 2 that he received a letter stating that John Doe 2 was being summarily dismissed. Cox then read aloud the letter.

109.    John Doe 2's letter was printed on letterhead that identified the Department of Justice and the Federal Bureau of Investigation and indicated that it was from the "Office of the Director." It was dated November 3, 2025, the day prior. It was addressed to John Doe 2, Washington Field Office, and it was signed by Patel. Attached was a page that asked John Doe 2 to "sign and date" an "Acknowledgment of Receipt of this letter." The body of the letter was substantively identical to the letter provided to John Doe 1. *See* **Ex. C.**

110.    After ADIC Cox read the letter aloud, John Doe 2 asked a series of questions about his firing, including why he was being fired, what violations of law or policy he had committed, whether the OPR process was followed, what due process he had been provided, and whether notice, a pretermination hearing, and an opportunity to respond had been afforded to him. Cox said he only knew what was in the letter.

111.    Toward the end of the meeting, Cox confirmed to John Doe 2 that, the prior day, there had been an intercession on his behalf by U.S. Attorney Jeanine Pirro, which was why John Doe 2 was initially spared. Cox said Pirro had called him a second time, that day, and had asked him to relay the message that she was sorry for this process and appreciated all the work John

Doe 2 had done.

112.    Notwithstanding the statements in his termination letter, as in John Doe 1's case, John Doe 2's SF-50 does not indicate that his removal was based on misconduct or unacceptable performance. Rather, the SF-50 lists the sole "reason" for removal as "Removal under Article 2 USC." *See* **Ex. D**.

113.    The content of John Doe 2's SF-50 and ADIC Cox's asserted lack of knowledge of the basis for John Doe 2's firing both indicate that the termination letter's reference to "poor judgment and a lack of impartiality in carrying out duties" was pretextual.

114.    At the time of his firing, John Doe 2 was either the only case agent, or the most senior case agent, on several active local public corruption cases. He was also the lead WFO agent in charge of coordinating election crimes investigations. He was fired on Election Day. As in John Doe 1's case, John Doe 2 was given no opportunity to transition his matters to other agents. He fears that because of this, crucial case details, developments, and strategy are now lost to the FBI and prosecutors.

### K. Defendant Patel and elected officials continue to disparage agents assigned to Arctic Frost.

115.    In the aftermath of Plaintiffs' firings, which were publicly reported, Republican elected officials impugned the Arctic Frost investigation with new vigor, characterizing it as a "partisan dragnet,"[79] a "political witch hunt,"[80] and an abuse of power by the "Left."[81]

---

[79]    Senator Ron Johnson (@SenRonJohnson), X (Nov. 4, 2025 at 18:12 ET), https://x.com/SenRonJohnson/status/1985847594761752999 (last accessed Mar. 18, 2026).

[80] *Sen. Blackburn's office says she plans to sue after phone records subpoenaed*, WBIR (Nov. 12, 2025), https://www.wbir.com/article/sports/locked-on/lo-tennessee/sen-blackburns-office-plans-to-sue-phone-records-subpoenaed/51-3a7e9cf7-fc43-4258-9397-577e464d30cb (last accessed Mar. 18, 2026).

[81] Lindsey Graham (@LindseyGrahamSC), X (Dec. 11, 2025 at 10:14 ET), https://x.com/LindseyGrahamSC/status/1999135649127940501 (last accessed Mar. 18, 2026).

116.    Months after Plaintiffs' termination, President Trump, Defendant Patel, and Senator Grassley have continued to disparage Plaintiffs and their FBI service.

