**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE 1 and<br>JOHN DOE 2,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>KASHYAP P. PATEL,<br>in his official capacity as Director of the<br>Federal Bureau of Investigation; FEDERAL<br>BUREAU OF INVESTIGATION; TODD<br>BLANCHE, in his official capacity as Acting<br>Attorney General of the United States; and<br>U.S. DEPARTMENT OF JUSTICE,<br><br>   *Defendants*. | No. 1:26-cv-00959-JMC |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE**
**COMPLAINT FOR FAILURE TO STATE A CLAIM FOR RELIEF**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 3

    I.    FBI Policies and Practices ................................................................................ 3

    II.   Plaintiffs' FBI Background and Experience .................................................... 5

    III.  Plaintiffs' Assignment to Arctic Frost ........................................................... 6

    IV.  Defendants' Campaign To Purge the FBI of Personnel Perceived as Politically Disloyal to President Trump, Including Arctic Frost Agents ............................................. 8

    V.   Plaintiffs' Firings ........................................................................................... 10

        A.   John Doe 1's Firing ............................................................................ 10

        B.   John Doe 2's Firing ............................................................................ 11

    VI.  President Trump's and Director Patel's Continued Disparagement of Plaintiffs and Plaintiffs' Struggle to Find New Employment ................................................ 12

LEGAL STANDARD ....................................................................................................... 13

ARGUMENT ..................................................................................................................... 14

    I.    The Complaint States a First Amendment Claim for Retaliation for Perceived Political Affiliation. ............................................................................................... 14

        A.   The Complaint Plausibly Alleges that Plaintiffs Were Fired Because of Perceived Lack of Political Support for President Trump. ....................................................... 15

        B.   Defendants' Arguments That Plaintiffs Fail to Meet Their First Amendment Pleading Burden Are Meritless. ................................................................................ 19

    II.   The Complaint States a Procedural Due Process-Property Interest Claim. .................... 22

        A.   Plaintiffs Claim a Protected Property Interest Arising from Rules and Understandings Fostered by the FBI, Not Based on a Statute or Regulation that Places Substantive Limits on Official Discretion................................................... 22

        B.   Based on the FBI's Policies and Practices, Plaintiffs Reasonably Understood They Would Be Terminated Only for a Job-Related Reason. ......................................... 26

        C.   The FBI's Summary Dismissal Policy Does Not Defeat Plaintiffs' Property Interest................................................................................................................. 27

            1.   The FBI's Summary Dismissal Policy Applies Solely to Misconduct and Does Not Expand the Permissible Grounds for Termination of Non-Probationary Special Agents........................................................... 27

2.     The Summary Dismissal Policy's Removal of Certain Procedural Protections Does Not Affect the Existence of a Property Interest. ................................... 29

3.     Defendants' Argument that the Summary Dismissal Policy Does Not Create a Property Interest Attacks a Strawman ............................................................. 31

III.    The Complaint States a Procedural Due Process-Liberty Interest Claim on a "Stigma-Plus" Theory. ...................................................................................................... 33

IV.    The Complaint States a Procedural Due Process-Liberty Interest Claim on a "Reputation-Plus" Theory on Behalf of John Doe 1. ...................................................... 36

CONCLUSION .................................................................................................................... 42

**TABLE OF AUTHORITIES**

**Cases**

*Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir. 2007) .................................................. 14

*Acevedo-Diaz v. Aponte*, 1 F.3d 62 (1st Cir. 1993) ......................................................... 18

*Alexis v. Dist. of Columbia*, 77 F. Supp. 2d 35 (D.D.C. 1999) .................................................. 40

*Am. Council of Learned Societies v. Nat'l Endowment for the Hums.*, No. 25-CV-3657 (CM), 2026 WL 1256545 (S.D.N.Y. May 7, 2026) ........................................................... 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................... 13

*\*Ashton v. Civiletti*, 613 F.2d 923 (D.C. Cir. 1979) ...................................................... 23, 24, 26, 32

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) .............................. 13, 35, 40

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) ...................................................... 23, 33

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................... 13

*Berger v. Astorino*, No. 14-cv-3618 (VB), 2015 WL 873318 (S.D.N.Y. Feb. 23, 2015) .............. 15

*Bloch v. Powell*, 348 F.3d 1060, 1069 (D.C. Cir. 2003) ................................................... 24

*Bowie v. Maddox*, 642 F.3d 1122 (D.C. Cir. 2011) ......................................................... 15

*\*Branti v. Finkel*, 445 U.S. 507 (1980) ................................................................. 14, 15

*Butters v. Nat'l Acad. of Scis.*, 176 F.4th 43 (D.C. Cir. 2026) ...................................................... 13

*Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532 (1985) ...................................................... 22, 30

*Crooks v. Mabus*, 845 F.3d 412 (D.C. Cir. 2016) ................................................................. 25

*Daney v. Dep't of the Interior*, 25 F. App'x 994 (Fed. Cir. 2001) .................................................. 25

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ......................................................... 21

*DL v. Dist. of Columbia*, 302 F.R.D. 1 (D.D.C. 2013) ................................................... 39

*\*Doe v. DOJ*, 753 F.2d 1092 (D.C. Cir. 1985) .............................................................. 37, 41, 42

*Doe v. U.S. Postal Serv.*, 317 F.3d 339 (D.C. Cir. 2003) ......................................................... 21

*Elrod v. Burns*, 427 U.S. 347 (1976)..................................................................... 14

*Esparraguera v. Dep't of the Army*, 101 F.4th 28 (D.C. Cir. 2024) ........................................ 23, 30

*Evans v. Sebelius*, 716 F.3d 617 (D.C. Cir. 2013)..................................................... 18

*Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013) ...................................... 38, 40

*Flaningam v. Cnty. of Winnebago*, 243 F. App'x 171 (7th Cir. 2007) ........................................ 25

*Garrow v. Gramm*, 856 F.2d 203 (D.C. Cir. 1988) ........................................................ 25

*Harrison v. Bowen*, 815 F.2d 1505 (D.C. Cir. 1987) ...................................................... 36

*Heffernan v. City of Paterson*, 578 U.S. 266 (2016)................................................... 14

*Herron v. Fannie Mae*, 861 F.3d 160 (D.C. Cir. 2017)................................................. 36

*Jefferson v. Harris*, 170 F. Supp. 3d 194 (D.D.C. 2016) .......................................... 33, 36

*Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994)....................................... 33, 34, 35, 36

*Langeman v. Garland*, 88 F.4th 289 (D.C. Cir. 2023) ............................................. 31, 32

*Mazaleski v. Treusdell*, 562 F.2d 701 (D.C. Cir. 1977) ...................................................... 36

*McCormick v. Dist. of Columbia*, 752 F.3d 980 (D.C. Cir. 2014).......................................... 35, 37

*McGinnis v. Dist. of Columbia*, 65 F. Supp. 3d 203 (D.D.C. 2014) ............................................ 35

*Mori v. Dep't of the Navy*, 917 F. Supp. 2d 60 (D.D.C. 2013)....................................... 21

*Mosrie v. Barry*, 718 F.2d 1151 (D.C. Cir. 1983) ........................................................ 37

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) ................................................. 22

*Neiman-Marcus v. Lait*, 13 F.R.D. 311 (S.D.N.Y. 1952) ................................................. 40

*Nielsen v. Preap*, 586 U.S. 392 (2019)...................................................................... 29

*O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998)............................................... 37, 39

*O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996) ........................................... 14

*Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1 (1st Cir. 2011)........................................ 16, 20

iv

*Perry v. Sindermann*, 408 U.S. 593 (1972)................................................................. 23, 25, 27, 32

*Peter B. v. CIA*, 620 F. Supp. 2d 58 (D.D.C. 2009) ....................................................... 39

*Pharm. Rsch. & Mfrs. of Am. v. HHS*, 43 F. Supp. 3d 28 (D.D.C. 2014) ............................... 18, 34

*Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 998 F.3d 999
    (D.C. Cir. 2021) .............................................................................................. 38

*Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49 (1st Cir. 2013)................................. 16, 17, 21

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ...................................................................... 38

*Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990)..................................................... 14

*Simmons v. Rubio*, 170 F.4th 905 (D.C. Cir. 2026)......................................................... 14

*Sissel v. HHS*, 760 F.3d 1 (D.C. Cir. 2014) ................................................................. 40, 42

*Sobin v. Dist. of Columbia*, No. 19-CV-02580 (ABJ), 2020 WL 4732098
    (D.D.C. Aug. 14, 2020)..................................................................................... 22

*Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203 (D.C. Cir. 2020) ...................................... 36

*Tarpeh-Doe v. United States*, 904 F.2d 719 (D.C. Cir. 1990) .......................................... 31

*Vezzetti v. Pellegrini*, 22 F.3d 483 (2d Cir. 1994)......................................................... 15

*Wilburn v. Robinson*, 480 F.3d 1140 (D.C. Cir. 2007) .................................................. 15

*Work v. United States ex rel. McAlester-Edwards Co.*, 262 U.S. 200 (1923) ....................... 29

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 13, 15

**Executive Orders**

Executive Order No. 14147 (Jan. 20, 2025) ................................................................. 34, 35

**Other Authorities**

*Restatement of Torts* § 564 cmt. c (1938) .................................................................. 38

**INTRODUCTION**

Plaintiffs are former Special Agents of the Federal Bureau of Investigation ("FBI") who were summarily fired in fall 2025 as part of a purge of personnel who had been assigned to Arctic Frost, an investigation into a suspected conspiracy to overturn the results of the 2020 Presidential election. As the complaint alleges in detail, Plaintiffs had exemplary accomplishments and pristine disciplinary records. In Arctic Frost, as in all other investigations to which they were assigned, Plaintiffs fully adhered to FBI and Department of Justice ("DOJ") policies and procedures and executed their law enforcement duties without bias or political motive. No investigation or inquiry preceded their firings, and there was no evidence that Plaintiffs had engaged in misconduct or improperly performed their duties. Rather, Plaintiffs were terminated based solely on their assignment to Arctic Frost, because of Defendants' perception that agents assigned to that investigation were political non-supporters of President Trump. Indeed, FBI Director Kash Patel, then-Attorney General Pam Bondi, and President Trump himself all made statements supporting the reasonable inference that Plaintiffs' firings were motivated by a perception that Plaintiffs were politically disloyal to Trump. Plaintiffs' firings constituted retaliation for perceived political affiliation in violation of the First Amendment.

In addition, Plaintiffs' summary firings—which included no notice or opportunity to respond—violated Plaintiffs' due process rights under the Fifth Amendment. As alleged in detail in the complaint, based on the FBI's own policies and practices, each Plaintiff reasonably understood that as a non-probationary Special Agent, he would only be fired for a job-related reason: unacceptable performance, abuse of leave, inability to perform the essential duties and responsibilities of the position, national security concerns, or misconduct. Thus, each Plaintiff had a protected property interest in his FBI employment and was deprived of that protected property interest without due process of law.

