**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE 1 *et al.,*<br><br>    Plaintiffs,<br><br>    v.<br><br>KASHYAP P. PATEL, *et al.*,<br><br>    Defendants. | Case No. 1:26-cv-00959-JMC |
| JAMIE GARMAN, *et al.,*<br><br>    Plaintiffs,<br><br>    v.<br><br>KASHYAP P. PATEL, *et al.*,<br><br>    Defendants. | Case No. 1:26-cv-01086-JMC |

**BRIEF OF *AMICUS CURIAE***
**THE FEDERAL BUREAU OF INVESTIGATION AGENTS ASSOCIATION ("FBIAA")**
**IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* is a not-for-profit corporation registered with the IRS under Internal Revenue Code § 501(c)(6).  It has no parent corporation and does not issue stock.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

INTEREST OF AMICUS CURIAE .......................................................................................... 1

ARGUMENT ............................................................................................................................ 3

    A.   Non-partisan service is foundational to the effectiveness of the FBI. ............................... 6

    B.   Congress created a specialized retirement system to recruit and retain
         FBI Special Agents for career service. ............................................................................ 9

    C.   The FERS-LEO retirement system supports the mission of a professional,
         non-partisan workforce.. .................................................................................................. 12

    D.   Adherence to the chain of command is integral to the Bureau's success. ........................ 20

CONCLUSION ........................................................................................................................ 24

ii

## TABLE OF AUTHORITIES

**Cases**

*Langeman v. Garland*, 88 F. 4th 289 (D.C. Cir. 2023) ................................................................. 5

*McGrain v. Daugherty*, 273 U.S. 135 (1927)............................................................................. 6

**Statutes**

5 U.S.C. § 2301 (Merit system principles) ..................................................................................11

5 U.S.C. § 3331 (Oath of office)................................................................................................. 1

5 U.S.C. § 5304 (Locality-based comparability payments)....................................................... 16

5 U.S.C. § 5545a (Availability pay for criminal investigators) ................................................ 15

5 U.S.C. § 8336 (CSRS—Immediate retirement)....................................................................... 1

5 U.S.C. § 8401 (FERS—Definitions)................................................................................. 13, 14

5 U.S.C. § 8412 (FERS—Immediate retirement) ..................................................................... 13

5 U.S.C. § 8415 (FERS—Computation of basic annuity) ........................................ 14, 15, 16, 20

5 U.S.C. § 8421 (FERS—Annuity supplement)....................................................................... 15

5 U.S.C. § 8421a (FERS—Reductions on account of earnings from work performed while

   entitled to an annuity supplement).................................................................................... 19

5 U.S.C. § 8422 (FERS—Deductions from pay; contributions for other service; deposits) ........ 17

5 U.S.C. § 8425 (FERS—Mandatory separation)..................................................................... 13

5 U.S.C. § 8462 (FERS—Cost-of-living adjustments)............................................................. 19

10 U.S.C. § 892 (Failure to obey order or regulation)............................................................... 21

26 U.S.C. § 501 (Exemption from tax on corporations, certain trusts, etc.)................................ 2

28 U.S.C. § 531 (Federal Bureau of Investigation) .................................................................... 5

28 U.S.C. § 533 (Investigative and other officials; appointment) ............................................... 2

28 U.S.C. § 536 (Positions in excepted service)..........................................................................11

Pub. L. No. 80-168, 61 Stat. 307 (1947) (annuities for investigatory personnel of the Federal

   Bureau of Investigation who have rendered at least twenty years of service)............................ 9

Pub. L. No. 94-503, 90 Stat. 2427 (1976) (term of FBI Director)............................................... 23

Pub. L. No. 99-335, 100 Stat. 514 (Federal Employees' Retirement System Act of 1986).......... 12

Pub. L. No. 101-428, 104 Stat. 928 (Capitol Police Retirement Act)......................................... 10

Pub. L. No. 112-96, 126 Stat. 156 (Middle Class Tax Relief and Job Creation Act of 2012) ...... 20

**Other Congressional Materials**

Cong. Rsch. Serv. Rep. No. 98-972,
 *Federal Employees' Retirement System: Summary of Recent Trends* (Dec. 12, 2023)...............12

Cong. Rsch. Serv. Rep. No. R42631,
 *Retirement Benefits for Federal Law Enforcement Personnel* (Aug. 8, 2024)........................... 9

S. Rep. No. 80-76 (1947) (on bill to provide enhanced FBI special agent annuity)................. 9, 10

*Special Retirement Policies for Law Enforcement Officer and Firefighters: Hearing Before the
 Subcomm. on Comp. & Emp. Benefits of the H. Comm. on Post Off. and Civ. Serv.*, 95th Cong.,
 (Sept. 27, 1977)....................................................................................................................11

**DOJ Materials**

Director Louis J. Freeh, *Standards of Conduct Disciplinary Matters—Revision of the FBI's
 Disciplinary Process* (Mar. 5, 1997)...................................................................................... 5

Assistant Attorney General Jolene Ann Lauria, *Memorandum for All Department of Justice
 Career Employees*, July 8, 2024, https://www.justice.gov/archives/jmd/file/834486/dl............ 3

Attorney General Harlan Fiske Stone, *Memorandum for Mr. Hoover*, May 13, 1924 ......... 7, 8, 20

Director Christopher Wray, *Director Wray's Remarks at the FBI Agents Association's G-Man
 Honors Dinner*, FBI (Nov. 21, 2024)...................................................................................... 1

Director Christopher Wray, *Memorandum for the Attorney General re Approval to Open a
 Certain Sensitive Investigative Matter Investigation*, U.S. DOJ (Apr. 4, 2022)....................... 21

DOJ, THE FBI: A CENTENNIAL HISTORY, 1908-2008 (2008).................................................... 6, 23

DOJ, *FY 2027 FBI Budget Request to Congress* (Mar. 2026) ...................................................... 22

DOJ, *FY 2027 FBI Budget Request at a Glance*......................................................................... 22

DOJ, *OIG Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct
 Investigations*, Sept. 2021 .................................................................................................... 5

DOJ Policy Statement 1200.07 (Sept. 23, 2019). ........................................................................ 14

**OPM Materials**

5 C.F.R. § 842.802 (FERS—Subpart H—Definitions)................................................................ 13

Federal Workforce Data Table Builder, U.S. OPM,
 https://data.opm.gov/explore-data/data/table-builder ........................................................ 21, 22

**Other Authorities**

BLACK'S LAW DICTIONARY (12th ed. 2024) ................................................................ 5

HOMER CUMMINGS & CARL MCFARLAND, FEDERAL JUSTICE: CHAPTERS IN THE HISTORY OF
JUSTICE AND THE FEDERAL EXECUTIVE (1937) ........................................................ 9

