**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE 1 and JOHN DOE 2, | |
| *Plaintiffs*, | |
| v. | |
| KASHYAP PATEL, in his official capacity as Director of the Federal Bureau of Investigation; FEDERAL BUREAU OF INVESTIGATION; PAMELA BONDI, in her official capacity as Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE, | Case No. 26-cv-959-JMC |
| *Defendants*. | |

**BRIEF AS AMICI CURIAE OF BIPARTISAN FORMER DEPARTMENT OF JUSTICE OFFICIALS AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Amici are former high-level Department of Justice ("DOJ") officials who served during Republican and Democratic administrations. (*See* Appendix A.)  Collectively, Amici have decades of experience working closely with agents of the Federal Bureau of Investigation ("FBI") to advance DOJ's mission "to uphold the rule of law, to keep our country safe, and to protect civil rights."  *See* About DOJ | Our Mission, https://www.justice.gov/about.  Amici are intimately familiar with the history behind and enduring importance of the principle that DOJ and FBI personnel must carry out their work free from partisan-motivated political influence and retribution, including (indeed, especially) from the White House.  The independence of federal law enforcement is essential to the DOJ's mission to "follow[] the facts and the law wherever they may lead, without prejudice or improper influence," and "to earn the trust of, and inspire

confidence in, the public we serve." *See id*. By institutionalizing this principle after Watergate via legislation, regulation, and policy, bipartisan majorities in Congress and successive Administrations of both parties successfully restored, and reaffirmed the public's confidence in, the rule of law in the wake of constitutional crisis.

Today, the FBI and its thousands of dedicated special agents wield immense authority in furtherance of their mission to "protect the American people and uphold the Constitution." *See* FBI | Mission, https://www.justice.gov/doj/federal-bureau-investigation. The nation has come to accept the FBI's exercise of expansive authority precisely because the FBI has, over the last 50 years, institutionalized principles of independence and nonpartisanship. In amici's experience as DOJ officials, we observed FBI agents exercising their authority independently, responsibly, and consistent with our nation's most cherished values.

Plaintiffs' experience illustrates the precarity of this arrangement. The FBI has at its disposal powerful and intrusive investigative tools that can be used at its discretion and with little if any oversight from outside the FBI. As a result, amici submit, the FBI is uniquely susceptible to threats from those who seek to exploit these powers by turning the DOJ into a purely partisan political cudgel. Here, as alleged in detail in the Plaintiffs' complaint, the Defendants have sought to undermine a half-century of independence as guiding principle by publicly firing dozens of dedicated and apolitical FBI professionals simply because they previously worked on matters that are no longer politically or personally aligned with the views of the current administration. Putting aside the resulting violation of Plaintiffs' rights, the inevitable impact of this 'purge' will be to chill the independence of remaining and future career agents, attorneys, analysts, and other staff at the FBI, DOJ and other law enforcement agencies, who must now act with the understanding that their investigative and law enforcement judgments can, for the first

1

time in their careers, be assessed through a partisan political lens.  Amici respectfully suggest that the Court should deny Defendants' motion to dismiss Plaintiffs' well-pleaded complaint.

## INTRODUCTION

The Justice Manual, DOJ's governing articulation of its policies and procedures, emphatically declares that all of its actions "must be impartial and insulated from political influence" and that its "investigatory and prosecutorial powers be exercised free from partisan consideration." Justice Manual § 1-8.100.  No mere platitude, this has been the guiding principle of federal law enforcement for the past 50 years, the importance of which cannot be overstated.  It was born of historical experience, as amici recount below, when decades of open abuse of federal law enforcement for partisan ends by Presidents of both parties eventually led to Watergate and constitutional crisis.  The resulting institutionalization of guardrails meant to insulate DOJ from political pressure brought our nation back from the brink and has constituted an enduring bipartisan consensus since 1978: that though part of the Executive Branch, DOJ's law enforcement mission and unique responsibility to do justice above all other considerations mean that it can and must be shielded from improper partisan influence, including from the White House itself.  *See generally Berger v. United States*, 295 U.S. 78, 88 (1935) (the Government's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done"); *see also* Andrew Kent, *Congress and the Independence of Federal Law Enforcement*, 52 U.C. DAVIS L. REV. 1927, 1930 (2019) (describing overriding goal of "remov[ing] as far as possible the influence of political actors on the investigation and prosecution of specific cases").  No less than the faith and confidence of the American people in the rule of law depends on it.