117.    On January 12, 2026, President Trump posted a link to an article about Arctic Frost on Truth Social, and wrote: "These FBI Agents are total Scum, in their own way no better than the insurrectionists in Portland, Minnesota, Los Angeles, etc. Kash better get them out, NOW! Radical Left Lunatics put in by the 'Auto Pen' and Obama!"[82]

118.    Defendant Patel then replied to that Truth Social post the same day, writing: "Thank you Mr. President. Under your leadership, this FBI found the corrupt actors and terminated their employment last year. America voted for the end of weaponized law enforcement, and that's what we are delivering."[83]

119.    At a February 10, 2026, hearing of the Senate Judiciary Committee's Subcommittee on Privacy, Technology and the Law, Senator Grassley stated, with respect to lawfully issued Arctic Frost subpoenas, "These invasive efforts were spear-headed by partisan agents and prosecutors. Many have now been justifiably fired, despite the Democrats complaining about it."[84]

### L. Plaintiffs struggle to find new jobs.

120.    Given the specialized nature of their positions as FBI Special Agents, in which they worked on behalf of the United States government on sophisticated fraud and public corruption matters, among others, Plaintiffs reasonably view their prior employment at the FBI to have no

---

[82] Donald Trump (@realDonaldTrump), TRUTH SOCIAL (Jan. 12, 2026 at 16:07 ET), https://truthsocial.com/@realDonaldTrump/posts/115884164936451552 (last accessed Mar. 18, 2026).

[83] Kash Patel (@Kash), TRUTH SOCIAL (Jan. 12, 2026 at 17:42 ET), https://truthsocial.com/@Kash/posts/115884541495218344 (last accessed Mar. 18, 2026).

[84] Press Release, S. Comm. on the Judiciary, Grassley Demands Answers from Telecom Companies Who Turned Congressional Phone Records Over to Jack Smith (Feb. 10, 2026), https://www.judiciary.senate.gov/press/rep/releases/grassley-demands-answers-from-telecom-companies-who-turned-congressional-phone-records-over-to-jack-smith (last accessed Mar. 18, 2026).

comparator. Nonetheless, certain positions within the Executive Branch of the federal government would at least enable Plaintiffs to continue working as federal law enforcement officers, with some offering the possibility of obtaining the retirement benefits they expected to receive at the FBI. But on information and belief, Plaintiffs' removals from "federal service" and the termination letters' statements connecting Plaintiffs to alleged "weaponization" of government have indefinitely foreclosed Plaintiffs from such positions.

121. Since their firings, both Plaintiffs have struggled to obtain new employment.

122. At the time of his firing from the FBI, John Doe 1 was the sole breadwinner for his household. His family relied on him for income, health insurance, and the household costs of a family with two young children.

123. John Doe 1 understands the language of his termination letter to bar him from employment in the Executive Branch, and that his termination from the FBI is a hindrance to finding a new federal law enforcement position. Indeed, after his termination, John Doe 1 sent his resume to the Securities and Exchange Commission ("SEC") Office of the Inspector General, and never heard back. He therefore has been focused on attempting to secure a job outside government.

124. Soon after his firing, John Doe 1 had a good lead on a position at an independent regulatory organization. After an initial interview with an acquaintance supervising the investigations team there, the acquaintance communicated in substance that, assuming the Chief Executive Officer ("CEO") signed on, the job was his. John Doe 1 interviewed with the CEO, and initially, he felt the interview was going well. However, at the end of the interview, the CEO asked a series of pointed questions about John Doe 1's firing, including about the contents of the separation letter he received and whether members of the media or Senator Grassley's committee had contacted him. The CEO concluded the interview by expressing his sympathies for John Doe

34

1's plight but adding that the organization would have to carefully consider the optics of hiring John Doe 1, given the circumstances.

125.    Two weeks passed, and John Doe 1's acquaintance at the independent regulatory organization called to relay apologetically that John Doe 1 was not getting the job. She explained that "given the current environment and scrutiny," the organization "couldn't get comfortable bringing [John Doe 1] in right now," citing public reporting about John Doe 1's firing, which could be found via an internet search.

126.    On another occasion, John Doe 1, with the assistance of a former federal prosecutor and colleague, sought an independent consulting opportunity in his field. The intermediary relayed the company's ultimate response, that "[the company] compete[s] for government work, so it will be hard for someone like [John Doe 1] to get in here or with competitors." That employment lead evaporated. Over four months after his removal as an FBI Special Agent, John Doe 1 remains unemployed, relying on intermittent consulting work to try to support his family.