Plaintiffs' firings also deprived them of a protected liberty interest. As the complaint details, Plaintiffs' termination letters classified Plaintiffs as participants in the purported "weaponization" of government and removed Plaintiffs from "federal service." Plaintiffs' firings thereby did not simply deprive Plaintiffs of their current FBI positions but rather effected a status change that foreclosed their freedom to take advantage of employment opportunities in the Executive Branch and federal law enforcement. In John Doe 1's case, Defendants also infringed on his protected liberty interest by making public defamatory statements about John Doe 1 (whose identity had been publicly revealed via the release of investigative records produced by Defendants) and other Arctic Frost agents in connection with their firings.

In the face of Plaintiffs' compelling, well-pleaded allegations, Defendants' spartan motion to dismiss proceeds largely by evasion. Defendants do not take the facts as pleaded, and they repeatedly fail to cite or apply the relevant law.

With respect to Plaintiffs' First Amendment claim, Defendants do not dispute that the complaint plausibly alleges that Plaintiffs were fired based solely on their assignment to Arctic Frost. Defendants argue that Plaintiffs nonetheless fail to adequately plead a political motive, but they fail to contend with the complaint's detailed allegations of political animus, including statements by then-Attorney General Pam Bondi and Defendant Kash Patel that lay bare their belief that assignment to Arctic Frost equaled political disloyalty to Trump. Further, Defendants' challenge to Plaintiffs' First Amendment claim is virtually devoid of legal citations and entirely ignores relevant First Amendment cases.

Regarding Plaintiffs' Fifth Amendment claims, Defendants do not dispute that Plaintiffs were terminated without any investigation, notice, or opportunity to be heard. Defendants' argument that Plaintiffs fail to allege a protected property interest in their FBI employment again

2

simply ignores most of the complaint's factual allegations. Further, Defendants misconstrue the complaint's allegations regarding the source of Plaintiffs' property interest, and they fail to apply or even cite *Perry v. Sindermann* and *Ashton v. Civiletti*—cases that provide the legal framework for Plaintiffs' property interest claim—instead invoking a separate, inapplicable line of authority.

Finally, in response to Plaintiffs' liberty interest claims, Defendants ask the Court to ignore the plain language of Plaintiffs' termination letters and other facts alleged in the complaint. Those facts, and reasonable inferences drawn from them, plausibly allege that Plaintiffs' removal from "federal service" and categorization as participants in "weaponization" excluded them from a broad range of federal government employment. That is sufficient to state a "stigma-plus" claim. Defendants similarly disregard the complaint's well-pleaded allegations that Defendants' defamation of John Doe 1 in connection with his firing harmed John Doe 1's reputation and future employment prospects—allegations that state a "reputation-plus" claim.

Taking the well-pleaded allegations of the complaint as true and viewing them in the light most favorable to Plaintiffs, as required at the pleading stage, the Court should deny Defendants' motion to dismiss.

## FACTUAL BACKGROUND

### I. FBI Policies and Practices

The FBI is widely considered to be the country's premier law-enforcement agency, and its standards for admission and retention are high. Compl. ¶ 27. Accordingly, Special Agents undergo a rigorous selection process and extensive training, and the FBI continues to invest in Special Agents throughout their careers. *Id.* ¶¶ 27–31, 33–35. All new Special Agents must complete a probationary period—generally two years—during which a rating official must confirm that a new Special Agent possesses "the qualities and abilities necessary for successful service." *Id.* ¶ 32.

The work of a Special Agent can be grueling and dangerous, and the hours unforgiving. *Id.*

3

¶¶ 36–38. But the job also promises significant benefits, and Special Agents often embark on long careers within the Bureau. *Id.* ¶ 38. The FBI's recruitment website advertises that a career as a Special Agent is a way to "SECURE YOUR FUTURE," and that if a person becomes a Special Agent, he or she will "be able to enjoy . . . a secure retirement with pension." *Id.*

Consistent with this promise of job security, FBI policies and practices communicate that non-probationary Special Agents may be removed or terminated only for job-related reasons: unacceptable performance, abuse of leave, national security concerns, inability to perform the essential duties and responsibilities of their position, or misconduct. *Id.* ¶ 39. These bases for removal, and associated standards and procedures, are set forth in written FBI policies, including the *Performance and Development Program Policy Guide* (unacceptable performance and abuse of leave); the *Personnel Security Clearance and Access Policy Guide* (national security concerns); the *Fitness-for-Duty Policy Guide* (inability to perform essential duties and responsibilities); and the *Office of Professional Responsibility Policy Guide* ("*OPR Policy Guide*") and *Offense Codes and Penalty Guidelines* (misconduct). *Id.* ¶¶ 40–57.

With respect to misconduct, FBI policy generally provides that a non-probationary employee may appeal a removal or other adverse disciplinary penalty to the FBI's Disciplinary Review Board. *Id.* ¶ 50. In exceptional circumstances, FBI policy provides that the potential disciplinary penalties for more severe misconduct include "summary dismissal," which is a termination that even non-probationary employees are not permitted to appeal within the FBI. *Id.* As described in the FBI's policy documents, summary dismissal is solely a disciplinary penalty—FBI policy does not authorize summary dismissal outside the context of employee misconduct that has been the subject of an internal investigation. *Id.* ¶¶ 53–55.

Guidance from supervisors, quarterly OPR emails detailing examples of misconduct and

4

corresponding disciplinary penalties, and other FBI communications have reinforced the FBI's message to non-probationary Special Agents that they may consider their employment with the FBI secure absent misconduct, extreme deficiencies in job performance, or the handful of other grounds for termination set forth in the policies referenced above. *Id.* ¶ 60. As recently as September 2025, FBI Director Patel himself testified that "[t]he only way people get terminated at the FBI is if they fail to meet the muster of the job and their duties." *Id.* ¶ 82.

## II.    Plaintiffs' FBI Background and Experience

At the time of his firing on October 31, 2025, John Doe 1 had served with the FBI for over 21 years and was assigned to the Washington Field Office ("WFO"), working out of its Northern Virginia satellite office. *Id.* ¶ 10. As a Special Agent, John Doe 1 specialized in investigations of white-collar crime. *Id.* ¶ 11. He was a member of CR-13, a securities fraud squad, and as of October 31, 2025, was the primary or sole agent on multiple fraud and white-collar investigations. *Id.* ¶ 14. As a non-probationary Special Agent, John Doe 1's performance ratings were consistently "Exemplary," and he received multiple awards for outstanding performance. *Id.* ¶ 15. The fruits of John Doe 1's investigative work were featured several times in the DOJ Fraud Section's comprehensive review of enforcement trends and significant prosecutions. *Id.* ¶ 16. As recently as 2025, DOJ highlighted one of John Doe 1's cases in DOJ's end-of-year report, and Director Patel highlighted the case in a weekly email summary disseminated to all FBI employees. *Id.* In his FBI career, John Doe 1 was never subject to any disciplinary action or even a complaint. *Id.* ¶ 15.

At the time of his firing on November 4, 2025, John Doe 2 had served with the FBI for nearly eight years. *Id.* ¶ 17. He was assigned to the WFO, where he was a member of CR-10, working on investigations of public corruption involving local D.C. officials and fraud against the government. *Id.* ¶¶ 17–18. Prior to joining CR-10 in November 2022, John Doe 2 had worked on squads focused on espionage and media leaks and on counterintelligence. *Id.* ¶ 18.

By November 2025, John Doe 2 had become a senior CR-10 case agent and was one of the main agents on a sensitive fraud against the government investigation that the Trump DOJ considered a high priority. *Id.* ¶ 19. In addition, at the time of his firing, John Doe 2 was a senior member of the WFO Crisis Negotiation Team and had participated in several successful resolutions of incidents involving barricaded subjects and victims. *Id.* ¶ 20. John Doe 2 was also training for selection to become a WFO Special Weapons and Tactics ("SWAT") operator. *Id.* As a Special Agent, John Doe 2 received multiple individual cash awards and a citation for special achievement in recognition of the quality of his work, including his professionalism, leadership, and dedication in connection with sensitive investigations. *Id.* ¶ 21. Like John Doe 1, John Doe 2 was never subject to any disciplinary action or even a complaint, and as a non-probationary Special Agent, he consistently received "Exemplary" ratings in his performance reviews. *Id.* ¶ 22.

Based on the FBI's policies and practices, each Plaintiff reasonably understood that he would not be removed from the FBI without cause, and each Plaintiff relied on that understanding in continuing to serve with the FBI and in making other family, career, and financial decisions. *Id.* ¶ 61.

### III.    Plaintiffs' Assignment to Arctic Frost

In the FBI, Special Agents are expected to take on investigations as assigned. *Id.* ¶ 62. From approximately November 2022 to June 2023, Plaintiffs were assigned by their supervisors to work on "Arctic Frost," an investigation into a suspected conspiracy to illegally overturn the results of the 2020 Presidential election via a fake electors scheme. *Id.* ¶¶ 63–68. The investigation was opened in the early months of 2022 and examined dozens of subjects, one of whom was then-former President Trump. *Id.* ¶ 63. After the appointment of Special Counsel Jack Smith in November 2022, oversight of the investigation was transferred to the Special Counsel's Office. *Id.* The investigation ultimately led to a grand jury indictment of then-former President Trump.

*Id.* After Trump won the Presidential election in November 2024, Smith moved to dismiss the indictment on behalf of DOJ, citing DOJ policy not to prosecute sitting Presidents, and the case and investigation were closed. *Id.*

John Doe 1's involvement in Arctic Frost was limited. *Id.* ¶¶ 64–66. In October 2022, John Doe 1's supervisor informed him that the investigation into the former President and his associates required agents with financial investigative experience and that the supervisor had identified John Doe 1 for the temporary assignment. *Id.* ¶ 64. John Doe 1 began working on Arctic Frost in November 2022. *Id.* John Doe 1's contributions to Arctic Frost were largely administrative and ministerial. *Id.* ¶ 65. Indeed, his involvement was minimal enough that he continued to work on active, unrelated investigations that preceded his temporary assignment, only driving to Washington, D.C. every few weeks in connection with Arctic Frost. *Id.* ¶ 66. By June 2023, John Doe 1 had largely transitioned off the case. *Id.*

John Doe 2's involvement with Arctic Frost was similarly a detour from his regular duties. *Id.* ¶ 67. In or around November 2022, soon after John Doe 2 transferred to CR-10, the local public corruption squad, John Doe 2's supervisor informed him that a sensitive investigation handled by CR-15, the national public corruption squad, needed another experienced agent. *Id.* John Doe 2 thus began a temporary duty assignment working on Arctic Frost. *Id.* John Doe 2 was never one of the primary or lead agents on Arctic Frost, but rather played a supporting role, handling mostly administrative tasks, such as recording interviews at the request of other agents. *Id.* ¶ 68. In approximately June 2023, John Doe 2 ended his temporary duty assignment and returned to CR-10 and public corruption investigations involving local D.C. elections and officials. *Id.*

Throughout their brief involvement with Arctic Frost, John Doe 1 and John Doe 2 fully adhered to FBI and DOJ policies and procedures, including applicable statutory and regulatory

requirements, and executed their law enforcement duties without bias or political motive. *Id.* ¶ 69.