BEVERLY GAGE, G-MAN: J. EDGAR HOOVER AND THE MAKING OF THE AMERICAN CENTURY
(2022) ............................................................................................................ 6, 8, 20

Hugh Heclo, *OMB and the Presidency—the Problem of 'Neutral Competence,'*
THE PUBLIC INTEREST, Winter 1975, at 80 .............................................................. 13

DAVID E. LEWIS, THE POLITICS OF PRESIDENTIAL APPOINTMENTS (2008) .................................... 11

ALPHEUS THOMAS MASON, HARLAN FISKE STONE: PILLAR OF THE LAW (1956) .................... 6, 7, 8

Jonathan L. Rudd, *Our Oath of Office: A Solemn Promise*, FBI LAW ENFORCEMENT BULLETIN,
Sept. 2009 ...................................................................................................... 1

SANFORD J. UNGAR, FBI (1976) ............................................................................... 6

DON WHITEHEAD, THE FBI STORY (1956). ................................................................. 10

v

## INTEREST OF *AMICUS CURIAE*[1]

This *amicus* brief is filed on behalf of the Federal Bureau of Investigation Agents Association ("FBIAA"). The FBIAA was incorporated under the laws of the District of Columbia as a non-profit corporation in 1981. Its purpose is to advance and safeguard the careers, economic interests, conditions of employment, and welfare of active and retired Federal Bureau of Investigation ("FBI" or "Bureau") Special Agents. As FBI Special Agents, all FBIAA members have sworn oaths and devoted their careers to protecting the American people and upholding the Constitution.[2] To carry out this high-stakes mission, Special Agents across the country—and around the world—risk their lives every day to serve warrants, conduct surveillance on gangs and narcotics traffickers, prevent threats to national security, and protect vulnerable populations from predators.

---

[1] In accordance with Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* certifies that (1) this brief was authored entirely by counsel for *amicus curiae* and not by counsel for any party, in whole or part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from counsel for *amicus curiae*, no other person contributed money to fund preparing or submitting this brief. By way of additional disclosure, named plaintiffs in *Garman v. Patel* were members of the FBIAA prior their employment separation from the FBI. The *Doe* complaint reflects that John Doe 2 was also a member, *Doe* Dkt. 1 ¶ 103, and that John Doe 1 would have been eligible for membership as an active Special Agent, *id.* ¶ 10. As former Special Agents, plaintiffs are no longer active members of the FBIAA and are now eligible for associate member status only.

[2] Special Agents swear the same oath as each federal employee. *See* 5 U.S.C. § 3331. Then they re-swear the oath on graduation from new agent training at the FBI Academy in Quantico, VA. *See generally* Jonathan L. Rudd, *Our Oath of Office: A Solemn Promise*, FBI LAW ENFORCEMENT BULLETIN, Sept. 2009, at 23. The Academy is a rite of passage central to the Bureau's culture. Former FBI Director Christopher A. Wray noted that he did not miss a single Academy graduation ceremony in more than seven years leading the Bureau, such that he helped preside over 38 graduations during which he presented badges and credentials to more than 5,600 new Special Agents. Christopher Wray, *Director Wray's Remarks at the FBI Agents Association's G-Man Honors Dinner*, FBI (Nov. 21, 2024), https://www.fbi.gov/news/speeches-and-testimony/director-wray-remarks-at-the-fbi-agents-association-g-man-honors-dinner.

Today, the FBIAA serves nearly 12,000 active and associate members, including more than three quarters of all active FBI Special Agents. It provides them with professional resources, internal Bureau advocacy, legal representation, federal legislative advocacy, and financial support in times of crisis through two affiliated charitable funds (the FBIAA Memorial College Fund (MCF) and the FBIAA Membership Assistance Fund (MAF)).[3] As a 501(c)(6) organization, the FBIAA is authorized to advocate on issues of importance to Special Agents, including agent pay and benefits. FBIAA advocacy is non-partisan and issue driven.

FBIAA members are profoundly dedicated to the Bureau's law enforcement mission. They and their predecessors have served under the FBI motto of "Fidelity—Bravery—Integrity," which is reflected in the Bureau's seal and in the badges that Special Agents carry.[4] They were recruited by and rely on the apolitical career structure that for more than a century has been integral to the Bureau's professionalism and effectiveness. Each Special Agent, of course, has a personal interest in the unique career rights that were intentionally designed, established, and enhanced to recruit outstanding Special Agents—and to retain them to ensure their experience in the job continues to serve the FBI mission. The community of Special Agents also has a special understanding of the history of those structured rights and their ongoing significance to the effective discharge of the Bureau's statutory mission "to detect and prosecute crimes against the United States." 28 U.S.C. § 533.

---

[3] The MCF provides college scholarships to the children and spouses of FBI Agents who have passed away while actively employed by the FBI or within one year of retiring from active service. To date it has provided more than 400 such scholarships. MAF provides assistance to FBIAA members and their families who have been affected by emergencies and unforeseen tragedies. In fiscal year 2025, the MAF provided more than $900,000 in disbursements to those in need.

[4] *Seal & Motto: History and Heraldry of the Seal*, FBI, https://www.fbi.gov/history/seal-motto (last visited July 31, 2026) (describing adoption of seal and motto in 1935).

These cases present questions of exceptional importance regarding the relationship between the FBI Director's dismissal authorities and the non-partisan, professional law enforcement tradition that Special Agents are sworn to safeguard. Plaintiffs allege that they were fired, without due process, based on their perceived political beliefs and associations. *Doe* Dkt. 1 ¶¶ 81–114; *Garman* Dkt. 1 ¶¶ 1, 109, 123–42. And they allege that the Director improperly surmised those perceived political beliefs and associations from cases they were assigned to work—and did work—consistent with all FBI and DOJ policies and procedures, including applicable statutory and regulatory requirements. *Id.* Defendants stand by that as justification for termination. *Doe* Dkt. 18–1 & *Garman* Dkt. 28-1 at 5 (hereinafter "MTD"). But the prospect that a Special Agent's assignment can be a basis for termination would bracingly upend the law, structure, and tradition of the Bureau. It would turn on its head the settled and foundational protocol by which *refusing* any apparently lawful assignment might be the rare cause for summary termination.

The community of Special Agents is—and must be—the custodian of apolitical law enforcement that underpins the FBI. The FBIAA submits this amicus brief because these cases front an existential test for that ideal.