2

But as amici know well from firsthand experience and explain further below, even with guardrails in place, the ideal of politically independent federal law enforcement is no guarantee. The FBI still retains enormous discretionary powers to commence and conduct investigations, powers which in practical reality are necessarily exercised to a large extent independent of oversight.  Amici can affirm the considerable degree to which DOJ prosecutors presume and rely on the good-faith actions of FBI agents in utilizing these powers; thankfully, in amici's experience, the FBI has engendered a strong culture of political independence in recent decades, which has served as a bulwark against the misuse of federal law enforcement.  But this status quo remains susceptible to the threat posed by malicious and self-serving actors who would seek to exploit the FBI's powers without regard to the destruction wrought to the rule of law.

Amici submit that recent events, including the events underlying this lawsuit, represent such a threat.  Far from upholding its legally required duty of ensuring that law enforcement officials can do their work free from political pressure and retribution, DOJ is engaging in open and extreme politicization that treats the FBI as a mere tool for the pursuit of partisan vendettas. Amici respectfully submit the following to highlight the extraordinary dangers that such unlawful politicization represents and the vital importance of shielding the FBI's culture of independence from improper partisan politics.

## I.      Insulating DOJ From Partisan Pressure from Within the Executive Branch Restored and Has Ensured the Rule of Law for the Past Half Century

The dangers inherent to a Federal Government empowered with enormous, near-unfettered discretion to choose whom to investigate and prosecute, particularly following the establishment of the modern DOJ and FBI in the 20th century, have long been recognized.  In 1940, then-Attorney General and future Justice Robert Jackson famously warned: "It is in this realm—in which the prosecutor picks some person whom he dislikes or desires to embarrass, or

selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies." Robert H. Jackson, "*The Federal Prosecutor*" *An Address by Robert H. Jackson, Attorney General, Delivered at the Second Annual Conference of U.S. Attorneys*, 1, 5 (Apr. 1, 1940), https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf ("the real crime becomes that of being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of [decisionmakers]").[1] Yet deploying federal law enforcement to engage in such abuse—"picking the man and . . . putting investigators to work to pin some offense on him," *id.*—is precisely what Presidents of both parties, unconstrained by law or custom, long treated as their prerogative in the decades leading up to Watergate.

Perhaps most notoriously, Presidents Johnson and Nixon directly ordered the FBI to surveil and investigate individuals and groups viewed as partisan enemies for years, seeing the DOJ as an overt tool "to be used for political purposes and . . . to advance presidential power." Todd David Peterson, *Federal Prosecutorial Independence*, 15 DUKE J. CONST. L. & PUB. POL'Y 217, 264 (2020) (describing directives to target groups opposed to Administration policies in addition to journalists and members of Congress). The constitutional crisis provoked by the Nixon Administration's efforts to obstruct the FBI's investigations of clear wrongdoing related to Watergate (which included threats of retaliation against FBI agents who sought to resist White House directives to drop the matter, *see id*. at 265) was the culmination of this

---

[1] In 1940, Jackson was speaking at a time when the FBI had not yet become the massive force it is today; today, his descriptive and normative message applies with equal if not greater force to the FBI, which currently has 13,700 special agents and more than 20,000 "intelligence analysts, linguists, surveillance specialists, engineers, computer scientists, financial analysts, and other professionals." FBI | History, https://www.justice.gov/doj/federal-bureau-investigation.

normalization of Executive use of federal law enforcement for partisan political ends. President Nixon's entrenched attempt to treat the DOJ as an instrument of his own partisan bidding even in face of Congressional and prosecutorial investigation led to perhaps the greatest threat to our system of checks and balances and separation of powers in our nation's history.