127.    Since his firing on November 4, 2025, John Doe 2 likewise has yet to find new employment. John Doe 2 deeply desires to continue in public service, but he understands the language of his termination letter to bar him from any job in the Executive Branch.

128.    John Doe 2 was interested in applying to work for Congress as a Capitol Police Investigator, which he hoped might be possible because the position would be outside the Executive Branch, and in November 2025, he spoke to a Capitol Police contact. However, when John Doe 2 followed up in early January 2026, his contact said he had learned from HR that terminated FBI agents cannot join the Capitol Police as investigators. Thus, despite his commitment to public service, John Doe 2 has been applying for jobs in the private sector. He has not yet received any offers.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE FIRST AMENDMENT
### (RETALIATION FOR PERCEIVED POLITICAL AFFILIATION)
### (Against All Defendants)

129.    Paragraphs 1 through 128 are incorporated and realleged as if fully set forth herein.

130.    The First Amendment to the U.S. Constitution guarantees all citizens "the freedom of speech" to include free expression and association. It forbids government officials to fire government employees simply for not being supportive of a political candidate, party, or agenda. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64, 69 (1990) (citing *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980)).

131.    These protections apply even when the government incorrectly perceives a citizen's political affiliation. *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 268 (2016).

132.    Defendants' actions, as set forth above, constitute improper acts of political retribution, in violation of the First Amendment to the United States Constitution. Based merely on Plaintiffs' involvement in an investigation implicating then-former President Trump initiated during the Biden Administration, Defendant Kash Patel, Defendant Pamela J. Bondi, and elected officials with whom they acted in concert perceived Plaintiffs to be politically disloyal to President Trump and therefore targeted Plaintiffs for removal. Plaintiffs' terminations were unlawful because they were based on a perception that Plaintiffs were not political supporters of President Trump.

133.    Political support for President Trump is not a legal or appropriate requirement for the effective performance of Plaintiffs' respective roles within the FBI. Accordingly, perceived lack of political support for President Trump is an impermissible basis for termination of Plaintiffs' FBI employment.

134.   Defendants' unconstitutional actions harmed Plaintiffs by infringing upon the exercise of their constitutional rights, damaging their reputations, depriving them of their rightful status as FBI employees in good standing, eliminating their primary source of income, depriving them of health insurance, and reducing their retirement benefits.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE FIFTH AMENDMENT**
**(PROCEDURAL DUE PROCESS – PROPERTY INTEREST)**
**(Against All Defendants)**

135.   Paragraphs 1 through 128 are incorporated and realleged as if fully set forth herein.

136.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."

137.   Based on the FBI's own policies and practices, including but not limited to the *OPR Policy Guide*, the *FBI's Offense Codes and Penalty Guidelines*, the *Performance and Development Program Policy Guide*, and quarterly OPR emails, Plaintiffs had a legitimate expectation that they would be subject to removal from their positions as non-probationary Special Agents only for misconduct or other job-related reasons. Indeed, just weeks before Plaintiffs' firings, Defendant Patel testified under oath that "[t]he only way people get terminated at the FBI is if they fail to meet the muster of the job and their duties." For each Plaintiff, the rules and understandings fostered by the FBI justified a "legitimate claim of entitlement to continued employment absent 'sufficient cause.'" *Perry v. Sindermann*, 408 U.S. 593, 602-03 (1972). Each Plaintiff thus had a protected property interest in his continued employment as an FBI Special Agent.

138.   Defendants fired Plaintiffs without prior notice or opportunity for a hearing. Defendants thereby deprived Plaintiffs of their property interests by terminating Plaintiffs' respective employment with the FBI without due process of law and in violation of Fifth

37

Amendment protections.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE FIFTH AMENDMENT
## (PROCEDURAL DUE PROCESS – LIBERTY INTEREST – STIGMA-PLUS)
## (Against All Defendants)

139.    Paragraphs 1 through 128 are incorporated and realleged as if fully set forth herein.

140.    The Fifth Amendment's protection against deprivation of liberty without due process of law protects against adverse employment action by government officials that imposes a stigma or other disability that forecloses the government employee's freedom to take advantage of other employment opportunities.