**IV.    Defendants' Campaign To Purge the FBI of Personnel Perceived as Politically Disloyal to President Trump, Including Arctic Frost Agents**

During his third presidential campaign, President Trump stated his belief that the FBI was filled with employees who were politically opposed to him and expressed an intention to rid the Bureau of such individuals if he were to be re-elected. *Id.* ¶ 70. For example, in an interview he posted on Truth Social on May 15, 2023, Trump was asked what he would do to "fix the FBI." *Id.* ¶ 71. He responded that when he began his first term, the FBI was "loaded up with RINOs and with Democrats" and that "we really did do a tremendous job at getting tremendous numbers out," but he also asserted that "this is the deep state" and that his administration would make "very big changes" to rid the Bureau of such individuals if he were to be re-elected. *Id.* Trump's statements aligned with assertions made by Kash Patel in his 2023 book, *Government Gangsters*, which posited a "Deep State" composed of groups politically aligned against Trump and described the FBI as "[o]ne of the most cunning and powerful arms of the Deep State." *Id.* ¶ 72.

Consistent with these statements, soon after President Trump took office for the second time, then-Attorney General Pam Bondi announced a plan to purge the FBI of personnel deemed to be political non-supporters of President Trump—including personnel who worked on matters under the oversight of Special Counsel Jack Smith. *Id.* ¶ 80. During an interview on March 3, 2025, Bondi bragged, with respect to DOJ prosecutors who had already been fired: "[W]e got rid of the Jack Smith team. Gone. Those people are gone." *Id.* She then revealed that such firings would continue, proclaiming that "[t]here are a lot of people in the FBI and also in the Department of Justice who despise Donald Trump, despise us, don't want to be here," and "right now, we're going to root them out; we will find them, and they will no longer be employed." *Id.*

Meanwhile, Senators Chuck Grassley and Ron Johnson of the Senate Judiciary Committee

8

were waging a campaign against personnel who had been assigned to Arctic Frost. *Id.* ¶¶ 76–79. In January, March, and April 2025, Senators Grassley and Johnson publicly released Arctic Frost investigatory records provided by an alleged whistleblower. *Id.* ¶¶ 76–78. In conjunction with these releases, Grassley and Johnson issued public statements disparaging Arctic Frost personnel, *id.* ¶¶ 76, 79, and they demanded that Patel and Bondi produce "all DOJ and FBI records" related to the investigation, *id.* ¶ 78.

On September 16, 2025, during the opening of a Senate Judiciary Committee FBI Oversight hearing, Senator Grassley announced the release of several more pages of whistleblower-provided Arctic Frost records. *Id.* ¶ 81. During that same hearing, alluding to commitments he had made at his confirmation hearing, Patel testified: "I've said it before and I've said again, your case assignment . . . does not dictate your career or your termination." *Id.* ¶¶ 74–75, 82. Notwithstanding that statement, Patel by that time had already fired one of the lead Arctic Frost agents, as well as a Special Agent who had been incorrectly identified as assigned to a different investigation involving Trump. *Id.* ¶ 82.

Weeks later, news organizations reported that Patel had fired two more agents associated with Arctic Frost. *Id.* ¶ 83. On October 7, 2025, Patel confirmed those firings. *Id.* He remarked that the firings were based on the agents' purported "weaponization" and their membership in the so-called "Deep State," and alluded to DOJ's cooperation with Grassley's Judiciary Committee. *Id.* On October 10, 2025, the Senate Judiciary Committee issued a press release touting Grassley's release of Arctic Frost records as the impetus for Patel's firing of FBI agents earlier that week. *Id.* ¶ 84. In the weeks that followed, in apparent coordination, Senator Grassley, Director Patel, and President Trump continued to target and disparage FBI personnel involved with Arctic Frost. *Id.* ¶¶ 85–89.

9

On October 23, 2025, DOJ provided several hundred pages of Arctic Frost records to Congress, with names of career DOJ and FBI personnel unredacted. *Id.* ¶ 87. In a post on X, Patel took credit for the release. *Id.* The next day, October 24, 2025, President Trump posted on Truth Social: "Just in: Documents show conclusively that Christopher Wray, Deranged Jack Smith, Merrick Garland, Lisa Monaco, and other crooked lowlifes from the failed Biden Administration, signed off on Operation Arctic Frost. They spied on Senators and Congressmen/women, and even taped their calls. They cheated and rigged the 2020 Presidential Election. These Radical Left Lunatics should be prosecuted for their illegal and highly unethical behavior!" *Id.* ¶ 88.

On October 29, 2025, Senator Grassley's committee publicly released a trove of Arctic Frost investigation documents provided by DOJ, including documents in which the names of John Doe 1 and other career DOJ and FBI personnel appeared, unredacted. *Id.* ¶ 89.

## V.    Plaintiffs' Firings

Days after Senator Grassley's October 29 release of DOJ-provided Arctic Frost documents, John Doe 1 and John Doe 2 were summarily fired. *Id.* ¶¶ 90–96, 102–110.

### A.  John Doe 1's Firing

On October 31, 2025, John Doe 1 was preparing to go trick-or-treating with his two young children when he was ordered by Paul Reid Davis, the WFO Special Agent in Charge ("SAC"), to immediately report to the main WFO site in Washington, D.C. *Id.* ¶ 90. John Doe 1 asked something to the effect of, "This is it? Nothing can be done?," and Davis responded, "It is what it is." *Id.* At the WFO, Assistant Director in Charge ("ADIC") Darren Cox was holding a termination letter, which he read aloud in part before handing it to John Doe 1 and telling him he had been "removed from federal service." *Id.* ¶ 94. Cox said he was sorry to have to do this. *Id.* John Doe 1 asked what if any allegations of misconduct there were against him and what policies or procedures the Bureau followed in reaching the determination to remove him. *Id.* Cox said, "I don't know

10

anything beyond what's in the letter." *Id.*

John Doe 1's termination letter was signed by Patel and stated that John Doe 1 was "being summarily dismissed" from his position at the FBI and "removed from federal service . . . effective immediately." *Id.* ¶¶ 95–96 & Ex. A. The letter alleged that John Doe 1 had "exercised poor judgment and a lack of impartiality in carrying out duties leading to the political weaponization of the government," but identified no specific examples of deficient performance or misconduct. *Id.* ¶ 95 & Ex. A. The letter stated that John Doe 1's FBI employment was terminated "[p]ursuant to Article II of the United States Constitution and the laws of the United States." *Id.*

John Doe 1 subsequently spoke to an FBI Human Resources ("HR") employee about his termination. *Id.* ¶ 98. In a conversation on November 25, 2025, the HR employee told John Doe 1 that his firing would be termed an "Article II separation." *Id.* When John Doe 1 inquired whether his firing concerned misconduct or was for cause, the staff member replied, "No, there are other classifications that would designate that, this one doesn't designate that." *Id.* John Doe 1's Standard Form-50 ("SF-50") Notification of Personnel Action regarding his removal was consistent with the HR employee's description. The SF-50 did not indicate that John Doe 1's removal was based on either misconduct or poor performance: its sole listed "reason" for John Doe 1's removal was "Article 2 USC." *Id.* ¶ 99 & Ex. B.

### B. John Doe 2's Firing

On the afternoon of November 3, 2025, John Doe 2 was ordered by SAC Davis to report to the ADIC's office. *Id.* ¶ 102. On his way to the office, John Doe 2 called FBI and DOJ colleagues and informed them he was about to be terminated. *Id.* ¶ 103. The Assistant U.S. Attorney whom John Doe 2 called said he would "talk to some people." *Id.*

Outside the ADIC's office, SAC Davis told John Doe 2 "you are going to be terminated"

but that ADIC Cox was on a call. *Id.* ¶ 104. John Doe 2 waited outside the office for close to an hour. *Id.* Then, Davis came out and told John Doe 2 that there would "be no firings today" and that someone "had called on [his] behalf." *Id.* ¶ 105.

The next morning, November 4, 2025, John Doe 2 had just finished his workout at the FBI Headquarters gym when he received a call from Davis, who told him to report again to the ADIC's office. *Id.* ¶ 106. This time, ADIC Cox told John Doe 2 that he had received a letter stating that John Doe 2 was being summarily dismissed. *Id.* ¶ 108. Cox then read aloud the letter, which was substantively identical to the termination letter provided to John Doe 1. *Id.* ¶¶ 108–109 & Ex. C. After ADIC Cox read the letter aloud, John Doe 2 asked a series of questions, including why he was being fired, what violations of law or policy he had committed, whether the OPR process was followed, what due process he had been provided, and whether notice, a pretermination hearing, and an opportunity to respond had been afforded to him. *Id.* ¶ 110. Cox said he only knew what was in the letter. *Id.* Cox confirmed that, the day before, John Doe 2 initially had been spared because U.S. Attorney Jeanine Pirro had interceded on his behalf. *Id.* ¶ 111.

Like John Doe 1, John Doe 2 received an SF-50 that did not indicate that his removal was based on misconduct or unacceptable performance and listed the sole "reason" for removal as "Removal under Article 2 USC." *Id.* ¶ 112 & Ex. D.

## VI.    President Trump's and Director Patel's Continued Disparagement of Plaintiffs and Plaintiffs' Struggle to Find New Employment

Months after Plaintiffs' firings, President Trump and Director Patel continued to disparage Plaintiffs and their FBI service. *Id.* ¶¶ 116–118. In a January 12, 2026, Truth Social post, President Trump referred to Arctic Frost agents as "total Scum," deemed them "Radical Left Lunatics put in by the 'Auto Pen' and Obama," and demanded that Patel "get them out, NOW!" *Id.* ¶ 117. Patel responded to the post by reassuring Trump that "[u]nder your leadership," the "FBI found the

corrupt actors and terminated their employment last year." *Id.* ¶ 118.