## ARGUMENT

The Bureau has, over its history, built and maintained a force of Special Agents who pursue the mission of protecting the interest of the United States at the direction of the presidentially-appointed and Senate-confirmed leadership of the Department of Justice ("DOJ"). Service as a Special Agent requires strict non-partisanship.[5] To ensure the Bureau would attract a talented

---

[5] *See, e.g., Memorandum for All Department of Justice Career Employees from Assistant Attorney General Jolene Ann Lauria,* July 8, 2024, https://www.justice.gov/archives/jmd/file/834486/dl (referencing all FBI employees as "further restricted" under the Hatch Act and explaining consequent conduct prohibitions).

workforce and then fully benefit from the extensive and expensive training—and priceless field experience—of its sworn Special Agents, Congress enacted a tailored retirement system that incentivizes Special Agents to optimize their careers at the Bureau for the public interest—neither leaving too early nor staying too long. The system defers earned compensation until retirement, providing for enhanced benefits at a relatively early age.[6] It thereby powerfully incentivizes Special Agents to serve 20 to 25 years irrespective of political tides that may shift the Bureau's investigative priorities. It is premised on the shared expectation that a Special Agent can count on the opportunity to serve dutifully until that enhanced retirement matures.

The recent improper terminations of numerous Special Agents for their perceived political beliefs and associations—that is, perceived political beliefs and associations purportedly revealed by assignments they discharged professionally at the direction of DOJ leadership and the FBI chain of command—undermine this system and the vital characteristics of the Bureau it reinforces. Moreover, these unprecedented employment actions contradict the Bureau's specialized recruitment, retention, and retirement framework, as enacted by Congress into law.

To be clear: The FBI's career system is relevant not as mere argument about policy, but about policy embodied in law. The special statutory employment provisions designed for and available to all FBI Special Agents only make sense if Special Agents are protected from arbitrary termination, and from termination for their perceived beliefs based on having discharged lawful assignments properly made to them.

Specifically, Defendants claim that the "FBI's summary dismissal procedure . . . gives the FBI Director significant discretion to determine whether compelling or exigent considerations

---

[6] At a high level, an FBI Special Agent's retirement benefits are "enhanced" relative to the standard Federal Employees' Retirement System benefits generally available to federal civilian employees by special provisions for early retirement and annuity amounts. *See infra* at 15–17.

require that an FBI agent be removed." MTD at 1. But Defendants' position puts too much weight on "summary" dismissal and asks this Court to open a dangerous blast hole under the concept of "significant discretion." "Summary" entails abbreviated *procedure*, not unfettered *discretion*.[7] It does not sweep in the use here that Defendants claim is the Director's entitlement.

Contrary to Defendants' arguments, the Director's summary termination authority has only ever been used, and is only available, *for cause* in extraordinary circumstances.[8] More than a century of historical practice emphasizes that it does not allow for termination of employees for their perceived political beliefs and associations based on their having properly carried out lawful assignments. The Bureau does not have a comprehensive organic statute because Congress intentionally afforded significant flexibility to adapt to new threats. *See generally* 28 U.S.C. § 531 (Historical and Revision Notes). But Congress has enacted, enhanced, and improved a career employment system for Special Agents that inherently cabins whatever "significant discretion" a Director may properly claim in effecting terminations.

Defendants' assertions of effectively plenary dismissal authority for the Director are inconsistent with the history and tradition of the Bureau's operation as envisioned by Congress and reflected in the law. The Bureau unmistakably communicates that Special Agents are career rather than at-will employees, and—by the Bureau's own design—Special Agents understand their service that way. It is eminently sensible: Making employment decisions according to merit,

---

[7] *See Summary*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("1. Short; concise;" "2. Without the usual formalities; esp., without a jury;" "3. Immediate; done without delay.").

[8] *See generally* Director Louis J. Freeh, Standards of Conduct Disciplinary Matters—Revision of the FBI's Disciplinary Process (Mar. 5, 1997) ("Freeh Memo") (limiting summary termination to "extraordinary circumstances") quoted in DOJ Office of the Inspector General, *Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations*, Sept. 2021, at 15. *But see Langeman v. Garland*, 88 F. 4th 289, 296 (D.C. Cir. 2023) (holding that the Freeh Memo itself did not create a constitutionally protected property right).

pursuant to articulable standards and after due process, helps insulate the FBI from political interference and allows FBI Special Agents to discharge their duties without fear or favor. *Garman* Dkt. 1 at ¶ 63. The Bureau relies heavily on its career system—and that system's appurtenant statutory retirement benefits—to recruit new agents and ensure the availability and continuity of the Bureau's essential function within DOJ. Special Agents rely on that system and those benefits in choosing to join the Bureau and devote their careers to it.

### A.  Non-partisan service is foundational to the effectiveness of the FBI.

DOJ—and the Bureau—were reborn into their modern form in 1924 under Attorney General Harlan Fiske Stone, appointed by President Calvin Coolidge in the wake of the infamous Teapot Dome public corruption scandal.[9] In future Chief Justice Stone's own words, when he became Attorney General, "[t]he Bureau was filled with men with bad records, and many of them had been convicted of crime." ALPHEUS THOMAS MASON, HARLAN FISKE STONE: PILLAR OF THE LAW 149 (1956).[10] On May 9, 1924, Stone demanded the resignation of William Burns, the

---

[9] The precursor to the FBI dates to July 26, 1908, when Attorney General Charles Bonaparte ordered DOJ attorneys "to refer most investigative matters to his Chief Examiner" for assignment to a new force of 34 agents. THE FBI: A CENTENNIAL HISTORY, 1908-2008 at 4 (2008). The next year, mere days into the presidential administration of William Howard Taft, this new force was given "a secure place and the dignity of a title—the Bureau of Investigation." DON WHITEHEAD, THE FBI STORY: A REPORT TO THE PEOPLE 21 (1956).

[10] The Bureau's early years had been inauspicious. In 1921, President Warren G. Harding's attorney general, Harry M. Daugherty, chose William Burns as Director—and "[t]o a Bureau that was already ideologically politicized Burns added a partisan twist. He kept records of the party affiliation and political connections of individual agents and added to the force on the basis of specific recommendations from friendly congressmen." SANFORD J. UNGAR, FBI 45-46 (1976). The Daugherty/Burns years "ranked as the most chaotic, dishonest, and disgraceful in the history of the Justice Department." BEVERLY GAGE, G-MAN: J. EDGAR HOOVER AND THE MAKING OF THE AMERICAN CENTURY 90 (2022). Professor Gage explains it was a time when "Justice became known as the 'Department of Easy Virtue,' where poker games, whiskey peddling, and the baldest forms of graft prevailed." *Id*. After President Harding's death on August 2, 1923, congressional investigation of DOJ revealed an astonishing reach of graft and corruption inside the Department. *See generally* Hearings Before the Select Committee on Investigation of the Attorney General (Gov. Printing Off. 1924). The Supreme Court understatedly described these as "practices and

6

Bureau's holdover director who had been appointed by discredited Attorney General Harry Daugherty under President Warren G. Harding. *Id.* at 150. Stone promptly selected J. Edgar Hoover to be acting director (and, later that year, director). *Id.* Hoover is said to have agreed only "to accept the post if Stone would give him authority over hiring and let him take only educated and honorable men, divorced from partisan politics." *Id.* at 150–51.[11] And Attorney General Stone replied: "Young man, I wouldn't let you take the job under any other circumstances." *Id.* at 151.