The reforms implemented in Watergate's wake represented a necessary and seismic repudiation of this status quo, reflecting a bipartisan consensus that shielding DOJ and its components from partisan political interference in their investigative work was paramount to preserve our constitutional order.  In enacting the Civil Service Reform Act of 1978, Pub. L. No. 95-545, 92 Stat. 1111, Congress institutionalized a career workforce at DOJ that would be able to carry out the prosecutorial and investigatory work of the people free from "coercion for partisan political purposes." 5 U.S.C. § 2301(b)(8).  FBI agents, though a unique category, were also required by statute to be shielded from improper reprisals. *See id*. § 2303(c) (directing Attorney General to proscribe regulations to protect FBI employees from reprisals).  Also enacted in 1978, the Ethics in Government Act, Pub. L. No. 95-521, created the DOJ Department Ethics Office, to be overseen by the Department's highest-ranking career attorney, an Associate Deputy Attorney General, to ensure that all DOJ employees comply with legal and ethical obligations including as related to political influence and impartiality.

Meanwhile, within the Executive Branch, the DOJ implemented and strengthened procedures limiting contacts with the White House (as well as Congress) to strictly limited circumstances, to insulate the relevant line and supervisory DOJ officials making prosecutorial and investigatory decisions from improper influence. *See* Memorandum from Benjamin R. Civiletti to Heads of Offices, Boards, Bureaus and Divisions (Oct. 18, 1979), www.justice.gov/ag/aghistory/Civiletti/1979/10-18-1979.pdf.  Republican and Democratic

5

administrations have since repeatedly reaffirmed these contacts rules and the importance of the principle of insulating career law enforcement officials from partisan pressure. *See, e.g.*, Memorandum from Attorney General Eric Holder for Heads of Department Components, All United States Attorneys, at 1 (May 11, 2009), https://www.justice.gov/oip/foia-library/communications_with_the_white_house_and_congress_2009.pdf/download.; Memorandum from Attorney General Michael Mukasey for Heads of Department Components and United States Attorneys, at 1-2 (Dec. 19, 2007), https://www.justice.gov/sites/default/files/ag/legacy/2008/04/15/ag-121907.pdf.[2]

Taken together, these statutory and agency policy enactments have been the bedrock upon which the Federal Government has successfully ensured the public's trust in its capacity to uphold the rule of law and ensure the fair administration of justice over the past five decades—a trust that had been fundamentally shaken to the point of national crisis.  This hard-earned consensus—that DOJ and FBI must be shielded from partisan influence even from within the Executive Branch itself via institutionalized guardrails and proper accountability—has successfully vindicated the long-established ideal that, with respect to the exercise of its criminal law enforcement powers, the Federal Government must act as a "sovereign whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger*, 295 U.S. at 88. Defendants' actions here, if permitted to be left unchecked, would seriously undermine this successful constitutional order by returning to the lawlessness of the pre-Watergate status quo.

---

[2] *See also* Barack Obama, Commentary, *The President's Role in Advancing Criminal Justice Reform*, 130 HARV. L. REV. 811, 823 (2017) ("For good reason, particular criminal matters are not directed by the President personally but are handled by career prosecutors and law enforcement officials who are dedicated to serving the public and promoting public safety. The President does not and should not decide who or what to investigate or prosecute or when an investigation or prosecution should happen.").

## II.    The FBI's Investigative Powers Remain Considerable and Exercised Largely Independent of Oversight, Making Them Susceptible to Threat of Unlawful Partisan Coercion

Amici submit that, while of enormous significance, the protections developed over the past 50 years described above are alone insufficient to ensure that the DOJ, and particularly the FBI, is not put to improper use by an Executive who does not respect the institution or its culture of professionalism and independence. That is so because even today, our system necessarily still vests extraordinary power and discretion in the FBI, a reality that continues to implicate the same concerns that Robert Jackson raised nearly a century ago. As the facts of this case demonstrate, FBI agents thus remain a possible target for those who would exploit these powers while simply contravening or ignoring the legislative and policy guardrails against such abuse set up since 1978—which largely depend on the good faith compliance of an agency and White House operating behind closed doors. Such self-serving actors, like Defendants, understand that given the nature and scale of our law enforcement apparatus, the FBI must operate largely independent of any external oversight of its work, presenting opportunities for cooption of the FBI's extraordinary powers.