141.    In the course of unlawfully terminating Plaintiffs' respective employment without due process of law, Defendants prevented each Plaintiff from participating in his chosen profession or line of work by imposing a stigma that foreclosed each Plaintiff's freedom to take advantage of other employment opportunities in the Executive Branch and/or federal law enforcement. Specifically, by purporting to remove Plaintiffs from "federal service," by connecting them to the alleged "weaponization" of government, and by falsely signaling that Plaintiffs lacked integrity in the performance of their duties, Defendants intended to and did stigmatize Plaintiffs and impart a "status change" upon them that has impaired their liberty interests, without affording them the due process to which they are entitled.

142.    The lack of any due process afforded to Plaintiffs deprived them of the ability to challenge the accuracy of any evidence that allegedly served as the basis for their removal, if any, and to protect their freedom to take advantage of other employment opportunities in the Executive Branch and/or federal law enforcement. As a result of Defendants' actions, Plaintiffs have each suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present and future financial opportunities.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE FIFTH AMENDMENT**
**(PROCEDURAL DUE PROCESS – LIBERTY INTEREST – REPUTATION-PLUS)**
**(John Doe 1; Against All Defendants)**

143.    Paragraphs 1 through 128 are incorporated and realleged as if fully set forth herein.

144.    The Fifth Amendment's protection against deprivation of liberty without due process of law protects against reputational harm caused by government officials when that harm is accompanied by other harm.

145.    In the course of unlawfully terminating Plaintiffs' respective employment without due process of law, Defendants—primarily through Patel—publicly connected the termination actions to allegations that the terminated Arctic Frost agents had been "weaponizing" the FBI. This false and defamatory public smear impugned the professional reputation of all publicly identified fired Arctic Frost agents, including John Doe 1, suggesting they were something other than faithful and apolitical law enforcement personnel. This public reputational smear has caused not only the loss of John Doe 1's government employment but further harmed his present and future employment prospects. In the months following Plaintiffs' unlawful terminations, Patel has continued to engage in such defamatory speech, publicly describing the fired Arctic Frost agents as "corrupt" and compounding the reputational harm suffered by John Doe 1.

146.    The lack of any due process accorded to John Doe 1 deprived him of the ability to challenge the accuracy of any evidence that allegedly served as the basis for his removal, if any, as well as to protect his reputation. As a result, John Doe 1 has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present and future financial opportunities.

39

## VI.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court award them the following relief:

(1) A declaration that Defendants' actions violated Plaintiffs' First Amendment rights and an order of appropriate relief;

(2) A declaration that Defendants' actions violated Plaintiffs' Fifth Amendment due process rights and an order of appropriate relief, to include, but not be limited to, a name-clearing hearing;

(3) An order requiring Defendants to immediately reinstate Plaintiffs and enjoin Defendants from taking any further adverse personnel action against each of them without providing appropriate procedural due process as required by the Fifth Amendment;

(4) An order requiring Defendants to provide administrative relief as appropriate, including but not limited to rescission of Plaintiffs' removals from the FBI and corresponding amendment of the FBI's records and Plaintiffs' Official Personnel Folders;

(5) An award of the costs of this action and reasonable attorney fees under the Equal Access to Justice Act or any other applicable law; and

(6) Such other relief as the Court may deem just and proper.

Date:    March 19, 2026

Respectfully Submitted,


/s/ *Elizabeth Tulis*
Elizabeth Tulis (DDC No. NY0703/D.C. Bar No. 90042452)
Brittany Hanke (*pro hac vice* forthcoming)
PERRY LAW
445 Park Avenue, 7th Floor
New York, NY 10022
Tel: (212) 213-3070
Fax: (646) 849-9609
etulis@danyaperrylaw.com
bhanke@danyaperrylaw.com

/s/ *Margaret Donovan*
Margaret Donovan (DDC No. CT0026)
KOSKOFF KOSKOFF & BIEDER PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com


*Attorneys for Plaintiffs*