After their firings, Plaintiffs struggled to find new employment. *Id.* ¶¶ 121–128. After the Securities and Exchange Commission failed to respond to his resume submission, John Doe 1 decided to pursue opportunities in the private sector, but his publicly identified association with Arctic Frost and the circumstances of his firing hindered his efforts. *Id.* ¶¶ 123–126. John Doe 2 was interested in applying to work for Congress as a Capitol Police Investigator, but he learned that terminated FBI agents were ineligible for that position, *id.* ¶ 128, and he too struggled to obtain employment in the private sector, *id.* Plaintiffs understand their termination letters—which accuse them of conduct leading to the "weaponization" of government and purport to remove them from "federal service"—to bar them from any job in the Executive Branch. *Id.* ¶¶ 123, 127.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This standard is not a "'probability requirement,'" but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

The court must accept the well-pleaded allegations of the complaint as true and view them in the light most favorable to the plaintiff. *See Butters v. Nat'l Acad. of Scis.*, 176 F.4th 43, 45 (D.C. Cir. 2026). "A complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up). "In determining whether a complaint states a claim, the court may consider the facts alleged

13

in the complaint, documents attached thereto or incorporated therein and matters of which it may take judicial notice." *Simmons v. Rubio*, 170 F.4th 905, 910 (D.C. Cir. 2026) (quoting *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007)).

## ARGUMENT

**I.    The Complaint States a First Amendment Claim for Retaliation for Perceived Political Affiliation.**

"[P]olitical belief and association constitute the core of those activities protected by the First Amendment," *Elrod v. Burns*, 427 U.S. 347, 356 (1976), and the First Amendment generally prevents the government "from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 (1990); *see Branti v. Finkel*, 445 U.S. 507, 515 (1980). Thus, with a few exceptions, the Constitution bars the government from firing a public employee because of the employee's support or lack of support for a particular political candidate or party. *See Heffernan v. City of Paterson*, 578 U.S. 266, 270 (2016) (citing *Elrod* and *Branti*); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 720 (1996) ("There is no doubt that if Gratzianna had been a public employee whose job was to perform tow truck operations, the city could not have discharged him for refusing to contribute to Paxson's campaign or for supporting his opponent."); *Rutan*, 497 U.S. at 75 (holding that "promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees"). A government employer may violate the First Amendment by firing an employee for non-support of a political candidate even if its perception of the employee's political affiliation is incorrect. *See Heffernan*, 578 U.S. at 273–74. That is because firing an employee based on a belief about the employee's political affiliation "can cause the same kind, and degree, of constitutional harm whether that belief does or does not rest upon a factual mistake." *Id.* at 274.

14

While discrimination based on political affiliation is allowed for employees in positions for which political allegiance is an appropriate requirement, *Branti*, 445 U.S. at 518, Defendants do not argue that FBI Special Agents fall within any such exception. Therefore, Plaintiffs' First Amendment claim clears the Rule 12(b)(6) threshold if the complaint plausibly alleges that their perceived political affiliation—including perceived support or lack of support for a particular political candidate—was a substantial or motivating factor in their terminations. *See, e.g.*, *Berger v. Astorino*, No. 14-cv-3618 (VB), 2015 WL 873318, at *2 (S.D.N.Y. Feb. 23, 2015) ("To state a First Amendment political affiliation claim, plaintiff must allege facts tending to show his political affiliation 'was a substantial or motivating factor leading to dismissal.'" (quoting *Vezzetti v. Pellegrini*, 22 F.3d 483, 487 (2d Cir. 1994))); *cf. Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011) (explaining, with respect to speech-based First Amendment retaliation claim, that plaintiff must establish that protected speech was a "substantial or motivating factor" prompting the retaliatory act (quoting *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007))).

Plaintiffs have met this burden. Defendants do not dispute that the First Amendment prohibits the government from terminating FBI agents because of perceived lack of political support for President Trump. Defendants also do not dispute that Plaintiffs plausibly allege that they were fired based solely on their assignment to Arctic Frost. Thus, the only issue is whether Plaintiffs have plausibly alleged that their Arctic Frost assignment led to their firing because it was perceived as a mark of political disloyalty. Since the complaint plausibly alleges that Defendants targeted Plaintiffs because Defendants equated Plaintiffs' assignment to Arctic Frost with political non-support of President Trump, Plaintiffs have stated a First Amendment claim.

### A. The Complaint Plausibly Alleges that Plaintiffs Were Fired Because of Perceived Lack of Political Support for President Trump.

Numerous allegations in the complaint support a reasonable inference that Plaintiffs were

15

fired based on perceived political disloyalty to President Trump. Plaintiffs were exemplary agents who had received numerous accolades and who had never been the subject of any disciplinary action or even complaint. Compl. ¶¶ 14–16, 19–22. They executed their law enforcement duties without bias or political motive, and throughout their involvement with Arctic Frost, Plaintiffs fully adhered to FBI and DOJ policies and procedures, including applicable statutory and regulatory requirements. *Id.* ¶ 69. But Plaintiffs were caught in the crosshairs of Executive Branch officials fixated on political retribution. During his third campaign, President Trump signaled his intention to purge the FBI of agents deemed insufficiently loyal. *Id.* ¶¶ 70–71. Trump's statements tracked Patel's pronouncements in his book *Government Gangsters*, which painted the FBI as an arm of "Deep State." *Id.* ¶ 72. Later, in his periodic tirades against Arctic Frost personnel, President Trump would intersperse vague accusations of malfeasance with references to individuals' actual or perceived political affiliations, describing Arctic Frost personnel as "crooked lowlifes from the failed Biden Administration," "Radical Left Wing Lunatics," and "put in by the 'Auto Pen' and Obama." *Id.* ¶¶ 88, 117. Patel's own accusations against Arctic Frost agents were equally vague and politically charged, with Patel both impugning agents' professional integrity and skewering their purported "Deep State" affiliation. *Id.* ¶ 83.

These facts plausibly allege that Plaintiffs' assignment to Arctic Frost doomed them because Defendants viewed the assignment as proof of political disloyalty to Trump. *Cf. Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 56 (1st Cir. 2013) (facts supporting inference of political animus included, *inter alia*, that no plaintiff had "ever received a negative evaluation for her work at the [government agency]" and "that the critical decisions were made by newly appointed officials loyal to the [party in power] and in a politically charged atmosphere"); *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 18–19 (1st Cir. 2011) (facts supporting inference of

16

political discrimination included, *inter alia*, that defendants made "disparaging comments" about the prior administration, "including [one defendant's] expressed intent to 'clean up the kitchen,'" and new governor's "press statements that 'none of them voted for him' when questioned about potential employee firings"); *Am. Council of Learned Societies v. Nat'l Endowment for the Hums.*, No. 25-CV-3657 (CM), 2026 WL 1256545, at *53 (S.D.N.Y. May 7, 2026) (grant terminations reflected discrimination based on perceived political affiliation where grants "were treated as suspect because they were associated with the prior administration and so were presumed to not 'align with the Trump Administration'" (cleaned up)), *appeal filed*, No. 26-1832 (2d Cir.).

Dispelling any doubt, then-Attorney General Pam Bondi connected the dots when she bragged about firing Jack Smith's team, and, in warning that such firings would continue, equated assignment to an investigation of President Trump with political non-support of President Trump. In Bondi's words: "There are a lot of people in the FBI and also in the Department of Justice who despise Donald Trump, despise us, don't want to be here," and "right now, we're going to root them out; we will find them, and they will no longer be employed." Compl. ¶ 80. "In an environment in which [the] leader[]" of DOJ was equating assignment to an investigation of Trump with political opposition to Trump and was "voicing a need to shed nonpolicymaking employees" perceived to dislike President Trump, "it surely is plausible" that perceived political non-support for Trump was "a substantial or motivating factor" behind Plaintiffs' firings. *Rodriguez-Reyes*, 711 F.3d at 56. In their threadbare motion to dismiss, Defendants grapple with none of this. *See* Defendants' Combined Mem. in Supp. of Their Motions to Dismiss 4–6, ECF No. 18-1 ("MTD").

But there's more: As alleged in the complaint, Plaintiffs' termination letters each contained a justification that was clearly pretextual. Compl. ¶¶ 95–100, 109–113. While the letters stated that Plaintiffs were being terminated for "poor judgment and a lack of impartiality in carrying out

17

duties," *id.* Exs. A, C, Plaintiffs had pristine records, *id.* ¶¶ 15, 22, and their superiors could not explain the basis for this accusation or otherwise identify a ground for their firing, *id.* ¶¶ 94, 110. There was never any inquiry or investigation into Plaintiffs' conduct, *id.* ¶¶ 4, 90–114, and setting aside the termination letters' vague accusations, neither the letters nor any other communications to Plaintiffs identified any specific deficiencies in Plaintiffs' job performance. To the contrary, the HR employee who spoke with John Doe 1 told him his firing was not based on misconduct or for "cause." *Id.* ¶ 98. Plaintiffs' SF-50s were consistent with the HR employee's representation, and inconsistent with the unsupported accusations in Plaintiffs' termination letters, identifying "Article 2 USC" as the sole "reason" for their terminations and lacking codes that, according to the publicly available Office of Personnel Management ("OPM") *Guide to Processing Personnel Actions*, would denote a performance- or conduct-based firing. Compl. ¶¶ 99, 112 & Exs. B, D.[1]

In sum, there is every reason to believe that "poor judgment and lack of impartiality" was not the true reason for Plaintiffs' firings, and Defendants' resort to such a pretextual explanation buttresses the reasonable inference that the firings were motivated by political animus. *See, e.g.*, *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 70 (1st Cir. 1993) (evidence that "defendants' contemporaneous justification was a mere pretext" supported claim of discrimination based on political affiliation); *cf. Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013) (noting that in Title VII cases, pretext can

---

[1] Chapter 31 of the then-operative OPM *Guide to Processing Personnel Actions* directed users to the codes set forth in rules 35–40 for terminations based on "Conduct," rules 41–46 for terminations based on "Conduct and Performance," and rules 27–34 for terminations based on "Performance." OPM, *Guide to Processing Personnel Actions*, Ch. 31 ("Separations by Other than Retirement"), Table 31-B at 16 (effective Apr. 15, 2025) ("OPM *Guide*"), https://perma.cc/C2HJ-9GHM. Plaintiffs' SF-50s do not reflect such codes and instead appear to have been filled out per rule 65, which applies to terminations "Under circumstances not elsewhere described in this table." *See* Compl. Exs. B, D; OPM *Guide*, *supra*, Ch. 31, Table 31-B at 26. The Court may take judicial notice of the OPM *Guide*. *See Pharm. Rsch. & Mfrs. of Am. v. HHS*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies." (collecting cases)).

be shown by, *inter alia*, "changes and inconsistencies in the stated reasons for the adverse action" or "the employer's failure to follow established procedures or criteria" (citation omitted)).

### B. Defendants' Arguments That Plaintiffs Fail to Meet Their First Amendment Pleading Burden Are Meritless.

In their response to Plaintiffs' First Amendment claim, Defendants address few of the factual allegations noted above, fail to articulate the applicable First Amendment standard, and cite virtually no legal authorities. *See* MTD 4–6. Defendants' argument that Plaintiffs fail to meet their pleading burden boils down to two contentions: (1) that Patel's repeated disparagement of Arctic Frost agents, including his accusation of "weaponization," precludes an inference that Plaintiffs' firings were because of perceived political non-support for President Trump, *id.* at 5, and (2) that Plaintiffs fail to allege facts that would constitute direct evidence that Plaintiffs were fired based on lack of political support for President Trump, *id.* at 5–6. These arguments are without merit.