A few days later, on May 13, 1924, Attorney General Stone issued a one-page memorandum ("Stone Memo") directing the Bureau to ensure that all new Special Agent appointees must be "of known good character and ability, giving preference to men who have had some legal training." *Id.*[12] The FBI thus began to hire lawyers and accountants—and later scientists, technologists, and other specialists—into a professionalized career service as Special Agents. *Id.*

Importantly, the Stone Memo mandated that a professional force must be developed to execute the mission of DOJ leadership. Indeed, its first point provided that: "The activities of the Bureau are to be limited strictly to investigations of violation of law, *under my direction or under the direction of an Assistant Attorney General* regularly conducting the work of the Department of Justice." *Id.* (emphasis added). In other words, the personnel reforms were fashioned to ensure the

---

deficiencies which . . . were operating to prevent or impair [the Department's] right administration." *McGrain v. Daugherty*, 273 U.S. 135, 151 (1927).

[11] By another account, Hoover's condition was: "The bureau must be divorced from politics and not be a catch-all for political hacks." UNGAR, FBI at 48.

[12] The text of the Stone Memo is substantially reproduced in A.T. Mason's landmark 1956 Stone biography. *See* MASON, PILLAR OF THE LAW at 151. Professor Gage substantially analyzes the memo, drawing from it that "[i]t was Stone, not Hoover, who took charge of events" reconstructing the Bureau. GAGE, G-MAN at 107. An image from FBI files with then-Acting Director Hoover's initials and acknowledgment is available at https://historicalgmen.squarespace.com/corruption-the-beginnings (last visited July 31, 2026).

force of Special Agents would faithfully execute the assignments given to them by the lawyers in charge of DOJ.[13]

The Stone Memo also directed that the Bureau "discontinue the services of those who are incompetent [or] unreliable." *Id.*[14] Defendants may read that to be a source of plenary personnel discretion—effectively an unfounded Unitary Executive type of authority for the FBI Director. But, in the context of the one-page Stone Memo—which also withdrew authority for arbitrary or non-merits-based employment decisions—it plainly was not that. Instead, it was directed at the very particular problem of Special Agents from the Harding/Daugherty years—people who did not show up for the job or acted corruptly, for personal gain—and it was not a permission slip for a Director to repeat the partisan and grift-driven personnel practices Stone expressly repudiated.

The Stone reforms had their desired effect. In 1933, Stone—by then an Associate Justice of the Supreme Court of the United States—reflected with satisfaction on implementation of the FBI personnel system envisioned by his memo nine years earlier, writing that the Director "refused to yield to any kind of political pressure; he appointed to the Bureau men of intelligence and

---

[13] The Stone Memo anticipated a variation of the concept of "neutral competence" in specialized civil service. *See* Hugh Heclo, *OMB and the Presidency—the Problem of 'Neutral Competence*,' THE PUBLIC INTEREST, Winter 1975, at 80. Professor Heclo explained that "neutral competence" is "not a prescription for sainthood." *Id.* at 81. "Rather it consists of giving one's cooperation and best independent judgment of the issues to partisan bosses—and of being sufficiently uncommitted to be able to do so for a succession of partisan leaders." *Id.* It was a prescription for a career service responsive to presidential control rather than opposed to it. As Heclo articulated it, the proverbial motto of neutral competence is: "Speak out, shut up, carry up, carry out." *Id.* at 82.

[14] Mason misquoted this as "incompetent and unreliable." The copy used by Professor Gage in the Marquette University Library that was obtained from FBI files shows that the text was "incompetent or unreliable." *See* GAGE, G-MAN at 742 (source for chapter 10, note 3); *see also supra* note 12 (link to copy with Hoover's initials).

8

education, and strove to build up a morale such as should control such an organization." *Id.* at 152 (quoting Harlan Fiske Stone to Felix Frankfurter, April 14, 1933).[15]

### B. Congress created a specialized retirement system to recruit and retain FBI Special Agents for career service.

To strengthen and build on the first decade of professionalization of the Bureau's force, Congress created a distinct retirement system for FBI Special Agents in 1947. *See* Pub. L. No. 80-168, 61 Stat. 307. Attorney General Tom C. Clark testified personally in support of the legislation in the Senate (March 25, 1947) and the House of Representatives (May 26, 1947). The ensuing law made Special Agents eligible for early retirement, after at least 20 years of service and at a minimum age of 50. As the Senate committee report summarized Attorney General Clark's testimony, the retirement plan had two purposes. First, it would prevent Special Agents facing great physical demands in their work from being forced to serve "into old age." S. Rep. No. 80-76, at 2 (1947). Second, it would prevent Special Agents from leaving "the service at an early age and at such time as the government would have begun netting some results from its $9,000-per-man training investment, which is in addition to the Special Agent['s] previous self-investment of $10,000 to $12,000 expended to obtain a B.A. degree." *Id.* (Today, the federal government spends approximately $300,000 per new agent to train, house, and equip each new Special Agent in the 18-week Basic Field Training Course in Quantico—and, of course, the expense of college degrees also has increased substantially in the ensuing eight decades.)

---

[15] In his 1937 landmark history of the Department of Justice, Attorney General Homer Cummings gave the credit to his predecessor Stone for having "directed his attention to needed readjustment of the Bureau of Investigation." HOMER CUMMINGS & CARL MCFARLAND, FEDERAL JUSTICE: CHAPTERS IN THE HISTORY OF JUSTICE AND THE FEDERAL EXECUTIVE 382 (1937). Cummings expanded: "By the simple expedient of confining investigations exclusively to violations of statutes and by a reorganization of the personnel through elimination of the unfit and their replacement with agents of legal education or knowledge of accounting, reenforced by a system of rigid inspection and intensive special training, he laid the foundations for a new and efficient service." *Id.* at 382–83.

And so, a second future member of the Supreme Court serving as attorney general shepherded important Bureau personnel practice into law.[16] The new "more generous retirement program was considered necessary to retain youthful individuals for career service." Cong. Rsch. Serv. Rep. No. R42631 at 4 (Aug. 8, 2024). Director Hoover himself submitted a letter to Senator William Langer (as Chair of the Senate Committee on Civil Service) in support of the Attorney General's testimony, writing: "As you know, over many years I have done everything possible to make of the Federal Bureau of Investigation a true career service." S. Rep. No. 80-76, at 3. Hoover continued: "It is my belief that the legislation which you have proposed would take a very vital step toward this end since it would certainly be very much of a stabilizing factor." *Id.*

In 1956, Hoover summarized the personnel system that had developed over two decades as follows:

> Another strength of the FBI arises from the fact that our organization is a career service, in which appointments and promotions are made on the basis of ability, merit and competence. Each of the eleven attorneys general under whom I have served as director has been unswerving in his support of the Bureau as a career service. And each has supported the Bureau against any move to inject the element of political favoritism into its operation.
>
> * * *
>
> It is not easy to develop good executives. And the fine executives who have developed within the FBI have developed through experience and having added responsibilities placed upon them as they demonstrate their capabilities. The energy and devotion they have given the Bureau could not be bought. Each could double and triple his salary in private industry. If money alone were the prime consideration in these men's lives, then I would not have the caliber of executive ability around me that I do.