It is true that when the subject of an improper investigation is charged, the FBI's actions will be reviewed, and he or she will at least have the opportunity to be vindicated, when the case is assigned to a federal judge.[3] But review of FBI actions by a federal judge in connection with a criminal case is the exception, not the rule. The most recent data, for March 2026, indicates that federal charges were filed in just 38% of FBI investigations referred to federal prosecutors that

---

[3] The dismissals of the indictments of James Comey and Letitia James, brought by an unlawfully appointed U.S. Attorney specifically to do the White House's bidding to target the President's perceived enemies, demonstrate this possibility. *See United States v. James*, 810 F. Supp. 3d 752 (E.D. Va. 2025); *United States v. Comey*, 810 F. Supp. 3d 768 (E.D. Va. 2025).

month.  The remaining 62%—or more than 1,000 investigations in just that month—were closed without further action.[4]  The many thousands of FBI investigations per year that do not result in charges will never be reviewed by a federal judge, no matter how intrusive or unwarranted.

And that data does not account for those FBI investigations that were not and will never be presented even to federal prosecutors for review.  Indeed, the FBI is authorized to identify individuals for investigation and to take certain investigative steps without *any* involvement of federal prosecutors or oversight from outside the FBI.  For example, the FBI is authorized to conduct an investigative "Assessment" of an individual without any "factual predicate" to suggest the person has committed or plans to commit a federal crime, or any oversight from outside DOJ ("Assessments").  Attorney General's Guidelines for Domestic FBI Operations (2024) § 5 at 115 (the "Guidelines"); *see also id.* § 5.6.  The Guidelines expressly authorize agents, operating within FBI lines of supervision, to initiate an "Assessment" based on less than "information or allegation," and with "no particular factual predication."  *Id.* § 5.1.  This may include, "for example," nothing more than a mere "reason to collect information or facts *to determine* whether there is a criminal or national security threat."  *Id.*; *see also, e.g.*, *Am. C.L. Union v. Clapper*, 785 F.3d 787, 816 (2d Cir. 2015) ("Assessments are distinguished from investigations in that they may be initiated without any factual predication.").  The Guidelines expressly contemplate Assessments that "touch on or are partially motivated" by a subject's protected status (such as race, gender, sexual orientation) and exercise of First Amendment rights.  Guidelines § 5.2.  In face of such capaciously permissive criteria, there are few legal constraints to protect against the abuse of Assessments.  The Guidelines place responsibility for "ensuring that Assessments are not pursued for frivolous or improper purposes" solely with the

---

[4] *See* https://tracreports.org/tracfbi/quickfacts/tracfbi_general.html#jfbi_general_ref.

"FBI employees who conduct Assessments," *id.*—there is, in other words, no external check on the decision to undertake an Assessment.[5]

The Guidelines provide the FBI with still greater authority where they meet the low standard for a "Preliminary Investigation" or "PI."  The FBI is authorized to open a PI, during which more intrusive investigatory tools may be used, based on "any 'allegation or information' indicative of possible criminal activity or threats to the national security."  *Id.* § 6.1.  The Guidelines note, for example, that an allegation from an untested confidential informant "with no established history" would suffice to unlock the additional investigative authority attendant to a PI.  *Id.* § 6.5.  Here again, the Guidelines do not prohibit the FBI from initiating a PI based in part on otherwise protected First Amendment criteria.  *Id.* § 6.3.  And although the FBI must alert certain other officials in the DOJ if it opens a Preliminary Injunction involving a "SIM," section 6.10, the narrow "SIM" categories exclude a wide array of perceived political adversaries that the agent may investigate without notifying anyone outside of the FBI.[6]