*First*, contrary to Defendants' contention, *id.* at 5, Patel's false accusations against Plaintiffs in their termination letters and in the wake of their firings do not defeat the inference that the firings were motivated by political animus or somehow support a counter-inference that the firings were undertaken in good faith. As alleged in the complaint, the termination letters' accusations of "poor judgment and a lack of impartiality in carrying out duties" were completely unsupported. Compl. ¶¶ 69, 94–95, 98–100, 110–113. And neither Patel nor any other Defendant pointed to any evidence that Plaintiffs engaged in "weaponization" or "politicization." *Id.* ¶¶ 87, 94–95, 99, 109, 112, 118.

Defendants rely on the language in the termination letters to argue that Plaintiffs were fired based on "how they performed their assigned duties." MTD 1, 5, 11. But that assertion fails to account for the allegations of the complaint, which must be taken as true. Those allegations support the reasonable inference that the explanation provided in the termination letters was pretextual, and that Patel's public accusations against Plaintiffs and other Arctic Frost agents were false and

19

defamatory. *See supra* Part I.A; *infra* Part IV. Further, Patel's own accusations against Plaintiffs were not even "consistent." *Contra* MTD 5. While Plaintiffs' termination letters contained unsubstantiated allegations that they had exercised "lack of impartiality" and "poor judgment" "leading to" the "weaponization of the government," Compl. ¶¶ 95, 109, Exs. A & C, Patel's commentary in January 2026 went further, impugning the fired agents as "corrupt actors," while still failing to identify any actual acts of misconduct, *id.* ¶ 118.

The complaint thus offers no basis to credit Patel's proffered justifications for Plaintiffs' firings. Indeed, Defendants do not dispute that notwithstanding Patel's testimony that "your case assignment does not dictate your career or termination," *id.* ¶ 82, Plaintiffs have plausibly alleged that they were fired based on their assignment to Arctic Frost. Patel's false statements bolster, rather than weaken, the inference of political animus. *See, e.g.*, *Ocasio-Hernandez*, 640 F.3d at 18 ("Blanco's alleged misstatements to the press about the reasons for the terminations at La Fortaleza and about conducting regular performance evaluations bolster the plaintiffs' contention that the terminations had a discriminatory basis.").

*Second*, Defendants do not show that Plaintiffs' allegations of political animus are otherwise insufficient. Beyond their quixotic attempt to transform defamation into evidence of good faith, Defendants have little to say in support of their contention that Plaintiffs' First Amendment claim fails to clear the Rule 12(b)(6) threshold—Defendants' combined response to the *Doe* and *Garman* plaintiffs' respective First Amendment claims runs barely two pages. Unable to explain why the allegations detailed above are insufficient to support a reasonable inference of political retaliation, Defendants simply ignore them. *See supra* Part I.A.

Defendants' last-ditch argument appears to be that Plaintiffs do not allege statements by Bondi, Trump, or Patel that would constitute direct evidence that Plaintiffs were fired for an

unconstitutional reason. For example, Defendants fault Plaintiffs for failing to allege that Bondi or President Trump said directly "that agents assigned to Arctic Frost (much less Plaintiffs in particular) do not support the President or that they ordered Director Patel to remove agents assigned to Arctic Frost on that basis." MTD 6. And they protest that Plaintiffs "do not allege Director Patel ever said he was removing Plaintiffs for that reason" or allege that Patel removed Plaintiffs based on a "directive" from Bondi or President Trump "to dismiss employees who did not support the President." *Id.* But this "Circuit has repeatedly recognized that there is 'no distinction between the probative value of direct and circumstantial evidence.'" *Mori v. Dep't of the Navy*, 917 F. Supp. 2d 60, 65 (D.D.C. 2013) (quoting *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 343 (D.C. Cir. 2003)). "In fact, circumstantial evidence is particularly important in bias and discrimination cases, in which direct evidence is either not present or difficult to obtain." *Id.* (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–100 (2003)); *accord Rodriguez-Reyes*, 711 F.3d at 56 ("Direct evidence of political animus is not a sine qua non."). There is no basis for Defendants' suggestion that circumstantial facts are insufficient to support a claim of retaliation for perceived political affiliation, let alone at the pleading stage.

Here, however categorized, Plaintiffs' allegations amply support a reasonable inference that Patel and Bondi were attempting—consistent with Trump's wishes—to purge the FBI of agents assigned to investigations of Trump because they believed affiliation with such investigations signaled political disloyalty, *see, e.g.*, Compl. ¶ 80 (Bondi's assertion that "*we*'re going to root them out; *we* will find them, and they will no longer be employed" (emphases added)); *id.* ¶ 118 (Patel thanking Trump for a social media post casting aspersions on Arctic Frost agents and noting that the agents were fired "[u]nder your leadership"). And, for all the reasons explained above, *see supra* Part I.A, the complaint plausibly alleges that perceived lack of political

21

support for Trump was a substantial or motivating factor in Plaintiffs' firings.

Accordingly, Plaintiffs have stated a claim for retaliation for perceived political affiliation in violation of the First Amendment.

## II.    The Complaint States a Procedural Due Process-Property Interest Claim.

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 546 (1985) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). To plead a property interest-based procedural due process claim, a plaintiff therefore must plausibly allege that the government deprived him of a protected property interest without adequate notice and opportunity to be heard. *See Sobin v. Dist. of Columbia*, No. 19-CV-02580 (ABJ), 2020 WL 4732098, at *4 (D.D.C. Aug. 14, 2020).

In their motion to dismiss, Defendants do not dispute that Plaintiffs have adequately pleaded that they did not receive any notice or opportunity to be heard, arguing only that Plaintiffs fail to allege a protected property interest. *See* MTD 6–11. Their argument is without merit. As set forth in the complaint, the FBI has cultivated rules and understandings supporting a reasonable belief that non-probationary Special Agents will be fired only for job-related reasons. Accordingly, Plaintiffs have plausibly alleged both that they had a protected property interest in their FBI employment and that they were deprived of that property interest without due process of law.

### A.    Plaintiffs Claim a Protected Property Interest Arising from Rules and Understandings Fostered by the FBI, Not Based on a Statute or Regulation that Places Substantive Limits on Official Discretion.

The government can create a protected property interest in continued government employment in more than one way. For example, a statute or regulation might place substantive limitations on when a government agency can fire an employee. *See Loudermill*, 470 U.S. at 538. Or the government might enter into a written contract with a government employee or provide a

formal grant of tenure. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576–77 (1972). But beyond such express or formal mechanisms, and more generally, "an employee has a property interest if the government has fostered rules and understandings which entitle the employee to believe that she would lose her job only for a job-related reason." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (quoting *Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979)) (cleaned up).

Thus, in *Perry v. Sindermann*, the Supreme Court held that, despite his lack of "formal contractual or tenure security," the respondent had sufficiently alleged a protected property interest in his position as an instructor at a public junior college. 408 U.S. 593, 599, 602 (1972). Though the college lacked a formal tenure system, the respondent had alleged that it had a "de facto tenure program" and that he and others had relied on a provision of the college's Faculty Guide that noted that the administration "wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work." *Id.* at 600. He also had pointed to "guidelines" promulgated by the Coordinating Board of the state college and university system that indicated that someone, like the respondent, who had been employed by the system for seven or more years had some form of tenure. *Id.* The respondent thus had sufficiently alleged "the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause.'" *Id.* at 602–03.

Similarly, in *Ashton v. Civiletti*, the D.C. Circuit held that "the FBI ha[d] fostered rules and understandings" that entitled a non-investigatory employee to "believe that he would lose his job only for a job-related reason" and thereby "gave him a property interest in his position." 613 F.2d

23

at 928. In reaching that conclusion, the Circuit rejected the government's argument that, because FBI positions are part of the excepted service and the employee lacked the statutory procedural protections guaranteed to members of the competitive service, the employee could not have a protected property interest in his FBI employment. *Id.* As the court explained, "those facts do not prevent the Bureau from giving its employees some security in their jobs." *Id.* The court concluded that an FBI Handbook's guidance that "[y]ou may assume that your position is secure, if you continue to do satisfactory work" conveyed a message of such job security, and that this message was reinforced by the fact that the plaintiff's position "was explicitly made probationary for one year." *Id.* at 929. As the court explained, "[a] probationary period, of course, would be unnecessary if the employer could dismiss a non-probationary employee at any time and for any reason." *Id.*

Defendants frame the property interest inquiry as whether "regulations . . . limit discretion by 'explicitly mandatory language.'" MTD 8 (quoting *Bloch v. Powell*, 348 F.3d 1060, 1069 (D.C. Cir. 2003)). In doing so, Defendants ignore *Perry v. Sindermann* and its progeny and elide the distinction between two lines of precedents—one focused on whether a statute or regulation places substantive limits on official discretion, and the other, applicable here, focused on whether the government employer has fostered rules and understandings that create a reasonable expectation that an employee will be fired only for a job-related reason. *Compare Bloch*, 348 F.3d at 1069 (rejecting property interest claim because the regulations invoked by the plaintiff did not "limit discretion by 'explicitly mandatory language'"), *with Ashton*, 613 F.2d at 928, 930 (concluding that FBI had "fostered rules and understandings which, by entitling appellant to believe that he would lose his job only for a job-related reason, gave him a property interest in his position," and rejecting argument that the FBI's exception "from the Civil Service regulations relating to selection and tenure" precluded such a property interest).

24

Defendants' reliance on two unpublished out-of-circuit decisions for the proposition that "handbooks, regulations, or policies that use permissive language when discussing potential grounds for dismissal . . . do not create a property interest in continued employment" repeats this mistake. MTD 8. While those decisions would be of limited persuasive value in any event, they also are inapposite: *Daney v. Department of the Interior* did not apply constitutional due process precedents at all. *See* 25 F. App'x 994, 995–96 (Fed. Cir. 2001) (per curiam). And *Flaningam v. County of Winnebago* addressed a claim that a regulation created a property interest by placing substantive limits on official discretion. *See* 243 F. App'x 171, 173–74 (7th Cir. 2007). In a footnote, the *Flaningam* court in fact explicitly acknowledged that "property interests [also] may be created by 'mutually explicit understandings,'" but noted that Flaningam had "fail[ed] to describe any particular 'policy' or 'practice' supporting the existence of a mutual understanding between the parties," and thus waived that theory. *Id.* at 173 n.1; *cf. Perry*, 408 U.S. at 603 (holding that respondent should be "given an opportunity to prove the legitimacy of his claim of . . . entitlement in light of 'the policies and practices of the institution'").