J. Edgar Hoover, *Foreword to* DON WHITEHEAD, FBI STORY at ii-iii.

---

[16] Over subsequent years, the special retirement system created for the FBI was extended administratively and by statute to certain other entities including the U.S. Marshals Service, U.S. Secret Service Special Agents, and the U.S. Capitol Police (Pub. L. No. 101-428, 104 Stat. 928 (1990)). *See* Cong. Rsch. Serv. Rep. R42631, at 5 (Aug. 8, 2024).

Examining the FBI's personnel system that same year, journalist Don Whitehead wrote: "FBI employees are not under Civil Service, but they are entitled to the same benefits and privileges received by other government employees [except] the FBI tries where possible to go a bit further." WHITEHEAD, FBI STORY at 127. He explained: "An agent may retire at age fifty after twenty years of service as an agent, and he receives about 40 percent of the average annual salary he was paid during the top five consecutive years of his career." *Id.* at 128.

And two decades later, FBI Director Clarence M. Kelley testified to Congress on the continued importance of the special retirement system:

> To attract and hold such highly qualified individuals it is necessary to insure that they are adequately compensated in return for service during their most productive career span. Further, their retirement plan must offer an economically feasible inducement to retire at a relatively early age when the rigors and demands of the service are better met by younger and more vigorous employees.

> I feel the present statute accomplishes these tasks well. The agent entering upon duty during prime earning years is assured of a reasonable retirement at or close to age 50. That this retirement is available and economically feasible at that time is important to both the individual and the Bureau.

*Special Retirement Policies for Law Enforcement Officer and Firefighters: Hearing Before the Subcomm. on Comp. & Emp. Benefits of the H. Comm. on Post Off. and Civ. Serv.*, 95th Cong., at 49 (Sept. 27, 1977).

Director Kelley further justified the retirement system as not merely for individual compensation but also for fostering and reinforcing essential Bureau values:

> The FBI is a career service and all special agents, regardless of their assignment, enter and serve with the clear understanding that they must be available for any assignment at any time consistent with the needs of the Bureau.

*Id.* at 51.

The FBI is an excepted service agency. *See* 28 U.S.C. § 536 ("All positions in the Federal Bureau of Investigation are excepted from the competitive service."). But "excepted" does not inherently mean non-career; it means merely that the Bureau is subject to a distinctive system of recruitment, retention, and discipline. As throughout the government, the law provides that civil service employees must be "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." 5 U.S.C. § 2301(b)(8)(A); *see also* DAVID E. LEWIS, THE POLITICS OF PRESIDENTIAL APPOINTMENTS 24, 25 tbl. 2.1 (2008) (observing that calling an agency such as the FBI "'excepted' is something of a misnomer . . . since the rights of employees in these personnel systems are usually very similar to those in the Title 5 civil service system").

In sum, the FBI's retirement system was created to ensure an apolitical, professional career corps of agents responsive to the investigative and law enforcement direction of the Department of Justice. In creating the modern Federal Employees' Retirement System ("FERS") in 1986, Congress incorporated the special provisions for "law enforcement officer" that were designed for and applied to all FBI Special Agents. *See* Pub. L. No. 99-335, 100 Stat. 514, 524–55.

When career FBI Special Agents are fired without cause and without due process, the public expense of recruiting and training these agents—and the value of their professional experience and institutional knowledge—is thrown away and unavailable to benefit the Bureau and the American people that the Bureau exists to serve and protect.

## C. The FERS-LEO retirement system supports the mission of a professional, non-partisan workforce.

A close look at the modern retirement system applicable to FBI Special Agents demonstrates the inconsistency between the goal of developing a strong cadre of experienced agents to carry out the Bureau's high-stakes, no-fail mission and Defendants' position in these cases that a Director may fire Special Agents for properly carrying out lawful assignments they

12

have been given by their chain of command. In 1986, Congress enacted FERS. Pub. L. No. 99-335.[17] Although FERS is a defined pension system generally applicable to federal employees, it contains special provisions for law enforcement officers (LEOs) through modified retirement eligibility provisions known colloquially (at least within the federal Human Resources community) as FERS-LEO. *See* 5 U.S.C. § 8412(d), (e).[18]

### 1. All FBI Special Agents are eligible for the FERS-LEO enhanced retirement.

FERS defines "law enforcement officer"—the term triggering FERS-LEO coverage"—as an employee with duties primarily either "the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States" or "the protection of officials of the United States against threats to personal safety" and "sufficiently rigorous that employment opportunities should be limited to young and physically vigorous individuals." 5 U.S.C. § 8401(17). The statutory definitions are supplemented by regulation. *See* 5 C.F.R. § 842.802.

Every FBI Special Agent is classified as a "Criminal Investigation Series 1811" position according to the Office of Personnel Management's General Schedule Qualification Standards. And all 1811 positions are eligible for FERS-LEO.

---

[17] Federal civilian employees hired after December 31, 1983, were covered by FERS in lieu of the Civil Service Retirement System (CSRS) that had been in place since 1920. *See generally* Cong. Rsch. Serv. Rep. No. 98-972, *Federal Employees' Retirement System: Summary of Recent Trends* (Dec. 12, 2023).

[18] FERS "sought to mimic the policies put in place by its predecessor, CSRS" and Congress "has done little to alter the definition of LEO for retirement purposes" since 1948. *Id.* at 4–5. The equivalent CSRS provision remains in the Code at 5 U.S.C. § 8336(c), reflecting text enacted in the Civil Service Retirement Act Amendments of 1956, § 6(c), 70 Stat. 736, 749—giving rise to the use of the term "6(c) benefits" to refer to LEO retirement provisions. *See, e.g.,* Office of Personnel Management, Retirement Facts #14, RI 83-20 (rev. Oct. 1997) at 2.

> 2. *Minimum and mandatory retirement ages encourage Special Agents to optimize their service.*

Under FERS-LEO, an FBI Special Agent who has served 20 years and reached age 50 is eligible for immediate retirement, as is an FBI Special Agent who has served 25 years at any age. 5 U.S.C. § 8412(d).