The investigative tools available in the course of Assessments and PIs are considerable. During an Assessment, agents may, for example, conduct surveillance; use confidential

---

[5] Of course, the FBI must conduct investigations from time to time that implicate political concerns, such as political corruption cases.  Although the Guidelines acknowledge as much, they implicate similar concerns about the possibility of abuse based on lack of external review. Where an Assessment involves a "sensitive investigative matter" or "SIM," that is, it "involv[es] the activities of a domestic public official or domestic political candidate . . . , religious or domestic political organization or individual prominent in such an organization, [the] news media," or it has "an academic nexus," the assessment may *still* be approved entirely within the FBI.  *Id.* § 5.7.1.  An assessment that falls into any of these narrow categories need only be brought to the attention of "other DOJ officials" outside the FBI at the discretion of the approving FBI official.  *Id.*

[6] For example, the investigation of a "domestic political official" would constitute a SIM, but the investigation of a *former* "domestic political official" would not.  Similarly, the investigation of a "prominent" member of a domestic political party would constitute a SIM, but the investigation of a member deemed not to be "prominent" would not.

informants; conduct interview and request information from members of the public and private entities; and obtain and review federal, state, and local government records, among other investigative techniques. *Id.* § 5.9.1.[7] A PI makes available all of the investigative tools available during an Assessment, and more. For example, agents who are working on a PI may also engage in monitoring of the subject's communications, including electronic communications;[8] video surveillance and other monitoring devices; they may conduct polygraph examinations; and they may engage in undercover operations. *See id*. § 6.9 at 181. Agents may also obtain mail covers—that is, a report from the US Postal service of all mail coming and going from a particular address—and search a subject's trash. *Id*. And agents may use administrative subpoenas—which agents may issue themselves, without the help of a prosecutor—to obtain information from third parties. *Id*.

Finally, it bears note that even in cases where DOJ prosecutors do become involved, the potential for abuse remains; indeed, the harm of a politically motivated investigation may be compounded. The risk that a politically motivated FBI agent will pair with a politically motivated prosecutor to engage in improper use of investigative tools cannot be discounted. But even prosecutors acting in good faith may exacerbate the harm caused by an agent acting from improper motives. Amici can attest from experience that DOJ prosecutors expect and rely on FBI agents to exercise their powers in good faith and in compliance with their ethical

---

[7] The Guidelines describe these investigative tools as the "least intrusive method[s] available," *id.* § 5.3.9, but that descriptor merely distinguishes them from other exceptionally intrusive investigative tools like search warrants, wiretaps, and surveillance devices—all of which require the approval of a federal judge and almost always involve one or more federal prosecutors.

[8] Such "consensual monitoring" occurs when one participant in the communication—usually an undercover agent or a confidential informant working with the FBI—consents to the recording. The other participant—the subject or target of the investigation—is unaware the exchange is being monitored. *See* 18 U.S.C. § 2511(2)(c).

obligations, including to refrain from bringing ongoing investigations to prosecutors that—even if involving ultimately chargeable offenses—have been initiated improperly based on partisan politics.  A prosecutor may not be aware, at least initially, that the subject of the investigation brought to her for potential prosecution was targeted for such improper reasons.  Without that knowledge, this prosecutor may then proceed to issue subpoenas, apply to the court for search warrants and arrest warrants, and pursue an indictment against the subject, inflicting significant harms.

In sum, the FBI's ability to yield its significant powers against individuals and groups, in a manner free from effective external oversight of judges, prosecutors, and the public, remains considerable.  When bad faith actors within the Executive Branch demonstrate blatant disregard for the statutory and policy safeguards meant to insulate FBI agents from improper partisan pressure, the potential for their abuse of these powers should give pause to this Court or anyone else concerned about upholding the rule of law.