In this case, Plaintiffs' lack of statutory "for-cause removal protection," MTD 8, is irrelevant because, in contrast to the cases cited by Defendants, Plaintiffs here are not proceeding on a theory that a statute or regulation is the source of their property interest. *Cf. Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016) (Navy regulation did not create protected property interest in NJROTC certification); *Garrow v. Gramm*, 856 F.2d 203, 206 (D.C. Cir. 1988) (addressing claim that 5 U.S.C. § 2302(b)(10) granted plaintiff a "legitimate claim of entitlement" to his job as an attorney at the Commodity Futures Trading Commission). Rather, Plaintiffs claim that they had a protected property interest in their FBI employment because the FBI, through its own policies and practices, fostered rules and understandings that supported a reasonable belief that each Plaintiff

would lose his job "only for a job-related reason." *Ashton*, 613 F.2d at 928.

> **B. Based on the FBI's Policies and Practices, Plaintiffs Reasonably Understood They Would Be Terminated Only for a Job-Related Reason.**

The complaint plausibly alleges that, based on FBI policies and practices, Plaintiffs reasonably understood that they would be terminated only for a job-related reason. *See Ashton*, 613 F.2d at 928.

As the complaint sets forth, the FBI recruits new Special Agents with the promise that a career as a Special Agent is a way to "SECURE YOUR FUTURE," advertising that if a person becomes a Special Agent, he or she will "be able to enjoy . . . a secure retirement with pension." Compl. ¶ 38. Special Agents' positions are explicitly probationary for an initial two-year period. *Id.* ¶ 32. And written FBI policies delineate limited, specific grounds on which non-probationary Special Agents may be terminated, all of them job-related: poor performance, *id.* ¶¶ 40–44; abuse of leave, *id.* ¶ 45; national security concerns, *id.* ¶ 56; medical inability to fulfill the essential duties and responsibilities of the position, *id.* ¶ 57; and misconduct, as defined in the FBI's Offense Codes, *id.* ¶¶ 46–55.

Guidance from supervisors, quarterly OPR emails detailing examples of misconduct and corresponding disciplinary penalties, and other FBI communications have reinforced the FBI's message that non-probationary Special Agents may consider their employment with the FBI secure absent misconduct, extreme deficiencies in job performance, or the handful of other grounds for termination set forth in the policies listed and described in the complaint. *Id.* ¶ 60. Underscoring this clear message, just weeks before Plaintiffs' firings, Director Patel himself stated, under oath, that "[t]he only way people get terminated at the FBI is if they fail to meet the muster of the job and their duties." *Id.* ¶ 82.

These facts plausibly allege that the FBI fostered "mutually explicit understandings" that

26

non-probationary Special Agents would only be fired for job-related reasons and that Plaintiffs therefore had a protected property interest in their FBI employment. *Perry*, 408 U.S. at 601. As the allegations of the complaint make clear, it is in the FBI's interest to cultivate these understandings: The FBI invests enormous resources in Special Agents' selection and training, Compl. ¶¶ 27–30, 33–35, and its promises of job security are clearly aimed at attracting and retaining those Special Agents, who commit to careers with the Bureau despite the great risks, burdens, and sacrifices that come with the job, *see id.* ¶¶ 36–38.

### C. The FBI's Summary Dismissal Policy Does Not Defeat Plaintiffs' Property Interest.

Defendants gloss over the complaint's detailed allegations regarding the policies and practices that support a reasonable expectation that non-probationary Special Agents will be fired only for job-related reasons, and instead focus on a partial quotation of the summary dismissal policy set forth in two FBI documents incorporated by reference in the complaint. MTD 9–10. In essence, Defendants argue that the summary dismissal authority described in these documents precludes a reasonable belief that non-probationary Special Agents will only be fired for cause. Defendants' argument is unpersuasive for at least three reasons: (1) the summary dismissal policy applies solely to misconduct—it does not expand the permissible grounds for termination of FBI employees; (2) the fact that summary dismissal denies FBI employees certain procedural protections does not affect the existence of a protected property interest; and (3) because Plaintiffs do not allege that the summary dismissal policy is the source of their property interest, Defendants' contention that the policy does not *create* a protected property interest is irrelevant.

### 1. The FBI's Summary Dismissal Policy Applies Solely to Misconduct and Does Not Expand the Permissible Grounds for Termination of Non-Probationary Special Agents.

Read in its entirety and in context, the FBI's summary dismissal policy self-evidently

outlines a disciplinary penalty for exceptional misconduct—not an unbounded authority to fire FBI employees for any reason. As described in the complaint, the FBI's summary dismissal policy is set forth in two documents, which deal exclusively with disciplinary matters: the *OPR Policy Guide* and the Preamble to the FBI's *Offense Codes and Penalty Guidelines*. Compl. ¶¶ 53–54. A review of these documents refutes Defendants' conclusory assertion that the disciplinary procedures therein "are independent of the summary dismissal procedure used for Plaintiffs' removals and do not constrain the Director's summary dismissal authority," MTD 11—which is perhaps why Defendants declined to attach the documents to their motion. Plaintiffs have provided copies for the Court's reference. *See* Tulis Decl., Ex. 1 (FBI, OPR, *Office of Professional Responsibility Policy Guide* (Sept. 8, 2021)) ("*OPR Policy Guide*"); Tulis Decl., Ex. 2 (FBI, *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process* (effective Jan. 1, 2024)) ("*Offense Codes and Penalty Guidelines*").

Within the *OPR Policy Guide*, the summary dismissal policy is set forth in the section on "Processes and Procedures" for employee misconduct cases, as one of the "Range of Potential Outcomes of OPR Adjudication." *OPR Policy Guide*, §§ 4.6, 4.6.1, 4.6.4; Compl. ¶ 53. In other words, summary dismissal is a penalty for a subset of the offenses that can be grounds for termination more broadly. Outside the disciplinary context, summary dismissal is inapplicable.

The Preamble to the *Offense Codes and Penalty Guidelines* reaffirms this limited focus by restating the summary dismissal policy and providing examples of factors considered in determining whether summary dismissal is appropriate: "the egregiousness of *the* misconduct, whether *the* misconduct is illegal/criminal, overwhelming evidence of *the* misconduct, or impact on the FBI's reputation." *Offense Codes and Penalty Guidelines* 3–4 (emphases added); Compl. ¶ 54. By referring to "the" misconduct, the examples confirm that the policy they are meant to

28

illuminate is premised on misconduct. *Cf. Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("Here grammar and usage establish that 'the' is a function word indicating that a following noun or noun equivalent is definite or has been previously specified by context." (cleaned up)); *Work v. United States ex rel. McAlester-Edwards Co.*, 262 U.S. 200, 208 (1923) (Congress's "use of the definite article [in reference to 'the appraisement'] means an appraisement specifically provided for").

While the factors applied in determining that misconduct is exceptional enough to warrant summary dismissal are ultimately discretionary, the FBI's policies give no hint that summary dismissal may be deployed in the absence of misconduct (as defined in the Offense Codes), let alone for reasons unrelated to FBI employees' performance of their jobs. Notably, summary dismissal is not even mentioned in any of the written policies that describe grounds for removal other than misconduct. For example, the *Performance and Development Program Policy Guide* specifies that unacceptable performance can be a ground for termination—but only if it is so deficient that the non-probationary employee fails a Performance Improvement Plan. Compl. ¶¶ 42–44. It contains no caveat that, for instance, notwithstanding the performance standards, the Director always has discretion to summarily dismiss an employee. *See generally* FBI Human Resources Division, *Performance and Development Program Policy Guide* (June 8, 2020), § 4.4, https://perma.cc/D4V7-KP7L. Defendants identify no language in the *OPR Policy Guide*, the *Offense Codes and Penalty Guidelines*, or any other FBI policy document that suggests summary dismissal is anything other than a disciplinary penalty for identified misconduct.

The summary dismissal policy therefore does not expand the permissible grounds for removal of non-probationary Special Agents beyond the job-related reasons listed above.

**2.    The Summary Dismissal Policy's Removal of Certain Procedural Protections Does Not Affect the Existence of a Property Interest.**

Defendants' argument that Plaintiffs lack a property interest because the summary

29

dismissal policy provides that the Director can terminate an employee without usual procedural protections, MTD 10, turns the due process standard on its head. According to Defendants' logic, a lack of due process demonstrates the absence of a property interest. The D.C. Circuit soundly rejected such reasoning in *Esparraguera*, noting: "The Supreme Court has made clear . . . that whether a property interest exists is not 'defined by the procedures provided for its deprivation.'" 101 F.4th at 39 (quoting *Loudermill*, 470 U.S. at 541). "'[W]ere the rule otherwise, the [Due Process] Clause would be reduced to a mere tautology.'" *Id.* (quoting *Loudermill*, 470 U.S. at 541).

Incidentally, Defendants' suggestion that FBI policy specifies that the "Director need not await an internal investigation" to summarily dismiss an employee, MTD 10, is incorrect. In fact, the summary dismissal policy states that, "[w]ith the exception of those who are preference-eligible, FBI employees subject to summary dismissal may not (a) ***review the redacted 263 file***; (b) prepare a written response; or (c) make an oral presentation to the AD, OPR." *OPR Policy Guide*, § 4.6.4 (emphasis added); *Offense Codes and Penalty Guidelines* 4; Compl. ¶ 53. A "263 file" is "[t]he file that contains the investigative and adjudicative records of an employee's administrative inquiry." *OPR Policy Guide*, App. B, B-1; Compl. ¶ 53 n.41. In other words, in specifying the procedures that are unavailable in the case of summary dismissal, the policy presumes that an employee subject to summary dismissal will have already gone through an "administrative inquiry," including investigation and adjudication. The reference to "the redacted 263 file" is notable for purposes of the Court's due process analysis not because it indicates that Plaintiffs were entitled to certain process under the FBI's own policies, but rather because it reinforces the message that summary dismissal is not "independent of" the FBI's broader disciplinary procedures, *contra* MTD 11—and that its necessary predicate is misconduct.

30

### 3.   Defendants' Argument that the Summary Dismissal Policy Does Not Create a Property Interest Attacks a Strawman.

Finally, Defendants' assertion that the summary dismissal policy does not *create* a protected property interest attacks a strawman, MTD 10, as Plaintiffs have not alleged that the FBI's summary dismissal policy is the source of their property interest. Though an explicit citation is missing, Defendants seemingly confuse this case with *Langeman v. Garland*, in which a former Special Agent claimed a protected property interest in FBI employment based solely on a 1997 memorandum by then-Director Louis Freeh (the "Freeh Memo") that set forth the FBI's original summary dismissal policy—a claim the D.C. Circuit rejected. *See Langeman v. Garland*, 88 F.4th 289, 294–96 (D.C. Cir. 2023). Defendants' failure to directly invoke *Langeman* is understandable, as the distinctions between Langeman's property interest theory and Plaintiffs' underscore the strength of Plaintiffs' claim here.