FBI Special Agents are subject to the FERS-LEO mandatory retirement at age 57 (or when completing 20 years of service if over that age). 5 U.S.C. § 8425(b)(1). The head of an agency— for the Bureau, the FBI Director—is authorized to grant exemptions up to age 60. *Id.* DOJ policy limits the exercise of that authority, including by requiring the FBI Director to make advance notification of any waiver to the Assistant Attorney General for Administration. U.S. DOJ Policy Statement 1200.07, at 8 (Sept. 23, 2019).

These enhanced retirement benefits were designed to recruit and retain highly qualified individuals for FBI service in light of the intense physical and psychological demands placed on Special Agents. Enhanced benefits further recruiting by incentivizing entry into the Bureau at a young age, following an earned college degree. They promote retention through a critical career period by deferring compensation into retirement. And they support and incentivize career service by financially enabling full retirement at an earlier age and with fewer years of service than other federal civilian employees.

> 3. *The FERS-LEO enhanced annuity makes joining and staying at the Bureau more attractive.*

FBI Special Agents who serve to their retirement dates are eligible for an enhanced annuity calculation under FERS-LEO. As for any FERS retiree, an "average pay" calculation is made by taking the average of the employee's highest rate of basic pay "over any 3 consecutive years of service." 5 U.S.C. § 8401 (termed the "high-3 salary" in retirement calculation).

14

An FBI Special Agent who retires after 20 years of service at minimum retirement age benefits from the special FERS-LEO enhancement to the multiplier for years of service in calculating the annuity—that is, the annualized defined benefit retirement payment. The Special Agent's annuity is calculated by awarding a 1.7 percent multiplier for the first 20 years of service and then a 1 percent multiplier for additional years of service. 5 U.S.C. § 8415(e).

That is a very substantial 70 percent enhancement of the multiplier for the first 20 years of service relative to a typical FERS retiree, for whom the annuity is calculated by multiplying a flat 1 percent of the "average pay" by the number of years of the employee's total service. 5 U.S.C. § 8415(a).

By virtue of immediate retirement eligibility at age 50 (or earlier for a Special Agent who has served 25 years), an FBI Special Agent who retires prior to age 62 is also eligible for an annuity supplement until reaching the minimum age for Social Security coverage. 5 U.S.C. § 8421.

The prospect and promise of these enhanced retirement benefits are critical to the decisions Special Agents must make—with support from their families—to continue service in high-risk public service positions, turning down private-sector job offers with higher salaries.

    4.   *Comparing the FERS-LEO value proposition with ordinary civil service.*

Compare an FBI Special Agent and a typical civil servant who each enters federal service at age 27. By age 47, each has advanced to General Schedule grade 13, step 10, with assignments in Washington, DC.[19] By age 50, each has accrued three years at an average annual pay of $158,322.

---

[19] General Schedule grade 13 is the typical maximum grade for Special Agents who are not in managerial assignments. For comparison, the Judiciary uses the equivalent grade for a law clerk who has two years of legal work experience after law school and an active bar membership. *See generally Qualifications, Salary, and Benefits*, OSCAR (Apr. 26, 2023), https://oscar.uscourts.gov/qualifications_salary_benefits.

The FBI Special Agent is eligible for immediate retirement under FERS-LEO. Her high-3 salary for pension calculation is enhanced by 25 percent for Law Enforcement Availability Pay (referred to as AVP within the FBI, and LEAP by the Office of Personnel Management)—the statutory compensation that she receives for working unpredictable overtime consistently amounting to total duty in excess of 50 hours per week.[20] *See* 5 U.S.C. § 5545a. Her annuity will be equal to 1.7% of her high-3 salary (including the AVP enhancement, but subject to a statutory cap in 5 U.S.C. § 5304(g)(1)), for her first 20 years of service and another 1% for the remaining three (37% total), which amounts to roughly $73,000.[21] She will receive monthly payments totaling that amount each year, adjusted annually for inflation, for the remainder of her life.[22]

---

[20] The AVP system enhances retirement compensation—and the value of the FERS-LEO multiplier—at the expense of current pay. For example, a relatively new FBI Special Agent who has graduated from basic field training and is assigned to Washington, DC, might be Grade 11, step 1—with a 2026 salary of $85,447. AVP entails a commitment to work 50-hour weeks (instead of standard 40-hour weeks), for which a 25% premium will increase the actual annual pay rate to $106,809. A similarly graded officer in a law enforcement agency that does not use AVP, working the same schedule, would instead be entitled to overtime pay at one and a half times the locality-adjusted rate for Grade 10, step 1. *See* 5 U.S.C. § 5504. Ten extra hours per week for 52 weeks is 520 hours. The applicable hourly rate is $55.89. *See 2026 Salary Table*, U.S. OPM, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/26Tables/html/DCB_h.aspx. So, the equivalent premium pay to AVP using the hourly model would be $29,069. The officer at the non-AVP agency would thus be paid $114,516—almost $8,000 more than the FBI Special Agent for the same hours of work. Unlike AVP, however, overtime does not count toward average annual pay for retirement purposes. As such, it is yet another aspect of FBI pay policy that defers compensation to incentivize a Special Agent's career service through full FERS-LEO retirement eligibility.

[21] This is an estimation. In practice, the high-3 salary will be slightly lower than the final year's pay rate because of annual cost-of-living adjustments to federal pay tables. But a retiree also may credit unused sick leave as extra time toward the pension computation such that the multiplier will be slightly higher than the actual years of service. *See* 5 U.S.C. § 8415(m)(2).

[22] Early immediate retirement under FERS-LEO also affords early availability of federal retiree health care benefits that provide an additional important source of financial security, including by bridging a gap between early retirement—at age 50 in the above example—and Medicare eligibility at age 65.

16

The typical civil servant is not eligible for immediate retirement until reaching age 57 (the minimum retirement age for an employee with 30 years of service). His annuity at that point will be only 30 percent of his average annual pay—roughly $47,500—and that annuity will start seven years later than the Special Agent's. He will draw the pension for fewer years and in a lower annual amount. He will have served more years of federal service to earn it.

The FERS-LEO enhancement of the annuity thus constitutes roughly one-third of a Special Agent's defined benefit pension benefits. It ensures financial stability for FBI Special Agents earned through commitment to a career that has unique physical and psychological demands, year after year, through one administration after another.[23] But that benefit is realized (and realizable) only when the individual has the opportunity to reach the minimum retirement threshold. Defendants' asserted termination authority would eliminate a Special Agent's confidence in the promise of that earned benefit in exchange for a minimum number of years of service, eroding the retention power that Congress decided was worth the expenditure of public funds.