### III.    The FBI's Strong Culture of Independence Is the Primary Bulwark Against Political Cooption and Must Be Protected

Thankfully, significant as they are, the FBI's internally exercised investigative powers have been protected from partisan abuse in the decades following Watergate based in part on the exceptional professionalism of the FBI's dedicated agents.  In amici's experience, along with federal prosecutors, FBI agents have, over the past decades, developed a "strong culture" that has "stress[ed] professionalism, fairness, impartiality, and nonpartisanship."  Kent, 52 U.C. DAVIS L. REV. at 1930.  That culture went hand-in-hand with the creation of a broad-based popular and political consensus that DOJ should remain independent of political concerns, as reflected in the enactment and repeated affirmation of the post-Watergate reforms described above.  *See supra* Section I.  Given the FBI's substantial authority to initiate investigations, amici respectfully

11

submit that the FBI's hard-won culture, as expressed through its many outstanding agents and supervisors, is the principal bulwark against the agency's misuse for political ends. These "soft" restraints are critical because, as discussed at length, there are few practical legal and external restraints on FBI agents' authority to select targets for investigation.

But this culture of impartiality and nonpartisanship is not a given and must be defended. Actions such as defendants', unleashing retribution against dedicated, long-serving officials simply for doing their jobs consistent with their ethical obligations, cut at the heart of the culture of independence. Should that culture be eroded, as it becomes clear that bad-faith actors may act with impunity to dictate investigative targets for partisan purposes, the primary bulwark constraining open abuse of the FBI's powers will be fatally undermined.

Amici submit that a fair and efficient federal criminal justice system requires all participants to act in good faith and consistent with the constitution principles, laws, and norms that we, over the course of our Nation's history, have developed to constrain the power of the Federal Government. Federal agents are the bedrock of this system, and it is their work from which prosecutors build cases, over which federal judges and juries preside, and for which defendants are held to account. In amici's experience, the importance of independent, apolitical investigators is not only essential to the fulfillment of the DOJ's stated mission, but crucial to a society built on the rule of law.

**CONCLUSION**

For the reasons set forth above, and based on amici's experience and the public record in this matter, amici respectfully submit that Defendants' actions constitute a direct attack against our justice system's hard-earned, bedrock tenet that federal law enforcement must be free to do its day-to-day work insulated from partisan political interference. As our history has shown, the

12

rule of law and the fair administration of justice depend on our ability to preserve and defend this principle against cynical attempts at exploiting the FBI's considerable powers for such improper partisan ends.

Respectfully submitted,

August 4, 2026

*Kevin L. Owen*

Kevin L. Owen, Esq.
Bar ID: MD16693
GILBERT EMPLOYMENT LAW, P.C.
8403 Colesville Rd. Suite 1000
Silver Spring, MD 20910
301.608.0880
kowen@gelawyer.com


_____/S/_____
Stephen Cha-Kim*
FREE & FAIR LITIGATION GROUP
266 West 37th Street, 20th Floor
New York, NY 10018
(646) 434-8604
carey@freeandfair.org

*pro hac vice application forthcoming

*Counsel for Amici Curiae*

13

**Appendix A – List of Amici**

**Michael R. Bromwich**, Inspector General for the U.S. Department Justice (1994-1999), Associate Counsel for the Office of Independent Counsel: Iran-Contra (1987-1989; 1990-1991), Assistant United States Attorney for the Southern District of New York (1983-1987).

**Robert J. Cleary**, United States Attorney for the District of New Jersey (1999-2002), Acting United States Attorney for the Southern District of Illinois (2002-2002), First Assistant United States Attorney for the District of New Jersey (1994-1999), and Assistant United States Attorney for the Southern District of New York (1987-1994);

**Diedre M. Daly**, United States Attorney for the District of Connecticut (2013-2017), First Assistant United States Attorney for the District of Connecticut (2010-2013), and Assistant United States Attorney for the Southern District of New York (1985-1997);

**John S. Martin Jr.**, United States Attorney for the Southern District of New York (1980-1983), and Assistant United States Attorney for the Southern District of New York (1962-1966).

14