*First*, Langeman's claim was factually distinct. Langeman's property interest theory rested entirely on the now-superseded 1997 Freeh Memo. *See Langeman*, 88 F.4th at 294; Compl. ¶¶ 51–52. In his appeal, Langeman did not point to the *OPR Policy Guide*, nor to the *Offense Codes and Penalty Guidelines*, let alone to the versions of those documents cited by Plaintiffs in this case. *See* Br. of Pl.-Appellant, *Langeman v. Garland*, No. 22-5264 (D.C. Cir. Dec. 28, 2022). Those publications make clear that summary dismissal is a penalty for misconduct, *see supra* Part II.C.1, and that it does not expand the permissible bases for termination of non-probationary Special Agents beyond the job-related reasons set forth in the written FBI policies described in Plaintiffs' complaint—none of which were before the court in *Langeman*.

*Second*, Langeman's claim rested on a different legal theory. Citing *Tarpeh-Doe v. United States*, 904 F.2d 719, 722 (D.C. Cir. 1990), Langeman argued that the Freeh Memo's summary dismissal policy created a property interest by functioning like a statute or regulation that "placed

31

*substantive* limits on official discretion." Br. of Pl.-Appellant 14–15, *Langeman v. Garland*, No. 22-5264 (D.C. Cir. Dec. 28, 2022). The D.C. Circuit rejected this argument, explaining that the Freeh Memo did "not contain 'explicitly mandatory language' limiting official discretion." *Langeman*, 88 F.4th at 295. Langeman did not argue, under *Perry v. Sindermann* and *Ashton v. Civiletti*, that the FBI, through its policies and practices, had fostered rules and understandings supporting a reasonable belief that he would be fired only for a job-related reason, and the court thus did not analyze Langeman's claim under that framework. *See id.* at 294–96. Indeed, like Defendants here, neither of the parties in *Langeman* even cited *Perry* or *Ashton*. *See* Br. of Pl.-Appellant, *Langeman v. Garland*, No. 22-5264 (D.C. Cir. Dec. 28, 2022); Br. of Def.-Appellees, *Langeman v. Garland*, No. 22-5264 (D.C. Cir. Feb. 27, 2023); Reply Br. of Pl.-Appellant, *Langeman v. Garland*, No. 22-5264 (D.C. Cir. Apr. 10, 2023).

In this case, Defendants' failure to contend with—or even acknowledge—*Perry* and *Ashton* underscores the weakness of Defendants' position. They offer no argument under those binding precedents because they can't. As explained above and detailed in the complaint, the FBI's own policies and practices entitled Plaintiffs to reasonably believe that they would be fired only for a job-related reason. Compl. ¶¶ 39–61. Plaintiffs therefore had a protected property interest in their employment as non-probationary Special Agents, even in the absence of a statute or regulation providing for-cause removal protections. *See Perry*, 408 U.S. at 602–03; *Ashton*, 613 F.2d at 928–30. And, as Defendants do not dispute, Plaintiffs plausibly allege that they were each deprived of that property interest without notice or an opportunity to be heard. *See* Compl. ¶¶ 4, 90–114.

Accordingly, the complaint plausibly alleges that Defendants deprived Plaintiffs of a protected property interest without due process of law in violation of the Fifth Amendment.

**III.    The Complaint States a Procedural Due Process-Liberty Interest Claim on a "Stigma-Plus" Theory.**

Plaintiffs have plausibly alleged that they were deprived of a protected liberty interest without due process under a "stigma-plus" theory. The government's dismissal of an employee without procedural protections may implicate a protected liberty interest if it "impose[s] . . . a stigma or other disability that foreclose[s] [the person's] freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 573. "[A] government action that potentially constrains future employment opportunities must involve a tangible change in status to be actionable under the due process clause." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994). "Such a change may be shown in one of two ways." *Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016). "The first is if the government's actions formally or automatically excluded Plaintiff from future government employment opportunities." *Id.* (cleaned up) (quoting *Kartseva*, 37 F.3d at 1528). The second is if the government's actions "had the 'broad effect of largely precluding him from pursuing his chosen career.'" *Id.* (cleaned up) (quoting *Kartseva*, 37 F.3d at 1528). Whether a government action involves a "tangible change in status" is ultimately a factual inquiry. *See Kartseva*, 37 F.3d at 1528–30. "If a government action does constitute an adjudication of status under law, the underlying factual and legal determinations are subject to due process protections." *Id.* at 1527.

Here, the complaint plausibly alleges that Plaintiffs' firings imposed a stigma that foreclosed their freedom to take advantage of employment opportunities in federal law enforcement and the Executive Branch—that is, Defendants' actions have "formally or automatically excluded Plaintiff[s] from future government employment opportunities" in those spheres. *Jefferson*, 170 F. Supp. 3d at 205 (cleaned up). *First*, Plaintiffs' termination letters purported to remove them from "federal service," conveying in plain language a broad exclusion

33

from any other federal government employment. *Second*, Plaintiffs' termination letters—and related statements by Patel and elected officials—accused them of contributing to purported "weaponization" of government. Compl. Exs. A, C. The Trump Administration has made clear that any federal employee deemed to have engaged in "weaponization" will be "root[ed] out."[2] Pursuant to an Executive Order titled "Ending the Weaponization of the Federal Government," "[i]t is the policy of the United States to identify and take appropriate action to correct past misconduct by the Federal Government related to the weaponization of law enforcement and the weaponization of the Intelligence Community." Executive Order No. 14147 (Jan. 20, 2025). The Executive Order directs the Attorney General to prepare a report recommending "remedial actions" with respect to such purported "weaponization," *id.*, and the Attorney General created a working group specifically targeting "weaponization."[3] *Third*, following their firings, neither Plaintiff succeeded in obtaining alternate federal government employment. Compl. ¶¶ 121–128.

While the precise scope and effect of Plaintiffs' removal from "federal service" and categorization as participants in purported "weaponization" cannot be known without discovery, the allegations of the complaint and the judicially noticeable facts regarding the Executive Branch's anti-weaponization policy support the reasonable inference that Plaintiffs' firings have disqualified them from a broad swath of federal government jobs, implicating a liberty interest. *Cf. Kartseva*, 37 F.3d at 1528 ("[I]f State's action formally or automatically excludes Kartseva from work on some category of future State contracts or from other government employment opportunities, that action changes her formal legal status and thus implicates a liberty interest.").

---

[2] Memorandum for all Department Employees from the Attorney General, Restoring the Integrity and Credibility of the Department of Justice at 1 (Feb. 5, 2025) ("Restoring Integrity Memo"), https://perma.cc/JM2P-GGEB. The Court may take judicial notice of this memorandum because it is posted on DOJ's public website. *See Pharm. Rsch. & Mfrs. of Am.*, 43 F. Supp. at 33.

[3] Restoring Integrity Memo, *supra* note 2, at 1.

Defendants argue that the Court should infer that the removal from "federal service" language in Plaintiffs' termination letters "says nothing about whether Plaintiffs could obtain federal government jobs in the future." MTD 17. But Defendants offer no support for this conclusory assertion, which disregards the plain meaning of "federal service." And even if one possible explanation for the reference to removal from "federal service" is that the FBI wanted to convey that Plaintiffs' current FBI employment was being terminated, the mere existence of that alternative explanation does not render Plaintiffs' claim implausible. *See Banneker*, 798 F.3d at 1129 (where inference favoring plaintiff is reasonable, complaint survives the motion to dismiss even if defendant offers an alternative plausible explanation).

In addition to announcing Plaintiffs' removal from "federal service," the termination letters classified Plaintiffs as having participated in purported "weaponization" of government. Compl. Exs. A, C. Defendants do not even attempt to argue against the reasonable inference that the "weaponization" classification precludes Plaintiffs from other employment in the Executive Branch pursuant to Executive Order 14147 and federal policy implementing that Executive Order. Such preclusion from Executive Branch jobs is sufficient to support a stigma-plus claim. *See Kartseva*, 37 F.3d at 1529. A stigma-plus plaintiff need not allege public dissemination of the reasons for his termination, *see McCormick v. Dist. of Columbia*, 752 F.3d 980, 988 (D.C. Cir. 2014); *McGinnis v. Dist. of Columbia*, 65 F. Supp. 3d 203, 214 (D.D.C. 2014), and thus it is neither here nor there whether Defendants "publicly disclose[d] the [termination] letters" or made the letters available to local government or private employers, MTD 18.

Contrary to Defendants' contention, MTD 18, Plaintiffs' termination letters did not merely allege unsatisfactory "job performance," and Plaintiffs' claim that they experienced a tangible change in status is not based on a mere dismissal for poor job performance. Rather, the termination

letters indicated that Plaintiffs were being "removed from federal service" because they had participated in purported "weaponization of the government." Compl. Exs. A, C. Thus, the *Harrison* and *Mazaleski* cases cited by Defendants are inapposite. *Cf. Harrison v. Bowen*, 815 F.2d 1505, 1518 (D.C. Cir. 1987) (plaintiff dismissed merely for "unsatisfactory job performance"); *Mazaleski v. Treusdell*, 562 F.2d 701, 706 (D.C. Cir. 1977) (same). More generally, because Plaintiffs' stigma-plus claim is not based on a theory that Defendants' actions "'seriously affected, if not destroyed' Plaintiffs' 'ability to pursue [their] chosen profession,'" MTD 17 (quoting *Jefferson*, 170 F. Supp. 3d at 205), but rather relies on Plaintiffs' formal or automatic exclusion from a broad range of government employment, *see Kartseva*, 37 F.3d at 1528, Defendants' argument that Plaintiffs' allegations fail to state a claim under that theory is irrelevant.

Because there has been no discovery in this case, the "present record" is of course "cloudy" as to whether Plaintiffs' removal from "federal service" and designation as participants in "weaponization" have in fact disqualified them from other Executive Branch or federal law enforcement jobs. *Id.*; Compl. Exs. A, C. But at the motion to dismiss stage, Plaintiffs are not required to *prove* such disqualification. *See Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1211 (D.C. Cir. 2020) (citing *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017)). Because Plaintiffs have, at the very least, alleged facts supporting a reasonable inference that their terminations "effected a change in [their] status sufficient to implicate a liberty interest," *Kartseva*, 37 F.3d at 1529, they have met their pleading burden, and Defendants' challenge to Plaintiffs' stigma-plus claim fails.

## IV.   The Complaint States a Procedural Due Process-Liberty Interest Claim on a "Reputation-Plus" Theory on Behalf of John Doe 1.

John Doe 1 also has adequately pleaded a procedural due process-liberty interest claim on

a "reputation-plus" theory.[4] In a reputation-plus claim, "the plaintiff points to the conjunction of official defamation and adverse employment action." *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). In other words, the defamation must "be accompanied by a discharge from government employment" or similar adverse employment action. *Id.* (quoting *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983)). "This theory makes the termination actionable only where the terminating employer has disseminated the reasons for the termination and such dissemination is defamatory." *McCormick*, 752 F.3d at 988.