     5. *Enhanced retirement benefits feature prominently in FBI recruiting and retention programs.*

The Bureau leans heavily on the promise of enhanced retirement benefits to meet its recruiting needs. Indeed, FBI recruiting materials continue to prominently and repeatedly feature the promise of FERS-LEO enhanced retirement benefits. The Bureau's current FBI Jobs recruiting site declares: "As an agent, you can retire with 25 years of service at any age or 20 years at age

---

[23] FERS-LEO employees earn enhanced annuities not only through service, but also through higher statutory pay deductions while in service. Every FBI Special Agent's paycheck is subject to extra withholding by the government for FERS-LEO coverage—in the total amount of 4.9% for those hired beginning in 2014 (half a percent more than for a typical FERS-covered employee). 5 U.S.C. § 8422(a)(3)(C).

50." https://fbijobs.gov/special-agents#salary-and-benefits (last visited July 31, 2026).



**SECURE YOUR FUTURE**

As an agent, you can retire with 25 years of service at any age or 20 years at age 50. As an employee, you are eligible to receive benefits like a federal pension and retirement plan, student loan repayment, locality and availability pay, health insurance, and more.

Similarly, a July 17, 2024 FBI Jobs recruiting post on Facebook asks:

> Evaluating options surrounding becoming an FBI special agent? The unique benefits that come with the role make it an even more enticing choice. Special agents receive a comprehensive benefits package that includes a federal pension and retirement plan, contributing to staff members' financial security for the future.[24]

Recruiting pitches like these demonstrate how central these promises and stability are to current and future Special Agents. Special Agents sign on to and continue through career service with reasonable expectations of job tenure—and they rely on a protected interest in earning enhanced retirement benefits upon completion of their career at the Bureau—because the FBI tells them they should.

Now consider the FBI Special Agent in our example above at age 47. If she exits federal service at that time, she would be eligible only for a deferred retirement without the LEO enhanced multiplier, because she did not reach the minimum age and years of service for a FERS-LEO retirement. She will not become eligible for even the full deferred retirement until age 62. She will have a lower average pay (that is, the "high-3" figure that is the multiplier for years of service with or without the LEO enhancement)—for which the value will by then have been eroded by 15 years

---

[24] Post by FBI Jobs, FACEBOOK (July 17, 2024), https://www.facebook.com/FBIJobs/posts/evaluating-options-surrounding-becoming-an-fbi-special-agent-the-unique-benefits/507573584993765.

of inflation. And she will be entitled to only 20% of her high-3 salary rather than the 37% to which she would have been entitled after 20 years of service and reaching age 50.

To be clear: This FBI Special Agent is losing the benefit of the 1.7 multiplier for her years of service and at least 12 years of payments between ages 50 and 62. In addition, she will not receive the benefit of inflation adjustments prior to her deferred retirement, such that the value of her high-3 will be eroded by inflation.[25] Assuming a steady 2% annual rate of inflation, that alone is a reduction of more than 25% in the value of the annual amount payable after the missed years. She will lose out on continued federal employee health benefits for herself and her family— including the roughly 72% of premiums paid by the government—for 15 years until Medicare eligibility. And she will lose out on at least seven years of the annuity supplement that is not offset for additional income until age 57. *See* 5 U.S.C. § 8421a(b)(4)(B)(ii). All told, that is many hundreds of thousands of dollars of value left on the table in the event of departure (or taken away in the case of firing).

As a practical matter, many FBI Special Agents receive significant private sector recruitment interest after 15 years of service. At that career juncture, a Special Agent will have valuable experience and expertise in commercially important work with high private-sector demand, including in bolstering cybersecurity, countering international bad actors, and mitigating insider threats. Loyalty to the Bureau and its mission remains a powerful and important retention force. But, consistent with its statutory design, FERS-LEO creates enormous financial incentives for a veteran FBI Special Agent to decline outside offers and remain in active service at least until immediate retirement eligibility under FERS-LEO. In light of the vesting of enhanced retirement

---

[25] Annuity payments are subject to annual cost-of-living increases. 5 U.S.C. § 8462. But those increases only begin with retirement, such that a former federal employee taking deferred retirement will see an erosion of the value of high-3 salary.

benefits after 20 years, the final two years of a Special Agent's service prior to that threshold are likely to be the most economically significant in public service or any later employment.

Congress created this system so that FBI Special Agents at the peak of training, experience, and physical performance would have powerful financial incentives to remain in duty status until minimum retirement eligibility. If a Director can fire a Special Agent based on an apparently lawful and properly predicated assignment the Special Agent was directed to perform—as Defendants posit in this case—then a senior Special Agent will no longer be able to count on earning an enhanced retirement based on an expected term of diligent public service, and the private sector offers become comparatively attractive on a risk-adjusted basis.[26]

### D. Adherence to the chain of command is integral to the Bureau's success.

The Bureau simply cannot function if individual Special Agents must choose whether to accept a lawful assignment that could later get them fired, or alternatively to reject it and become subject to firing for insubordination. FBI Special Agents have long understood that they are subject to assignment and reassignment at any time based on the needs of the Bureau. *See* GAGE, G-MAN at 122.

By design, the Bureau does not choose its investigations; rather, it follows the direction of the attorney leadership at the Department of Justice, just as then-Attorney General Stone envisioned in his 1924 memo. Relatedly, individual Special Agents do not choose their assignments. They understand that, not dissimilarly to members of the uniformed services, they

---

[26] It is apparent, not speculative, that Congress structured a special retirement provision differently when the opportunity to earn a federal pension is subject to political winds. The same Code section that provides for FERS-LEO made Members of Congress and congressional staff eligible for a heightened 1.7 percent multiplier of average pay per year of service after only five years in the job. *See* 5 U.S.C. 8415(b), (c). (Enhanced congressional retirement benefits were phased out by new law in 2012. *See* Pub. L. No. 112-96, §5001(c) (Reduction in Congressional Annuities), 126 Stat. 156, 199 (codified at 5 U.S.C. § 8415(d)).).

are obliged to follow lawful orders. *Cf.* 10 U.S.C. § 892. Refusing an assignment or lawful order would be grounds for dismissal following internal process—or even, perhaps, under the Director's summary (i.e., abbreviated) termination authority.

But under Defendants' articulation of the Director's summary dismissal authority, a Special Agent who professionally carries out a lawful and properly predicated assignment—regardless of whether he or she agrees with it—may be subject to later termination for having done so.[27]

Amicus FBIAA asks what a career Special Agent would then be guided to do when confronted with any assignment? To the extent a Special Agent cannot count on the benefits of the FERS-LEO system that Congress specifically crafted and tailored for the Bureau, the recruitment and retention effects that were central to that design would be substantially defeated.