In this case, John Doe 1 has plausibly alleged "the conjunction of official defamation and adverse employment action," *id.*, supporting a reputation-plus claim. As the complaint alleges, Defendants disclosed John Doe 1's identity as an Arctic Frost agent by providing investigative records naming John Doe 1 to the Senate Judiciary Committee for release to the public. Compl. ¶¶ 87–89. Defendant Patel then terminated him, offering the false and pretextual justification that John Doe 1 had contributed to the "political weaponization of the government." *Id.* ¶¶ 95–96. And Patel publicly connected Defendants' terminations of Arctic Frost agents to that allegation of weaponization, ultimately adding the accusation that the fired agents were "corrupt actors." *Id.* ¶¶ 83, 87, 118. These false and defamatory public smears impugned the professional reputation of all fired Arctic Frost agents, including John Doe 1, suggesting they were something other than faithful and apolitical law enforcement personnel. *Id.* ¶ 145. The complaint plausibly alleges that the stigma from Defendants' statements "hampered [John Doe 1's] future employment prospects." *Doe v. DOJ*, 753 F.2d 1092, 1111 (D.C. Cir. 1985); *see* Compl. ¶¶ 87, 118, 121–126.

Defendants' contention that John Doe 1 nevertheless fails to state a reputation-plus claim

---

[4] As noted in the complaint, the reputation-plus claim is brought on behalf of John Doe 1 only. Defendants' arguments with respect to whether John Doe 2 has stated a reputation-plus claim, *e.g.*, MTD 16, thus are irrelevant.

37

is without merit.

*First*, Defendants argue that their statements about John Doe 1 were not defamatory, asserting that "[t]he allegation of weaponization or politicization also 'is not actionable in defamation' because it is 'so imprecise or subjective that it is not capable of being proved true or false.'" MTD 14–15 (quoting *Farah v. Esquire Magazine*, 736 F.3d 528, 534–35 (D.C. Cir. 2013)). Defendant DOJ itself, though, has established a working group with the express purpose of identifying "weaponization" in the federal government in order to "root [it] out."[5] The Attorney General, at least, viewed "weaponization" as capable of factual proof. In establishing that working group, then-Attorney General Bondi also drew a parallel between weaponization and corruption, suggesting that both concepts encompass lack of a "righteous spirit and just intentions."[6] An accusation of corruption is classic defamation. *See, e.g.*, *Rosenblatt v. Baer*, 383 U.S. 75, 99 (1966) (Harlan, J., concurring in part) ("[A] statement that all members of a school board or a city council are corrupt is sufficiently definite to constitute a defamatory publication of each member thereof." (quoting *Restatement of Torts* § 564 cmt. c (1938))). And Defendant Patel explicitly linked these concepts when he described the fired Arctic Frost agents as both participants in "weaponized law enforcement" and "corrupt actors." Compl. ¶ 118.

Defendants cannot seriously argue that "weaponization" should not be considered defamatory when Defendants themselves have spent the last year-and-a-half treating the term as common parlance for lack of "integrity and credibility."[7] Defendants' new insistence that an accusation of "weaponization" is nothing more than a subjective opinion runs afoul of this Circuit's chutzpah doctrine. *See, e.g.*, *Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 998

---

[5] Restoring Integrity Memo, *supra* note 2, at 1.
[6] Restoring Integrity Memo, *supra* note 2, at 1.
[7] *E.g.*, Restoring Integrity Memo, *supra* note 2, at 1.

F.3d 999, 1005 n.13 (D.C. Cir. 2021) ("Appellant accuses the agency of acting inconsistently despite its own twists and turns. This argument violates our chutzpah doctrine."); *DL v. Dist. of Columbia*, 302 F.R.D. 1, 15 (D.D.C. 2013), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017) ("The District is a direct cause of the financial hardship that they now argue disqualifies counsel from representing the plaintiff class in this case. The Court rejects this argument as it runs afoul of this jurisdiction's chutzpah doctrine.").

*Second*, Defendants argue that Patel's defamatory statements cannot form the basis for a reputation-plus claim because they did not occur "together with" Plaintiffs' firings, suggesting that a plaintiff must plead that his firing and the defamatory statements occurred on the same day. *See* MTD 12. But the requirement that defamation be "accompanied by" a discharge from government employment does not demand any specific temporal proximity. *O'Donnell*, 148 F.3d at 1140. Even if it occurs after a plaintiff's firing, defamation is deemed to accompany the termination if it is "being offered as the official reason for the termination." *Peter B. v. CIA*, 620 F. Supp. 2d 58, 72 (D.D.C. 2009). In this case, shortly after Patel announced that records identifying Arctic Frost agents by name showed "weaponization and politicization at the highest levels of government," Compl. ¶ 87, he fired John Doe 1 and cited "weaponization" in John Doe 1's termination letter, *id.* ¶ 95, and, in a subsequent public statement, expressly linked the Arctic Frost agents' firings to purported weaponization and corruption, *id.* ¶ 118. These facts amply establish that Defendants' defamation of John Doe 1 was "accompanied by" his termination from employment.

*Third*, Defendants argue that because Patel's statements did not expressly name John Doe 1, they did not actually defame him. MTD 12–13. But John Doe 1's identity as an Arctic Frost agent was public (because Defendants themselves released investigative records that Senator Grassley and the Judiciary Committee then publicized), and the public would necessarily have

39

understood Patel's statements to reference John Doe 1 as a member of the small group of fired Arctic Frost agents. This is sufficient for defamation. *See Alexis v. Dist. of Columbia*, 77 F. Supp. 2d 35, 41 (D.D.C. 1999) ("Where the group or class [defamed] is small, and each and every member of the group or class is referred to, then any individual member can sue." (alteration in original) (quoting *Neiman-Marcus v. Lait*, 13 F.R.D. 311, 315 (S.D.N.Y. 1952))). Indeed, it would create perverse incentives if the rule were that the government could reveal that a fired government employee was a member of a particular group, and then, with a wink and a nod, make defamatory statements about the group—so long as those statements did not expressly name the employee.[8]

Similarly, Defendants' contention that Patel's post-firing statement was not defamatory because the public "would not have known whether [John Doe 1 was] among the referenced 'corrupt actors' whose employment was 'terminated,'" MTD 14, is without merit. Essentially, Defendants argue that Patel's statement could be understood to apply to only a sub-group of fired Arctic Frost agents. *See id.* But the interpretation that Patel was referring to all the fired Arctic Frost agents as "corrupt actors" is at the very least equally plausible, and certainly a reasonable inference from Patel's blanket statement. The Court is obligated to construe all reasonable inferences in Plaintiffs' favor. *See Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014), *reh'g denied*, 2015 WL 6472205 (D.C. Cir. Aug. 7, 2015); *Banneker*, 798 F.3d at 1129. And the allegations of the complaint support the reasonable inference that members of the public would understand John Doe 1 to be the "subject of" Defendants' defamatory statements about Arctic Frost agents. *Farah*,

---

[8] Notably, under the "small group" exception to the general rule that a defamatory statement must refer to the individual plaintiff, there is no requirement that the defendant publicize the plaintiff's membership in the group. *See generally Alexis*, 77 F. Supp. 2d at 41. The fact that Defendants here facilitated the release of John Doe 1's identity in cooperation with the Senate Judiciary Committee, Compl. ¶¶ 84–89, merely underscores Defendants' responsibility for the damage to John Doe 1's reputation and job prospects.

736 F.3d at 533; *see* Compl. ¶¶ 83–89, 117–118, 124–126.

*Fourth*, contrary to Defendants' contention, MTD 13, the complaint plausibly alleges that the defamatory statements injured John Doe 1 in his "trade, profession, or community standing." As the complaint alleges, Patel invoked "weaponization" as the reason for John Doe 1's and other Arctic Frost agents' firing, both in Plaintiffs' termination letters and in statements to the public, and Patel amplified that defamation when he publicly declared that the fired Arctic Frost agents were "corrupt actors." Compl. ¶¶ 83, 87, 95–96, 118. These facts are sufficient for a reputation-plus claim. *See, e.g.*, *Doe*, 753 F.2d at 1111–12 (allegations that plaintiff was "discharged on the basis of allegations of unprofessional conduct and dishonesty, and the charges were allegedly disseminated to prospective employers, public and private," stated reputation-plus claim). Further, two prospective employers indicated that John Doe 1's notoriety and the circumstances of his firing prevented him from receiving a job offer. Compl. ¶¶ 124–126.

Defendants assert that the mere "fact of [John Doe 1's] removal" from the FBI, and not any "defamatory statement," has been a "hindrance to finding a new federal law enforcement position." MTD 15–16. Defendants here gesture toward an argument that the complaint's reference to John Doe 1's understanding that "his termination from the FBI is a hindrance to finding a new federal law enforcement position," Compl. ¶ 123, amounts to an allegation that the circumstances of John Doe 1's termination are irrelevant to his difficulty in finding any new law enforcement position. But that is not what the complaint alleges, nor is it a reasonable inference. To the contrary, the reasonable inference is that Defendants' defamatory rhetoric has broadly interfered with John Doe 1's ability to find a new law enforcement job. *See id.* ¶¶ 121–126.

Defendants also argue that the Court should infer that John Doe 1's failure to obtain the position at the independent regulatory organization "was not caused by Defendants' statements,

but by information John Doe 1 chose to share during an interview and by 'public reporting about [his] firing.'" MTD 16. The Court, of course, is obligated to draw all reasonable inferences in Plaintiffs' favor. *See Sissel*, 760 F.3d at 4. But even if the Court were to accept Defendants' inference, John Doe 1 is not required to allege that the defamatory statements caused his rejection from a specific future employment opportunity to plead infringement of a liberty interest. *See Doe*, 753 F.2d at 1110–12 (surveying cases and concluding that allegation of public dissemination of defamatory charges sufficed to allege that resulting stigma harmed future employment prospects).

Accordingly, Defendants' challenge to John Doe 1's reputation-plus claim fails.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Date: July 28, 2026

Respectfully Submitted,

/s/ Elizabeth Tulis
Elizabeth Tulis (DDC No. NY0703/
D.C. Bar No. 90042452)
Brittany Hanke (admitted *pro hac vice*)
PERRY LAW
445 Park Avenue, 7th Floor
New York, NY 10022
Tel: (212) 213-3070
Fax: (646) 849-9609
etulis@danyaperrylaw.com
bhanke@danyaperrylaw.com

/s/ Margaret Donovan
Margaret Donovan (DDC No. CT0026)
KOSKOFF KOSKOFF & BIEDER, PC
3560 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com

*Attorneys for Plaintiffs*