FBI workforce statistics demonstrate that the problematic consequences of breaking the statutory promises of enhanced retirement eligibility are real, not hypothetical. When the promise is broken, current and future Special Agents undertake new career risk assessments. A January 28, 2023 FBI Jobs recruiting post lauded the Bureau's opportunities for a "uniquely stable career," proudly comparing the Bureau's 1.7% turnover rate to an average corporate turnover rate of 18%.[28] But that is no longer the case. According to federal data, between January 2025 and May 2026, some 1,407 FBI Special Agents left the Bureau.[29] These departures included scores of experienced

---

[27] That would be all the more striking for an investigation approved by the Director, the Deputy Attorney General, and the Attorney General—pursuant to special procedures for opening special investigations—and with consultation of the Assistant Attorney General for the Criminal Division and the U.S. Attorney for the District of Columbia. *See, e.g.,* Christopher Wray, *Memorandum for the Attorney General re Approval to Open a Certain Sensitive Investigative Matter Investigation*, U.S. DOJ (Apr. 4, 2022), https://www.grassley.senate.gov/imo/media/doc/doj_approval_to_open_arctic_frost.pdf.

[28] *See* Post by FBI Jobs, LINKEDIN (Jan. 28, 2023), https://www.linkedin.com/posts/turnover-fbi-fbijobs-share-7025203604596649984-D_sr.

[29] *See* Federal Workforce Data Table Builder, U.S. OPM, https://data.opm.gov/explore-data/data/table-builder (last visited July 28, 2026). This number was obtained by searching the

agents. And recruiting efforts have not kept up with these unprecedented departures. In January 2025, there were 13,411 onboard FBI Special Agents, but in May 2026 there were just 12,709.[30] All this while the Bureau has told Congress it needs to increase its *authorized* strength (that is, net of departures) by 1,288 Special Agents.[31] And it has asked for special pools of money for recruitment and retention even as it undermines the enhanced retirement benefits designed to address just that issue. The Bureau's current budget request to Congress explained:

> The FBI faces increased difficulty recruiting and retaining qualified professionals due to intense competition from the private sector and other Federal agencies. Filling vacancies as quickly as possible and minimizing attrition rates will better position the FBI to ensure mission execution and operational readiness to combat criminal and national security threats.

U.S. DOJ, FY 2027 FBI Budget Request to Congress at 68 (Mar. 2026).[32]

Defendants' theory of termination authority is already working a bracing change within the Bureau by impairing the statutory enhanced retirement system. If Defendants' uncabined read of the Director's authority were correct, a Special Agent who followed a lawful assignment and order of one incumbent Director would have reason to fear termination—and loss of substantial

---

"separations" dataset for the selected timeframe of January 2025 through May 2026 (the most recent available data as of the date of this filing), then selecting the following table elements: Agency (Department of Justice), Sub-Agency (FBI) and Employee Count. The data was then narrowed using the following filters: Position Classification – Occupation Series (1811 – Criminal Investigation) and Separation Type (selecting all).

[30] *Id*. This number was obtained by searching the "employment" dataset for the selected timeframe of January 2025 through May 2026 (the most recent available data as of the date of this filing), then selecting the following table elements: Agency (Department of Justice) and Employee Count. The data was then narrowed using the following additional filters: Sub-Agency (FBI) and Position Classification – Occupation Series (1811 – Criminal Investigation).

[31] *FY 2027 Budget Request at a Glance* at 1, FBI, https://www.justice.gov/jmd/media/1434466/dl?inline (last visited July 31, 2026).

[32] Available at https://www.justice.gov/jmd/media/1434246/dl?inline.

retirement benefits—under a future administration (and Director) that perceives, even incorrectly, a Special Agent's political beliefs and associations based on those assignments.[33]

The FBIAA submits that would be profoundly unfair to Special Agents in light of the dedicated career service to which they have committed. It would be similarly unfair to the families of these dedicated public servants who endure their loved ones working stressful assignments with long and unpredictable hours, involuntary moves due to reassignments, and constant fears of their loved one being injured or killed in the line of duty.

It bears further emphasis that FBI Special Agents are not the same as any other civil servant. They are law enforcement officers committed to sometimes dangerous work. And, over the years, many have paid the ultimate sacrifice.

A service martyr plaque at the Bureau reads: "In memory of Special Agents of the Federal Bureau of Investigation who were killed in the line of duty as the direct result of an adversarial action." THE FBI: A CENTENNIAL HISTORY at 122. A second plaque recognizes those who otherwise gave their lives in service, such as in hot pursuit: "In memory of Special Agents of the Federal Bureau of Investigation who lost their lives in the performance of a law enforcement duty." *Id.* at 124. As of today, 95 Special Agents and 12 other Bureau personnel are memorialized on the Wall of Honor.[34]

---

[33] In 1976, Congress provided that an FBI Director shall serve a single 10-year term. *See* Pub. L. No. 94-503, 90 Stat. 2427. To the extent that the Director changes with each new Administration—itself a departure from prior practice—the risk of whiplash in investigative priorities is considerably greater than it has been since the time of Attorney General Stone. It could attach, too, to protective assignments, given that FBI Special Agents may be assigned to security details, including those customary for the Attorney General of the United States and the FBI Director. Defendants' claimed summary termination authority would open the door, among other risks, to summary termination of Special Agents based on whom they were assigned to protect and a perception of political beliefs and personal association based on the protectee.

[34] *Wall of Honor*, FBI, https://www.fbi.gov/history/wall-of-honor (last visited July 31, 2026).

23

Special Agents know that they will place themselves in the literal line of fire as part of their service commitment. They do not undertake these careers for the money. But they do count on the employment regime provided by law to take care of them and their families. Defendants' claims in this case that a Director's summary dismissal power entails effectively uncabined discretion undermine legal and administrative foundations of career service by Special Agents that are essential to the Bureau and its important capabilities. Defendants' position would also unfairly impair the earned benefits of every Special Agent who has dedicated a career to important national service at the FBI.

**CONCLUSION**

For the foregoing reasons, *amicus* urges this Court to deny Defendants' motion to dismiss.

Date:   July 31, 2026                                   Respectfully submitted,

Washington, DC

**BAILEY & GLASSER, LLP**

*/s/ Michael L. Shenkman*

Michael L. Shenkman (D.C. Bar No. 1029094)
Brian A. Glasser (D.C. Bar No. 1024003)
Cary Joshi (D.C. Bar No. 1028594)
1055 Thomas Jefferson St., NW, Ste. 540
Washington, DC  20007
Tel: 202-463-2101
mshenkman@baileyglasser.com
bglasser@baileyglasser.com
cjoshi@baileyglasser.com

*Counsel for* Amicus Curiae *FBIAA*

24

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing *amicus* brief complies with LCvR 7(o)(4) in that it conforms to the requirements of LCvR 5.4 and does not exceed 25 pages.

I further certify that the foregoing complies with LCvR 7(o)(5) in that it conforms to the requirements of FRAP 29(a)(4).

I further certify that the foregoing complies with the typeface and type style requirements of LCvR 5.1(d) in that it has been prepared in a proportionally spaced typeface using Microsoft Word and 12-point Times New Roman font.

July 31, 2026                                    */s/ Michael L. Shenkman*
                                                  Michael L. Shenkman